No. 24-_____

---

In the

# United States Court of Appeals

## For the Eleventh Circuit

---

Spirit Airlines, Inc.,

*Petitioner,*

— v. —

United States Department of Transportation

*Respondent.*

---

**PETITION FOR REVIEW**

---

## CERTIFICATE OF INTERESTED PERSONS
## AND CORPORATE DISCLOSURE STATEMENT

Counsel for Petitioner certifies that the following is a complete list of interested persons and entities as required by Federal Rule of Appellate Procedure 26.1 and Eleventh Circuit Local Rule 26.1-1:

Crowell, Donald L., Attorney for Petitioner

Iyer, Subash, Attorney for Respondent

Kirstein, David M., Attorney for Petitioner

Spirit Airlines, Inc. (SAVE), Petitioner

U.S. Department of Transportation, Respondent

Young, Joanne W., Attorney for Petitioner

Petitioner Spirit Airlines, Inc. is a publicly traded corporation with its stock publicly listed under the ticker "SAVE". It has no parent corporation. No publicly held corporation holds 10% or more of its stock.

## PETITION FOR REVIEW

Under 49 U.S.C. § 46110(a) and Rule 15(a) of the Federal Rules of Appellate Procedures, Spirit Airlines, Inc. (Spirit) hereby petitions this Court for review of the final rule issued by Department of Transportation (the Department), entitled:

> *Enhancing Transparency of Airline Ancillary Service Fees*, 89 Fed. Reg. 34,620 (Apr. 30, 2024) (the Final Rule).
>
> A copy of the Final Rule is attached hereto as **Exhibit A.**

Spirit seeks review of the Final Rule on the grounds that it exceeds the Department's statutory authority, violates the First Amendment to the United States Constitution, and it is otherwise arbitrary, capricious, an abuse of discretion, and otherwise contrary to law. Spirit seeks an order vacating and setting aside the Final Rule.

Venue is proper in this court pursuant to 49 U.S.C. § 46110(a) because Spirit has its principal place of business within the Eleventh Circuit.

Dated: June 28, 2024                     Respectfully submitted,

                                         Joanne W. Young
                                         jyoung@yklaw.com
                                         David M. Kirstein
                                         dkirstein@yklaw.com
                                         Donald L. Crowell
                                         dcrowell@yklaw.com
                                         **Kirstein & Young PLLC**
                                         1750 K Street NW, Suite 700
                                         Washington, DC  20006
                                         Phone: (202) 331-3348
                                         Fax: (202) 331-3933

                                         *Counsel for Petitioner*

## CERTIFICATE OF SERVICE

I certify that, on June 28, 2024, I electronically filed the foregoing Petition for Review with the United States Court of Appeals for the Eleventh Circuit through the Court's CM/ECF system.

I further certify that pursuant to Fed. R. App. P. 15(c), I caused the foregoing Petition for Review to be served upon the Department of Transportation, Office of General Counsel by Federal Express and Electronic Mail, addressed as follows:

Subash Iyer
Acting General Counsel
Office of the General Counsel
U.S. Department of Transportation
1200 New Jersey Avenue, SE
Washington, DC 20590

Dated: June 28, 2024

Donald L. Crowell
**Kirstein & Young PLLC**
1750 K Street NW, Suite 700
Washington, DC 20006
Phone: (202) 331-3348
Fax: (202) 331-3933

*Counsel for Petitioner*

# EXHIBIT A

# DEPARTMENT OF TRANSPORTATION

## Office of the Secretary

## 14 CFR Parts 259 and 399

[Docket No. DOT–OST–2022–0109]

RIN 2105–AF10

## Enhancing Transparency of Airline Ancillary Service Fees

**AGENCY:** Office of the Secretary (OST), Department of Transportation (DOT).

**ACTION:** Final rule.

**SUMMARY:** The U.S. Department of Transportation (Department or DOT) is issuing a final rule to strengthen protections for consumers by ensuring that they have access to fee information for transporting baggage and changing or canceling a flight before ticket purchase. Under the final rule, U.S. air carriers, foreign air carriers, and ticket agents must clearly disclose passenger-specific or itinerary-specific fees for these services to consumers whenever fare and schedule information is provided for flights to, within, and from the United States. The Department is further requiring that carriers provide useable, current, and accurate information regarding fees for these critical ancillary services to any entity that is required to disclose critical ancillary service fee information to consumers. This final rule is in response to the Executive order on Promoting Competition in the American Economy, which directs the Department to take various actions to promote the interests of American workers, businesses, and consumers. The rule will ensure that consumers have the information they need to understand the true costs of air transportation that apply to them, which will create a more competitive market with better outcomes for consumers.

**DATES:** This rule becomes effective on July 1, 2024.

**FOR FURTHER INFORMATION CONTACT:** Heather Filemyr, Ryan Patanaphan, or Blane A. Workie, Office of Aviation Consumer Protection, U.S. Department of Transportation, 1200 New Jersey Ave. SE, Washington, DC 20590, 202–366–9342, 202–366–7152 (fax), *heather.filemyr@dot.gov,* *ryan.patanaphan@dot.gov,* or *blane.workie@dot.gov* (email).

**SUPPLEMENTARY INFORMATION:**

## A. Executive Summary

### (1) Purpose of the Regulatory Action

The purpose of this final rule is to ensure that consumers know upfront the fees carriers charge for transporting a first checked bag, a second checked bag, and a carry-on bag and for canceling or changing a reservation to avoid surprise fees that can add up quickly and add significant cost to what may, at first, look like a cheap ticket. Airlines [1] have imposed separate fees for ancillary services related to air travel beyond passenger air transportation as part of their business model for many years.[2] Ancillary service fees are not subject to the 7.5% airline ticket tax that is used to support the Aviation Trust Fund. These ancillary fees have become more complex over time and continue to confuse consumers, as explained in section B (2). Which airlines impose such fees, what services require payment of a fee, the amount of the fee, and whether the same fees apply to all passengers are in a continuous state of change. For example, during the Coronavirus-19 (COVID–19) public health emergency, several airlines advertised the elimination of ticket change fees, but despite these general announcements, airlines continued to impose, or later reimposed, change fees for certain fare types such as "basic economy." [3] In this context, consumer organizations have long advocated for more upfront disclosure of ancillary fees.[4]

On July 9, 2021, the President issued E.O. 14036, "Promoting Competition in the American Economy," [5] which launched a whole-of-government approach to strengthen competition across many sectors, including commercial aviation. Section 5, paragraph (m)(i)(F) of E.O. 14036 directed the Department to "consider initiating a rulemaking to ensure that consumers have ancillary fee information, including 'baggage fees,' 'change fees,' and 'cancellation fees,' at the time of ticket purchase." This rulemaking responds to the direction in E.O. 14036 to provide improved ancillary fee disclosures to consumers purchasing air transportation.[6]

### (2) Overview of Existing Requirements

In 2011, the Department issued a final rule titled, "Enhancing Airline Passenger Protections," [7] that sought to address consumer concerns regarding the proliferation of ancillary fees. In the rule, the Department added several disclosure requirements for airlines: (1) a disclosure on the homepage for at least three months of any increase in the fee for passenger baggage or any change in the free baggage allowance for checked or carry-on baggage; (2) a notice on the first screen with a fare disclosure that additional airline fees for baggage may apply and where consumers can go to access these baggage fees; (3) a notice on e-ticket confirmations regarding the free baggage allowance for that flight and any applicable fee for the first and second checked bag and carry-on bag; and (4) a disclosure of all fees for optional services in one central place on the seller's website, with non-baggage fees permitted to be expressed as ranges. Under the 2011 rule, the Department determined that checked and carry-on baggage were "fundamental" to air travel, and the Department required that fees for such services be expressed as specific charges on a central place on the airline's website (alongside other ancillary fees), with information about any differing prices and allowances based on the passenger's status. Based on ticket agent concerns that the rule would be costly to ticket agents as airlines were "updating and changing fees constantly," [8] the Department applied fewer or modified disclosure requirements to ticket agents.

Based on continued feedback by various stakeholders and advisory

---

[1] The preamble in this final rule uses the term "airlines" to refer to "air carriers" and "foreign air carriers" as those terms are used in the Department's regulations. The two terms are defined in 49 U.S.C. 40102(a)(2) and (a)(21).

[2] *See, e.g.,* Comment from the International Air Transport Association, p.4 ("Airlines have been separating baggage fees from the core transportation service for more than 14 years . . . ."), *available at https://www.regulations.gov/comment/DOT-OST-2022-0109-0085.*

[3] *See, e.g.,* Delta Air Lines, Delta Eliminates Change Fees, Building On Commitment to Flexibility for Consumers, Aug. 31, 2020, Alaska Airlines, Fly with Peace of Mind: Alaska Airlines Eliminates Change Fees Permanently, Sept. 1, 2020, American Airlines, Wave Goodbye to Change Fees, Spirit Airlines, How Can I Change or Cancel My Reservation? (visited Feb. 29, 2024). Website screenshots available in docket at *https://www.regulations.gov/docket/DOT-OST-2022-0109.*

[4] *See, e.g.,* Final Rule, Enhancing Airline Passenger Protections, 74 FR 68983, 68984 (Dec. 30, 2009) (noting that the subject of baggage fees disclosure would be included in future rulemaking following concerns raised by consumers and consumer associations). *See also* Final Rule, Enhancing Airline Passenger Protections, 76 FR 23110, 23142 (Apr. 25, 2011).

[5] 86 FR 36987 (*https://www.federalregister.gov/documents/2021/07/14/2021-15069/promoting-competition-in-the-american-economy*).

[6] This rulemaking also addresses section 5, paragraph (m)(i)(B) of E.O.14036. That section directed the Department to promote enhanced transparency and consumer safeguards, as appropriate and consistent with applicable law, including through potential rulemaking, enforcement actions, or guidance documents, with the aims of enhancing consumer access to airline flight information so that consumers can more easily find a broader set of available flights, including by new or lesser known airlines; and ensuring that consumers are not exposed or subject to advertising, marketing, pricing, and charging of ancillary fees that may constitute an unfair or deceptive practice or an unfair method of competition.

[7] 76 FR 23110, *supra.*

[8] *Id.* at 23145.

committees (further discussed below), the Department explored further changes to ancillary fee disclosure requirements in a 2014 notice of proposed rulemaking (NPRM) [9] and a 2017 supplemental notice of proposed rulemaking (SNPRM).[10] These efforts are further described in section B below, though neither resulted in changes to the regulation.

*(3) Summary of Major Provisions*

This final rule increases the protections provided to consumers as set forth in the summary table below.

| Subject | Requirement |
| --- | --- |
| Covered Entities ................................ | The final rule applies to U.S. air carriers, foreign air carriers, and ticket agents (excluding corporate travel agents) that advertise or sell air transportation directly to consumers. |
| | The Department defers for a later rulemaking the determination of whether metasearch sites that do not sell airline tickets but display airline flight search options directly to consumers are ticket agents that must disclose ancillary fee information required by this rule. |
| Critical Ancillary Services .................. | The rule defines critical ancillary services as any ancillary service critical to consumers' purchasing decisions. The ancillary services that this final rule identifies as critical to consumers are as follows: (1) transporting a first checked bag, second checked bag, and carry-on bag; and (2) changing or canceling a reservation. |
| | Any other service may also be determined, after notice and opportunity to comment, to be critical by the Secretary. |
| Disclosure of Fees and Policies for Critical Ancillary Services. | The final rule requires airlines and ticket agents to disclose fees for critical ancillary services during the itinerary search process at the first point where a fare and schedule is provided in connection with a specific flight itinerary. The fee disclosure includes noting that a fare category does not allow changing or canceling a reservation or transporting a checked or carry-on bag if that is the case. |
| | Policies for critical ancillary services must be disclosed before ticket purchase when a search is conducted online but are not required to be disclosed with the fare and schedule. |
| | The information disclosed must be accurate, clear, and conspicuous. Fees cannot be displayed through a hyperlink, but disclosure is permitted using pop-ups, expandable text, or other means. |
| Links to Book a Flight with a Carrier or an Online Travel Agency (OTA). | This final rule requires airlines and ticket agents that sell airline tickets to disclose critical ancillary service fees on the first page of their online platforms to which consumers are directed after searching for flight options on another entity's online platform (a metasearch site) unless the consumer was already provided accurate fee information on the directing entity's online platform. |
| Passenger-Specific and Anonymous Searches | This final rule requires carriers and ticket agents to disclose the fees for critical ancillary services as passenger-specific itinerary information if a consumer conducts a passenger-specific itinerary search. |
| | A passenger-specific itinerary search refers to a search that takes into account information specific to the passenger (*e.g.,* the passenger's status in the airline's frequent flyer program, the passenger's military status, or the passenger's status as a holder of a particular credit card) that was affirmatively provided by that passenger and information specific to the itinerary (*e.g.,* geography, travel dates, cabin class, and ticketed fare class such as full fare ticket) that may impact the critical ancillary service fees to be charged or policies to be applied. |
| | An anonymous itinerary search refers to a search that does not take into account information specific to the passenger but does take into account information specific to the itinerary (*e.g.,* geography, travel dates, cabin class, and ticketed fare class such as full fare ticket) that may impact the critical ancillary service fees to be charged or policies to be applied. |
| Opting Out of Disclosures ................... | The final rule does not permit airlines and ticket agents to omit disclosure of first checked, second checked, or carry-on baggage fees with the fare and schedule information on their online platform unless: (1) the airline/ticket agent asks consumers at the beginning of a search if they intend to travel with a carry-on bag or checked bags; and (2) a consumer affirmatively indicates that no one in the booking party intends to travel with carry-on bag or first or second checked bags. |
| | The final rule does not permit airlines or ticket agents to enable consumers to opt out of display of change and cancellation fees on the airline's or ticket agent's online platform. |
| Disclosures on Online Platforms ......................... | The final rule requires airlines and ticket agents to disclose the fees and policies for critical ancillary services on airlines' or ticket agents' online platforms. |
| | The final rule defines "online platforms" to be any interactive electronic medium, including, but not limited to, websites and mobile applications, that allow the consumer to search for or purchase air transportation from a U.S. carrier, foreign carrier, or ticket agent. |
| Offline (Telephone, In-person) Disclosures of Airline Ancillary Service Fees. | The final rule requires airlines and ticket agents to disclose to consumers during an in-person or telephone inquiry that critical ancillary fees apply if that is the case and upon request disclose those fees to consumers. |
| Sharing of Airline Ancillary Service Fee Information. | This final rule requires airlines to provide critical ancillary fee information to any entity that is required to disclose critical ancillary service fee information to consumers. |
| Percentage-Off Advertisements .......................... | The final rule requires airlines and ticket agents that advertise percentage-off discounts of a "flight," "ticket," or "fare" to apply the percentage-off discount to the full fare (*i.e.,* all mandatory government taxes/fees and carrier-imposed charges/fees). |
| | The final rule requires airlines and ticket agents that advertise percentage-off discounts of a "base fare" to apply the percentage-off discount to the full fare amount excluding all government taxes and charges (*i.e.,* all mandatory carrier-imposed charges/fees). |

[9] 79 FR 29970 (May 23, 2014).

[10] 82 FR 7536 (Jan. 19, 2017).

| Subject | Requirement |
|---|---|
| Compliance/Implementation Period .................... | The final rule requires that: (1) airlines must provide required critical ancillary fee data to ticket agents not later than six months after this rule's publication date, or October 30, 2024; (2) airlines must comply with all other regulatory requirements no later than 12 months after this rule's publication date, or April 30, 2025; (3) ticket agents that do not meet the Small Business Administration (SBA) definition of small entity must comply with all regulatory requirements no later than 18 months after this rule's publication date, or October 30, 2025; and (4) ticket agents that that meet the SBA definition of small entity must comply with all regulatory requirements no later than 24 months after this rule's publication date, or April 30, 2026. |

*(4) Costs and Benefits*

The final rule changes how U.S. air carriers, foreign air carriers, and ticket agents disclose information about certain ancillary fees for flights. Expected benefits of the rule result from the reduction of excess consumption of air travel, or deadweight loss, which occurs because consumers who are unaware of ancillary service fees behave as if the price for air travel is lower than it is. Annual benefits from reducing deadweight loss are expected to amount to $5.5 million. The other source of benefits estimated by the Department is from the time consumers will save when they search for airfare because they no longer need to interrupt their search to find information on ancillary service fees. Depending on assumptions regarding the number of consumers who consider ancillary fee information when they search for airfare, time savings benefits are expected to range from $365 million to $484 million annually.

Expected costs of this rule include costs to consumers due to the time needed to navigate increased amounts of information, which range from $239 million to $331 million annually. The primary estimated costs of the rule to carriers and ticket agents are the costs that they would incur to modify their websites by adjusting their displays of fares, schedules, and fees. Third parties involved in data exchange, such as Global Distribution Systems (GDSs) and direct-channel companies might incur some costs due the need to upgrade their systems, though the Department acknowledges that these entities are already upgrading systems for market reasons and have been for several years. Quantified costs range from $286 million to $378 million annually.

One effect of better information on ancillary fees is that some consumers will pay less for the ancillary services they use when they travel by air. These economic effects are not societal benefits or costs but represent a transfer from airlines to consumers, estimated to be about $543 million annually. This transfer represents $543 million in overpayment in fees for consumers, or from the perspective of airlines,

additional revenue from consumers who are surprised by fees and, for example, then need to pay a higher fee at the airport to check a bag. This transfer, as well as the benefits due to any reduction in deadweight loss, accrue to consumers and are expected to occur regardless of any time savings impacts.

**B. Background**

*(1) Existing Ancillary Fee Disclosure Requirements*

As noted above, the Department's existing regulations in 14 CFR 399.85 contain the requirements for ancillary fee disclosures as promulgated in the 2011 final rule. Under 14 CFR 399.85(a), airlines must promptly and prominently disclose any increase in fees for a carry-on or first and second checked bags and any change in bag allowances on the homepages of their websites. Paragraph (b) requires airlines and ticket agents to disclose clearly and prominently on the first screen with a fare quotation for a specific itinerary that additional airline fees for baggage may apply and where consumers can see these fees. Ticket agents may refer consumers to the airline websites for specific baggage fee information or to their own sites if they display airline baggage fees. Paragraph (c) requires airlines and ticket agents to disclose on e-ticket confirmations information regarding passengers' free baggage allowances and applicable fees for a carry-on bag and a first and second checked bag, expressed as specific charges taking into account any factors that affect those charges such as passenger status. Paragraph (d) requires airlines to disclose the fees for all ancillary services on their websites, accessible through a conspicuous link from the carrier's homepage. The paragraph notes that such fees may generally be expressed as a range, but baggage fees must be expressed as specific charges taking into account any factors that affect those charges.

Requirements in other regulations also have an impact on ancillary fees. Under 14 CFR 253.7, airlines may not impose any terms restricting refunds of the ticket price, charging monetary penalties on passengers, or raising the

ticket price, unless the passenger receives conspicuous written notice of the salient features of those terms on or with the ticket. In 14 CFR 399.88, sellers of scheduled air transportation may not increase the price of passenger baggage after the air transportation has been purchased by the consumer. As stated in the NPRM for this rulemaking, while the text of 14 CFR 399.88 references ancillary fees such as seat fees, the Department announced in 2011 that it would enforce the prohibition on post-purchase price increases only for carry-on bags and first and second checked bags.[11]

*(2) Problems With Existing Requirements and Efforts To Improve Disclosures*

Following the 2011 final rule, described above, the Department issued an NPRM titled "Transparency of Airline Ancillary Service Fees and Other Consumer Protection Issues" in 2014.[12] The 2014 rulemaking contained various proposals to enhance consumer protections, including a proposal to require the disclosure of certain airline ancillary service fees (*i.e.*, first checked bag, second checked bag, one carry-on item, and advance seat selection) to consumers through all sales channels on the first page on which a fare is displayed in response to a specific flight itinerary search request. The proposal to require disclosure of certain ancillary fees was based in part on a recommendation by the Future of Aviation Advisory Committee (FAAC).[13] The FAAC's 2010 report had

---

[11] *See also Guidance on Price Increases of Ancillary Services and Products not Purchased with the Ticket* (December 28, 2011). The application of the prohibition of the post-purchase price increase was at issue in a lawsuit filed by two airlines against the Department. The court considered the rule as applied under the December 28, 2011, guidance and upheld the Department's rule prohibiting post-purchase price increases as it is currently being applied. *Spirit Airlines, Inc.*, v. *U.S. Dept. of Transportation* (D.C. Cir. July 24, 2012), slip op. at 20–21. Petition for Writ of Certiorari denied on April 1, 2013.

[12] 79 FR 29970 (May 23, 2014).

[13] *See* Recommendation 11, in FAAC Final Report (2010), *available at https://www.transportation.gov/highlights/future-aviation-advisory-committee/faac-final-report.*

noted that, despite improvements in the air consumer experience, FAAC members felt that consumers sought greater transparency in the total cost of their tickets and that they should have the ability to choose between carriers that either do not charge for certain services or charge differing fees. The 2014 NPRM also relied on the statements of a successor committee, the Advisory Committee on Aviation Consumer Protection (ACACP), which in 2012 adopted the FAAC recommendation and added that all participants in the airfare and fee distribution system should be guided by principles of transparency, providing choices and offers that meet consumer needs, and knowing the full price before purchase.[14] While the ACACP commended the Department's regulatory efforts to add transparency, it noted that the aviation industry offered a variety of business models, network choices, and optional services, and that the level of choice was creating complexity for consumers. The ACACP had heard from advocates and ticket agents that consumers expect to know the cost of the entire trip before purchasing a ticket.[15]

In issuing the 2014 proposal on disclosure of certain airline ancillary service fees, the Department explained that the proposal was necessary because the 2011 rule, while a step in the right direction, did not fully address the problem of lack of transparency of ancillary services and products. The 2014 proposal on disclosure of airline ancillary service fees generated significant comments from consumers, airlines, ticket agents, and other interested parties. During the pendency of the 2014 rulemaking, the ACACP recommended that DOT require that change and cancellation fees be clear and displayed before ticket purchase.[16] Consumer advocates had asserted at an ACACP meeting held on June 23, 2015, that such fees had become significant and difficult to ascertain.[17] At that time,

the ACACP also discussed baggage fees and allowances, with consumer advocates noting that baggage allowance rules were confusing to consumers and that it was difficult for consumers to understand which airline's rules apply. At the same meeting, a ticket agent representative stated that every baggage fee scheme had "multiple layers and exceptions" that were not always dynamically available to ticket agents.[18]

In 2016, the Department decided not to issue a final rule on the issue of transparency of airline ancillary services given the complexity of the issues and additional considerations identified by comments submitted on the 2014 NPRM. Instead, the Department decided to seek additional information on the disclosure of fees for ancillary services in a supplemental rulemaking.[19] In January 2017, the Department issued an SNPRM, which focused solely on the issue of transparency of certain ancillary service fees.[20] In the 2017 SNPRM, the Department proposed to require fees for a first and second checked bag and a carry-on bag to be disclosed at all points of sale wherever fare and schedule information is provided to consumers. While the SNPRM was pending, in September 2017, the U.S. Government Accountability Office (GAO) noted that consumer group representatives stated that it had become "increasingly difficult for consumers to compare airfare ticket prices, fees, and associated rules, and understand what is included in their purchases."[21] On December 14, 2017, the SNPRM was withdrawn with the Department noting that the withdrawal is consistent with Executive Order (E.O.) 13771, Reducing Regulation and Controlling Regulatory Costs.[22] After the withdrawal, a number of State attorneys general urged the Department to reverse its decision, stating that they "regularly hear reports from consumers in [their] states who are

confused and frustrated by these fees, which significantly alter the total cost of travel."[23] E.O. 13771 was later revoked.[24]

While the disclosure regulations promulgated in 2011 remain in place, consumer advocates continue to express concerns to the Department that there is a market failure in air transportation pricing because consumers are unable to determine the true cost of air travel prior to ticket purchase. They have also raised concerns that consumers often find the process of determining the baggage fees that apply to them to be a complicated and time-consuming process. Consumer advocates have asserted that a lack of passenger-specific information regarding fees for ancillary services at the time of ticket purchase is causing a market failure by limiting the ability of consumers to understand the true cost of the travel they are looking to purchase and compare pricing between carriers and travel options. Consumer advocates have also noted a significant increase in the number of ancillary service fees imposed by carriers.

Certain members of Congress have expressed support for full, more specific, disclosure of ancillary service fees. Members of Congress have also sponsored legislation on this topic.[25] Further, the Joint Explanatory Statement of the 2018 Consolidated Appropriations Act requested that the Department work in collaboration with industry, consumers, and other stakeholders to establish guidelines on

---

[14] Report of the Advisory Committee on Aviation Consumer Protection 7–8 (Oct. 22, 2012), *available at https://www.transportation.gov/airconsumer/ ACACP/1st-ACACP-Report-22OCT2012.*

[15] *Id., see, e.g.,* Transcript—Advisory Committee on Aviation Consumer Protection, First Meeting, June 28, 2012, *available at https:// www.regulations.gov/document/DOT-OST-2012- 0087-0095.*

[16] Record of Meeting, Ninth Meeting of the Advisory Committee on Aviation Consumer Protection 3 (Sept. 1, 2015), *available at https:// www.transportation.gov/airconsumer/ACACP/9th- meeting-Sept-1/record.*

[17] *See* Record of Meeting, Eighth Meeting of the Advisory Committee on Aviation Consumer Protection 3–5 (June 23, 2015), *available at https:// www.transportation.gov/sites/dot.gov/files/docs/ resources/individuals/aviation-consumer-

protection/285976/acacp-record-8th-meeting- 23june2015.pdf; see also* Record of Meeting, Ninth Meeting of the Advisory Committee on Aviation Consumer Protection (Sept. 1, 2015).

[18] *Id.*

[19] In 2016, the Department issued a final rule that promulgated regulations related to carrier reporting, disclosure of codeshare operations, and display bias, while separating out the ancillary fee disclosure and ticket agent definition issues into separate rulemaking efforts. 81 FR 76800 (Nov. 3, 2016). The ticket agent rulemaking remains pending. *See* Fall 2023 Unified Agenda for rulemaking titled "Air Transportation Consumer Protection Requirements for Ticket Agents" (RIN 2105–AE57) at *https://www.reginfo.gov/public/do/ eAgendaViewRule?pubId=202310&RIN=2105-AE57.*

[20] 82 FR 7536 (Jan. 19, 2017).

[21] GAO 17–756, Commercial Aviation: Information on Airline Fees for Optional Services (September 2017), p. 33 at *https://www.gao.gov/ assets/gao-17-756.pdf.*

[22] 82 FR 58778 (Dec. 14, 2017).

[23] Letter from attorneys general from 16 States and the District of Columbia to Secretary Elaine L. Chao (Dec. 20, 2017).

[24] On January 20, 2021, the President issued E.O. 13992, "Revocation of Certain Executive Orders Concerning Federal Regulation," which revoked E.O. 13771 and certain other Executive orders.

[25] *See, e.g.,* Letter from Representative Nita M. Lowey to Secretary Elaine Chao (Dec. 8, 2017). *See also* section 203 of S. 3222, Airline Passengers' Bill of Rights (introduced by Senators Blumenthal, Markey, Whitehouse, Wyden, and Casey on November 17, 2021) at *https://www.congress.gov/ bill/117th-congress/senate-bill/3222/text?r=7&s=1,* proposing to mandate that DOT require airlines, online travel agencies (OTAs), metasearch engines and other ticket agents that provide flight search tools disclose all applicable taxes and ancillary fees at any point in which the fare is shown and in telephone communication with a prospective consumer in the U.S. at any point in which the cost of the air transportation is disclosed. *See also* The Unfriendly Skies: Consumer Confusion Over Airline Fees, Staff Report of Minority Staff of Senate Commerce Committee (August 6, 2015) at *https:// www.blumenthal.senate.gov/imo/media/doc/ 8%206%2015%20FINAL%20Airline% 20Report.pdf,* finding that ancillary fees, such as change and cancellation penalties, are increasingly less transparent regarding the true cost of air travel and recommending more transparency from the airline industry.

transparency of airline ancillary fees.[26] Subsequently, the Department tasked the Aviation Consumer Protection Advisory Committee (ACPAC) with examining this issue again.[27]

In 2019, during a meeting of the ACPAC, two consumer organizations underscored the difficulties faced by consumers in determining the total cost of air travel.[28] Consumer advocates maintained that consumers were confused by the complex charts that carriers and ticket agents provide to consumers to determine their baggage fees. The ACPAC heard from several consumer advocacy groups, including Travelers United, the National Consumers League (NCL), and the Global Business Travel Association (GBTA) regarding this issue. Consumer organizations that presented to the ACPAC stressed the importance of ensuring consumers can accurately and easily compare travel costs, inclusive of ancillary fees, and they recommended that ancillary fee information should be clearly displayed early in consumer purchase decisions.[29]

In December 2020, the ACPAC submitted a report to the Department recommending that the Department remain vigilant to ensure compliance with the existing transparency requirements. The ACPAC was silent on whether the Department should issue a new rulemaking on transparency of airline ancillary fees.[30] In July 2021, E.O. 14036 directed the Department to consider initiating a rulemaking to ensure consumers have ancillary fee information at the time of ticket purchase.

Based on E.O. 14036 and the above-described history of concerns raised by consumer organizations and individual consumers, including the individual complaints the Department has received reflecting the confusion consumers experience regarding ancillary fees,[31] the Department determined that this rulemaking is necessary to address ongoing inadequacies in existing ancillary fee disclosure requirements. It appears that consumers are generally unaware of the amount of the ancillary fees that apply to them when they book tickets. Consumer advocates contend that the ancillary services and fees that airlines currently post on their websites are not sufficiently useful to consumers to determine the cost of travel because airlines generally provide a range of fees for ancillary services aside from baggage. Airlines acknowledge that the fees for ancillary services often vary based on various factors such as the type of aircraft used, the flight on which a passenger is booked, or the time at which a passenger pays for the service or product. Regarding baggage fees, consumer advocacy organizations have reported to the Department that consumers often find the process of determining the baggage fees that apply to them to be a complicated and time-consuming process. Consumer advocates also expressed the view that because most passengers travel once per year or less, they may not be aware of certain ancillary service fees.[32] Advocates further argued that the practice of drip pricing, a pricing technique in which firms advertise only part of the price and reveal other charges later as the customer goes through the buying process, tends to lock consumers into engaging with a given seller, and reduces competition, because the customer has invested time and energy into the purchasing process and thus is less likely to abandon the purchase entirely and re-institute a fuller search for options.[33]

Following the issuance of E.O. 14036, the ACPAC met again in June 2022 to address the issue of transparency of airline ancillary service fees.[34] During the meeting, DOT solicited comment on topics being considered for the NPRM on ancillary fee transparency. These topics included identifying ancillary service fees critical to consumers, the sharing of airline data regarding critical ancillary service fees with ticket agents, and how to best display this information to consumers. DOT also solicited comment on whether fees for certain ancillary services should be disclosed at the first point in a search process where a fare is listed. At the meeting, a consumer advocate stated that consumers still do not know the specific amounts of baggage and change and cancellation fees that apply during the ticket purchase process.[35] Another consumer advocate expressed concerns with drip pricing.[36] The advocate also stated that baggage fees vary by airline and can depend on the flight, the time, and the day. A representative of the American Antitrust Institute stated that cancellation fees were discontinued at the beginning of the pandemic and then returned, and that drip pricing practices lock consumers into higher costs and suppresses competition. The representative also urged the Department to set policies to provide full fee information up front so consumers can make informed purchasing decisions based on the total cost of their itineraries.[37]

The Department continues to receive hundreds of consumer complaints each year regarding ancillary fees.[38] Based on past experience, the Department understands that the number of consumer complaints it receives directly from consumers is a small fraction of the total complaints received each year by airlines and ticket agents.[39] The requirements to provide specific baggage fee information and a range of fees for other ancillary services have not been as helpful to consumers in

[26] https://www.congress.gov/congressional-record/2018/03/22/house-section/article/H2697-1 at page H2872.

[27] See https://www.regulations.gov/document/DOT-OST-2018-0190-0001.

[28] See Summary of April 4, 2019 ACPAC Meeting 11–13, available at https://www.regulations.gov/document/DOT-OST-2018-0190-0019.

[29] See Summary of April 4, 2019 ACPAC Meeting 10–16, available at https://www.regulations.gov/document/DOT-OST-2018-0190-0019; see also Summary of September 24, 2020 ACPAC Meeting 19–20, available at https://www.regulations.gov/document/DOT-OST-2018-0190-0025.

[30] Report of the Aviation Consumer Protection Advisory Committee 5 (Dec. 31, 2020), available at https://www.transportation.gov/individuals/aviation-consumer-protection/acpac-report-secretary-transportation-december-31-2020.

[31] See, e.g., https://www.regulations.gov/document/DOT-OST-2022-0109-0021, https://www.regulations.gov/document/DOT-OST-2022-

0109-0022, https://www.regulations.gov/document/DOT-OST-2022-0109-0023.

[32] Presentation of FlyersRights.org (FlyersRights), available at https://www.regulations.gov/document/DOT-OST-2018-0190-0046.

[33] Id.; see also Presentation of American Antitrust Institute, available at https://www.transportation.gov/airconsumer/ACPAC/June2022Meeting/webcast (Day 1 morning session), and Federal Trade Commission, ECONOMIC ANALYSIS OF HOTEL RESORT FEES, (Jan. 2017), available at https://www.ftc.gov/system/files/documents/reports/economic-analysis-hotel-resort-fees/p115503_hotel_resort_fees_economic_issues_paper.pdf.

[34] See https://www.transportation.gov/airconsumer/ACPAC/June2022Meeting. A webcast of the meeting is available to view on the ACPAC website. Speakers' materials have been posted to the ACPAC docket at https://www.regulations.gov/docket/DOT-OST-2018-0190. On the second day of the meeting, the ACPAC addressed the separate but related issue of availability of airline flight information.

[35] Aviation Consumer Protection Advisory Committee (ACPAC) June 28 and 29, 2022 Meeting Minutes 8, available at https://www.regulations.gov/document/DOT-OST-2018-0190-0073.

[36] Id. at 9.

[37] Id. at 10.

[38] As noted in the NPRM of the present rulemaking, the Office of Aviation Consumer Protection (OACP) received over 550 complaints regarding change and cancellation fees and over 140 complaints regarding seat fees in 2021. In 2022, OACP received over 750 complaints regarding change and cancellation fees. During the first 5 months of 2023, OACP received over 300 complaints regarding change and cancellation fees.

[39] Compare, e.g., the 2,095 disability complaints filed with the Department in 2022 (available on page 66 of Air Travel Consumer Report issued February 2023, https://www.transportation.gov/sites/dot.gov/files/2023-04/February%202023%20ATCR_Revised.pdf), and the 42,306 disability complaints received by airlines in 2022 (available at https://www.transportation.gov/resources/individuals/aviation-consumer-protection/2022-disability-related-complaints-received-all).

determining the true cost of travel as the Department had anticipated when issuing its final rule in 2011.

## C. Notice of Proposed Rulemaking

The Department published its NPRM on Enhancing Transparency of Airline Ancillary Service Fees on October 20, 2022.[40] The NPRM was initially open to public comment for a period of 60 days (until December 19, 2022). During this time, the ACPAC was informed about the NPRM's principal provisions and heard from stakeholders at its meeting on December 8, 2022. Following several commenters' request for an extension due to the complexity of the rulemaking, the comment period was extended for 35 days until January 23, 2023.[41] On January 12, 2023, the ACPAC met again to deliberate and make recommendations related to the NPRM. Then, on January 18, 2023, the Department received a request to further extend the comment period on the basis that the requestor was not able to view the January 12, 2023, ACPAC meeting, and that at the time the request for extension was submitted, the meeting materials had not been posted to the docket. On January 20, 2023, the Department declined to extend the comment period based on that request noting that a video recording of the full meeting was posted publicly.[42] The Department received another request for additional time to provide comments on the NPRM, based primarily on technological and interface issues identified by the petitioner. In response, the Department posted a notice to its website stating that it was considering whether to grant that request and provided a preliminary list of recommendations made by the ACPAC at its January 12 meeting.[43]

On January 23, 2023, three commenters petitioned the Department for a public hearing on the NPRM pursuant to the Department's regulation on rulemakings relating to unfair and deceptive practices, 14 CFR 399.75. By a notice on March 14, 2023, the Department scheduled the hearing for March 30, 2023, and reopened the rulemaking to public comment from March 14 through April 6, 2023 (seven days following the hearing).[44]

### (1) Overview of Proposals

In the NPRM, the Department proposed to require airlines and ticket agents to disclose on the first page displayed following an itinerary search the fees for a first and second checked bag, a carry-on bag, ticket change and cancellation, and seat assignments that would enable a child 13 or under to be seated adjacent to an accompanying adult ("family seating"). The fees would need to be disclosed on the first page displayed following an itinerary search in which fare and itinerary information is shown, and they would need to be adjusted based on passenger-specific information provided by the consumer. The NPRM also proposed that the disclosures be displayed on the screen without the use of links or pop-ups, and that the same disclosures also be made during in-person or phone transactions. To enable ticket agents to provide the disclosures, the NPRM proposed that airlines provide fee rule information to ticket agents that sell or display air transportation. The Department did not propose to require that airlines provide the information to GDSs, which facilitate the purchase of tickets between airlines and consumers, but do not display or sell airline tickets to consumers. The NPRM proposed that these data sharing and disclosure requirements would become effective within six months of the issuance of a final rule. Specific provisions of the NPRM are discussed in more detail in section E of this document.

### (2) ACPAC Meetings on the Proposals

As noted above, after the NPRM was published, the ACPAC held two meetings to deliberate on the NPRM's provisions and to make recommendations. At its December 8, 2022, meeting, the ACPAC heard from Department staff regarding the proposed rule's provisions and from members of the public regarding their views.[45] The ACPAC's airline representative raised questions about the need for a rulemaking and asked about the Department's application of the unfair and deceptive practices standard. He questioned the Department's analysis of whether consumers were substantially injured. A member of the public representing the International Air Transport Association (IATA) also questioned whether consumers were unaware of the price imposed for baggage or seating before purchasing a ticket, and he indicated that it would be costly and time-consuming for systems

to conduct complex calculations on a passenger- or itinerary-specific basis to produce the proposed fee disclosures. He expressed his view that the rule should make fee information clear to consumers before purchase rather than during the itinerary search stage. The ACPAC's consumer representative raised questions about the impact the proposed disclosures would have on the amount of information being presented to consumers on screen. A member of the public representing Travelers United expressed the view that regulation is needed on fee disclosures and that consumers are harmed if they go through the reservation process and find out at the end that extra fees exist. A member of the public representing the American Society of Travel Advisors (ASTA) expressed concern about the proposed rule's treatment of offline (*i.e.,* telephone or in person) disclosures, and he urged the Department to make such offline disclosures available upon request or at the agent's discretion. A member of the public representing the Computer & Communications Industry Association (CCIA) stated that aggregators such as metasearch entities should not be subject to the rule.

On the issue of data distribution to ticket agents, the IATA representative noted that his organization supports the Department's proposal not to mandate that airlines distribute fee information to ticket agents through GDSs, but that the costs of implementing the data sharing proposal within the six-month compliance period would be significant. Multiple members of the public representing ticket agents and GDSs expressed the view that the Department should require airlines to distribute fee information to GDSs and disagreed with what they saw as GDSs being excluded from the proposal. In their view, GDSs were the most efficient method to move data from airlines to ticket agents, and that without using GDSs, ticket agents would have to bear resource-intensive costs to enter into agreements with airlines and to make data visible to customers.

Speakers at the December 8 meeting expressed differing views on whether the proposed compliance period of six months would be feasible, with the ACPAC's consumer representative stating that six months was not unrealistic given that capabilities exist for GDSs to provide the data necessary for ticket agents to comply, while speakers representing airlines and ticket agents asserted that six months was insufficient time, although acknowledging that the use of GDSs to transfer data could enable the proposed

---

[40] 87 FR 63718 (Oct. 20, 2022).

[41] 87 FR 77765 (Dec. 20, 2022).

[42] *See https://www.transportation.gov/airconsumer/AncillaryFeeNPRM-Dental-Extension-Comment-Period. See also* 88 FR 4923 (Jan. 26, 2023).

[43] *See https://www.transportation.gov/airconsumer/AncillaryFeeNPRM-Procedural-Information-January23-2023.*

[44] 88 FR 15622 (Mar. 14, 2023).

[45] Meeting minutes are available at *https://www.regulations.gov/document/DOT-OST-2018-0190-0110.*

requirements to be implemented more quickly than not using GDSs.

On January 12, 2023, the ACPAC publicly deliberated and voted on recommendations related to ancillary fees.[46] The ACPAC recommendations concerned the types of ancillary service fees that should be disclosed, the manner and form of the disclosures (*e.g.,* whether pop ups, roll overs, or links are acceptable), the timing of the disclosures, the application of fee disclosures to telephone or in-person inquiries, the ability for consumers to opt out of receiving the disclosures, the transactability of ancillary fees, the process for data sharing by airlines to ticket agents, the entities covered, and the appropriate compliance timeframes. On January 23, 2023, to facilitate the public's consideration of this NPRM, the Department publicly posted a written summary of the recommendations adopted by the ACPAC at its January 12 meeting.[47] The ACPAC's specific recommendations are discussed in section E, where the Department discusses these matters in substance.

*(3) Public Hearing Regarding Proposals*

Under 14 CFR 399.75, when the Department issues a proposed regulation declaring a practice in air transportation or the sale of air transportation to be unfair or deceptive to consumers under the authority of 49 U.S.C. 41712(a), any interested party may file a petition to hold a hearing on the proposed regulation. Section 399.75 further provides that the petition for a hearing shall be granted if the petitioner makes a clear and convincing showing that granting the petition is in the public interest. Factors in determining whether a petition is in the public interest include, but are not limited to: (i) Whether the proposed rule depends on conclusions concerning one or more specific scientific, technical, economic, or other factual issues that are genuinely in dispute or that may not satisfy the requirements of the Information Quality Act; (ii) Whether the ordinary public comment process is unlikely to provide an adequate examination of the issues to permit a fully informed judgment; (iii) Whether the resolution of the disputed

factual issues would likely have a material effect on the costs and benefits of the proposed rule; (iv) Whether the requested hearing would advance the consideration of the proposed rule and the General Counsel's ability to make the rulemaking determinations required by this section; and (v) Whether the hearing would unreasonably delay completion of the rulemaking.

On January 23, 2023, three commenters petitioned the Department for a public hearing on the NPRM. Airlines for America (A4A) raised two questions in its petition: (1) whether consumers are or are likely to be substantially injured or are misled by airlines' current disclosures of ancillary service fees; and (2) whether disclosures of itinerary-specific ancillary fees at the time of first search will result in the display of incomplete or inapplicable ancillary fee information, cause consumer confusion, and distort the marketplace. The Travel Technology Association (Travel Tech) stated in its petition that there is a fundamental disputed factual issue as to whether the proposed display requirements would benefit or harm consumers. Travel Tech also expressed the belief that the proposed disclosures are technically infeasible and requested a hearing to discuss these concerns as well as the Department's proposed time frame for compliance. In its comment on the NPRM, Google LLC also requested a hearing based on its assertion that the Department's analysis was flawed and that it was deficient in providing complaint-based evidence justifying the rulemaking. In arguing that a hearing is in the public interest pursuant to 14 CFR 399.75, A4A and Travel Tech asserted that each of the criteria in 14 CFR 399.75 for determining whether a hearing was in the public interest and must therefore be granted had been met. The Department granted the public hearing to afford stakeholders an opportunity, in addition to the public comment process, to present factual issues that they believe are pertinent to the Department's decision on the rulemaking.[48] The hearing was held on March 30, 2023,[49] and a video recording

of the full hearing was posted to the Department's website.[50]

Before the hearing, A4A raised objections about the designated Hearing Officer appointed by the Department.[51] The organization made a request for the appointment of a hearing officer that would be "neutral," rather than the Department's designated Aviation Consumer Advocate. Under the Department's regulation, the designation of a hearing officer is left to the discretion of the General Counsel.[52] The duty of the hearing officer is to preside over the hearing and to place the hearing minutes in the docket. The General Counsel, not the hearing officer, determines the Department's actions following a hearing.[53] In addition, the Department stated in a **Federal Register** document [54] that the appointment was appropriate because: (1) the designated hearing officer is a career civil servant who will execute the role in a neutral, fair, and professional manner; (2) the designated hearing officer's responsibilities as an Aviation Consumer Advocate are the same responsibilities that this individual has as an Assistant General Counsel of the Office of Aviation Consumer Protection and such responsibilities do not result in bias; and (3) the Hearing Officer's role is to conduct the meeting using generally accepted meeting management techniques and to not serve as a decisionmaker. As such, the Department proceeded with its appointment of the Department's designated Aviation Consumer Advocate as the hearing officer for the March 30, 2023, hearing.

A4A also objected to the second subject discussed at the hearing, "whether disclosures of itinerary-specific ancillary fees at the time of first search will result in the display of incomplete or inapplicable ancillary fee information, cause consumer confusion, and distort the marketplace." [55] A4A stated that, in advance of the hearing, the Department asked the public for information on current carrier and ticket agent practices, including how ancillary fee information is currently displayed, how many existing online booking systems do not display specific ancillary fees on itinerary search result pages but

---

[46] The committee voted in favor of moving forward with deliberation and issuing recommendations at the January 12, 2023, meeting, with the member representing airlines voting against moving forward while the NPRM's comment period remained open. The meeting minutes are available at *https://www.regulations.gov/document/DOT-OST-2018-0190-0111.*

[47] *See* Procedural Information Regarding Enhancing Transparency of Airline Ancillary Service Fees (January 23, 2023) at *https://www.transportation.gov/airconsumer/AncillaryFeeNPRM-Procedural-Information-January23-2023.*

[48] 88 FR 13389 (Mar. 3, 2023).

[49] 88 FR 15622 (Mar. 14, 2023). The Department granted a postponement to the hearing's originally scheduled date of March 16, 2023, due to concerns by A4A and Travel Tech that the original 15 days' notice was insufficient to identify speakers and to compile data responsive to the subjects presented in the March 3 notice. A4A also stated that it would have difficulty finding participants due to the hearing being scheduled during the Spring Break season.

[50] *https://www.transportation.gov/airconsumer/AirlineAncillaryFeeNPRM/March30_Public_Hearing_Recording.*

[51] *https://www.regulations.gov/document/DOT-OST-2022-0109-0718.*

[52] 14 CFR 399.75(b)(5)(ii).

[53] 14 CFR 399.75(b)(6).

[54] 88 FR 15622 (Mar. 14, 2023).

[55] This subject was offered by A4A in its petition for a public hearing. *See https://www.regulations.gov/comment/DOT-OST-2022-0109-0091.*

display ancillary fees on other pages of the booking process, whether the lack of ancillary fee information at the time of itinerary and fare selection for current systems results in higher total trip costs, and information from consumers on the time spent searching on current carrier or ticket agent websites. A4A asserted that these questions did not address A4A's intent in presenting the second subject of the hearing, which A4A explained was the impact of the Department's proposals to consumers. A4A stated that the failure to address this issue rendered the hearing ineffective. The Department disagrees with A4A's assertions that the public hearing failed to address the issue A4A posed for discussion and that the hearing was ineffective. In its notice announcing the public hearing,[56] the Department stated that it welcomed, for issue 2, "data and information regarding any potential for consumer confusion from overcrowded displays or information overload that could result from the Department's proposal, particularly on mobile or other devices with smaller displays." The Department also solicited "any other information that is pertinent to the Department's determination on this proposal." These requests for information are aligned with A4A's stated focus of the hearing's second subject and did not render the hearing ineffective.

As provided in 14 CFR 399.75, following the completion of the hearing process, the General Counsel shall consider the record of the hearing, and shall make a reasoned determination whether to terminate the rulemaking; to proceed with the rulemaking as proposed; or to modify the proposed rule. Based on the record in this rulemaking proceeding, including the comments submitted by members of the public, the recommendations of the ACPAC, and the information received during the public hearing, the Acting General Counsel has determined that the Department should proceed with the rulemaking. The Department has made several adjustments that reflect the public input received, as discussed in section E.

## D. Statutory Authority

### (1) Unfair and Deceptive Practices

The Department is implementing the revised regulatory requirements in this rule pursuant to its statutory authority in 49 U.S.C. 41712 to prohibit unfair and deceptive practices in air

transportation and the sale of air transportation. Under section 41712, a practice is "unfair" to consumers if it causes or is likely to cause substantial injury, which is not reasonably avoidable, and the harm is not outweighed by benefits to consumers or competition.[57] A practice is "deceptive" to consumers if it is likely to mislead a consumer, acting reasonably under the circumstances, with respect to a material matter. A matter is material if it is likely to have affected the consumer's conduct or decision with respect to a product or service.[58] Proof of intent is not necessary to establish unfairness or deception.[59] The elements of unfair and deceptive are further elaborated by the Department in its guidance document.[60]

In the NPRM, the Department tentatively determined that several practices conducted by airlines and ticket agents were unfair and deceptive in air transportation or the sale of air transportation. Members of the public provided input on the Department's preliminary determinations, including through submission of written comments and statements made at public meetings (i.e., ACPAC meetings and the March 30, 2023, public hearing). After fully considering the public input, the Department has concluded that the practices identified below are unfair and deceptive.

### (a) Bag Fees and Policies

Pursuant to its authority under section 41712, the Department is requiring airlines and ticket agents to disclose the fees for a first and second checked bag and a carry-on bag whenever fare and schedule information is provided to a consumer in response to a passenger-specific or anonymous itinerary search. The Department is also requiring disclosure of the applicable weight and dimensions of the first checked bag, second checked bag, and a carry-on bag before ticket purchase on an online platform.

### (i) Carriers

The Department has concluded that a carrier commits an unfair and deceptive practice in the sale of air transportation when it discloses an airfare in response to a consumer's itinerary search without providing accompanying information on applicable fees for a first and second checked bag and a carry-on bag and when it fails to disclose weight and dimension information for that baggage

before ticket purchase on an online platform.

Regarding fees, the Department has heard from consumers and other stakeholders that such fees, which had once been included in the airfare but may now be broken out from the airfare depending on the airline, route, fare class, or other factors, are often difficult to ascertain during the itinerary search and ticket purchase process. We find that the practice of not disclosing first and second checked bag and carry-on bag fees with the quoted airfare at the time of an itinerary search during the ticket purchase process prevents consumers from knowing the true cost of their tickets, and that the practice may cause consumers to invest time pursuing a ticket purchase based on an appealing airfare that ends up resulting in less favorable overall costs to the consumer when baggage fees are added. Under this rule, the bag fees disclosed must be passenger-specific fees if a passenger affirmatively provides information such as the passenger's status in the airline's frequent flyer program, the passenger's military status, or the passenger's status as a holder of a particular credit card. If the passenger does not affirmatively provide passenger-specific information, then the carrier must provide itinerary-specific fees, which would apply to the anonymous shopper, taking into account geography, travel dates, cabin class, and ticketed fare class (e.g., full fare ticket). The failure to disclose either passenger-specific or itinerary-specific bag fees with the quoted airfare at the time of an itinerary search is unfair because it causes or is likely to cause substantial injury, which is not reasonably avoidable, and the harm is not outweighed by benefits to consumers or competition.

The substantial injury this practice is likely to cause is the additional time spent searching to find the total cost of travel and any additional funds spent on air transportation that might have been avoided if the consumer had been able to determine the true cost of travel up front and readily select the best price. This harm is not reasonably avoidable even with the disclosures mandated in the 2011 rulemaking that improved consumer access to first and second checked bag and carry-on bag fee information by requiring those fees to be displayed on airlines' websites. Airlines often disclose bag fees in an untailored, static format or in complex charts that are confusing to consumers and not readily available when consumers need the information to consider whether an itinerary and price offering best suits their needs. The harm that consumers

---

[56] 88 FR 13389 (Mar. 3, 2023), available at https://www.federalregister.gov/documents/2023/03/03/2023-04510/enhancing-transparency-of-airline-ancillary-service-fees.

[57] 14 CFR 399.79(b)(1).

[58] 14 CFR 399.79(b)(2).

[59] 14 CFR 399.79(c).

[60] 87 FR 52677 (Aug. 28, 2022).

experience is not outweighed by benefits to consumers or competition because consumer confusion about applicable bag fees harms, rather than benefits, competition and creates less than optimal purchasing decisions by consumers. In addition, because existing disclosure requirements of baggage fees did not apply to online platforms other than websites, consumers who searched for air transportation on those platforms may not have received the baggage fee information that this final rule now requires. The Department has determined that the disclosure of passenger-specific or anonymous itinerary-specific fees whenever fare and schedule information is provided would promote informed buyers, enhance competition, and lower prices. The practice of not disclosing passenger-specific or anonymous itinerary-specific fees for first and second checked bags and carry-on bags when fare and schedule information is provided is also deceptive in that it misleads consumers into believing the total purchase price from one carrier for a particular itinerary or fare type is cheaper than that of another when that may not be the case. This belief is reasonable as carriers and agents often disclose only the airfare and not bag fees during an itinerary search. As carriers have different policies regarding the fees and limitations imposed to transport baggage, and because variation within each carrier depends on the fare category purchased or the status of the passenger, the current requirement that carriers inform consumers that fees for baggage may apply and where consumers can see these baggage fees during the booking process is not providing consumers sufficient notice of the total cost of the air transportation. Consumers are often diverted to complex charts that are confusing, prolong the consumer's process of evaluating itineraries and fares for purchase, and may ultimately not be instructive for many consumers in determining the bag fee that would apply to them. The cost of the first and second checked bag and carry-on bag is often material to consumers, as knowing such costs in conjunction with the ticket price is likely to affect the consumer's purchase decisions as well as whether to check or carry-on a bag.[61]

The Department has also determined that it is an unfair practice to not disclose on an online platform the applicable weight and dimension allowances of a first checked bag, a second checked bag, and a carry-on bag, adjusted based on passenger-specific information if information specific to the passenger has been affirmatively provided. However, the Department is of the view that, unlike fees, it is sufficient to provide weight and dimension allowances of a first checked bag, a second checked bag, and a carry-on bag before ticket purchase to avoid engaging in an unfair and deceptive practice. The Department agrees with the comments, which are discussed in section E (4)(b), that providing the policy information is less critical to consumers' decision making than the fees themselves; accordingly, the Department is allowing disclosure of these policies later in the ticket purchase process. Nevertheless, the practice of not disclosing applicable weight and dimension allowances is likely to also cause substantial injury to consumers if not disclosed prior to ticket purchase given airlines' policies on bag size vary and consumers who learn that the weight and dimensions allowances of the selected carrier are stricter than the common bag size may decide to select a different carrier. This harm is not reasonably avoidable because, even though existing regulations require the disclosure of this information on e-ticket confirmations, this disclosure is provided after ticket purchase, thereby depriving consumers of the ability to fully evaluate potentially better options for them prior to ticket purchase. There is no countervailing benefit to consumers or competition from the practice of not disclosing weight and dimension allowances of baggage before ticket purchase, as the lack of information to consumers reduces their ability to evaluate ticket purchases and harms competition.

(ii) Ticket Agents

The Department has concluded that a ticket agent commits an unfair and deceptive practice in the sale of air transportation when it discloses an airfare in response to a consumer's itinerary search without providing accompanying information on applicable fees for a first and second checked bag and a carry-on bag and when it fails to provide weight and dimension information for that baggage before ticket purchase on an online

platform. As noted above, the Department has heard from consumers and other stakeholders that baggage fees are often difficult to ascertain during the itinerary search and ticket purchase process. This difficulty is exacerbated on ticket agent channels in many cases, given the numerous airline and itinerary options presented. We find that the practice of not disclosing baggage fees with the quoted airfare at the time of an itinerary search prevents consumers from knowing the true cost of their air tickets, and that the practice may cause consumers to invest time pursuing a ticket purchase based on an appealing airfare that ends up resulting in less favorable overall costs to the consumer when baggage fees are later added. The failure to disclose bag fees with the quoted airfare at the time of an itinerary search is unfair because it causes or is likely to cause substantial injury, which is not reasonably avoidable, and the harm is not outweighed by benefits to consumers or competition.

The substantial injury this practice is likely to cause is the additional time spent searching to find the total cost of travel and any additional funds spent on air transportation that might have been avoided if the consumer had been able to determine the true cost of travel up front and readily select the best price. This harm is not reasonably avoidable, as described regarding carriers in section D (1)(a)(i). In addition, ticket agents provide a means for consumers to evaluate different travel options, often on different airlines. The harm of increased time and costs involved in the ticket purchase process is not outweighed by benefits to consumers or competition because consumer confusion about applicable bag fees harms, rather than benefits, competition and creates less than optimal purchasing decisions by consumers. The Department has determined that the disclosure of passenger-specific fees whenever fare and schedule information is provided would promote informed buyers, enhance competition, and lower prices.

The practice of not disclosing passenger-specific fees for first and second checked bags and carry-on bags when fare and schedule information is provided is also deceptive in that it misleads consumers into believing the total purchase price from one carrier for a particular itinerary or fare type is cheaper than that of another when that may not be the case. This belief is reasonable as ticket agents often disclose only the airfare and not bag fees during an itinerary search. The current requirement that ticket agents provide a generic notice that "fees for baggage

---

[61] As noted in the NPRM, the GAO found that since airlines first imposed checked baggage fees, the number of checked bags per passenger has declined. GAO also explains that checked baggage fees have led to greater amounts of carry-on baggage. GAO 10–785, Commercial Aviation: Consumers Could Benefit from Better Information about Airline-Imposed Fees and Refundability of Government-Imposed Taxes and Fees (July 14,

2010) at *https://www.gao.gov/assets/gao-10-785.pdf.*

may apply'' during the booking process is not providing consumers sufficient notice of the total cost of the air transportation. Although existing regulations require carriers and ticket agents to inform consumers during the booking process about where consumers can see baggage fees, ticket agents may refer consumers to the carrier's website to search for fees, which would necessitate the consumer leaving the ticket agent's website, prolonging the consumer's process of evaluating itineraries and fares for purchase. The cost of the first and second checked bag and carry-on bag is often material to consumers, as knowing such costs in conjunction with the ticket price is likely to affect the consumer's purchase decisions.

The failure to disclose the applicable weight and dimension allowances of a first checked bag, a second checked bag, and a carry-on bag, adjusted based on passenger-specific information affirmatively provided by the consumer, is also an unfair practice. The Department has decided to require disclosure of these weight and dimension allowances before ticket purchase, rather than during the itinerary search process like bag fees, because the Department has been persuaded by commenters that providing this information is less critical to consumers' decision making than the fees themselves. This practice is likely to cause substantial injury to consumers given airlines' policies on bag size vary and consumers may have to pay more to transport their bags because of high airline fees for oversized or overweight bags than would have been the case if they knew the weight and dimensions allowances prior to ticket purchase and selected a different carrier with a bag size and dimension allowance that suited their circumstances. This harm is not reasonably avoidable, because even though existing regulations require the disclosure of this information on e-ticket confirmations, the disclosure is provided after ticket purchase, thereby depriving consumers of the ability to fully evaluate the cost of their ticket before purchase. There is no countervailing benefit to consumers or competition from the practice of not disclosing weight and dimension allowances of baggage before ticket purchase, as the lack of information to consumers reduces their ability to evaluate ticket purchases and harms competition.

(b) Change and Cancellation Fees and Policies

Pursuant to its authority under section 41712, the Department is requiring airlines and ticket agents to disclose the fees to change and cancel a ticket in response to a passenger-specific or anonymous itinerary-specific search and to disclose ticket change and cancellation policies before a consumer's purchase of air transportation on an online platform.

(i) Carriers

The Department concludes that a carrier commits an unfair practice in the sale of air transportation when it discloses an airfare in response to a consumer's itinerary search without providing accompanying information on applicable change and cancellation fees and fails to provide change and cancellation policies before ticket purchase on an online platform. The practice is unfair because it causes or is likely to cause substantial injury, which is not reasonably avoidable, and the harm is not outweighed by benefits to consumers or competition.

The Department currently requires the disclosure of these fees on or with the ticket.[62] This requirement, however, means that consumers often receive information about these fees after the purchase of the ticket is already made (*i.e.*, upon receipt of the ticket confirmation), which the Department determines in this final rule is not sufficient disclosure. The practice of not disclosing these fees while consumers select an itinerary and fare causes substantial injury to consumers in that passengers may not be aware of the change and cancellation fees that apply to a particular fare being offered, and they may then select a fare without adequate notice that they could incur significant fees to change or cancel their tickets.

These harms are not reasonably avoidable if the carrier does not provide disclosures on its cancellation or change fees during the itinerary search process and policies before ticket purchase on an online platform. Although carriers are already required to have change and cancellation policy and fee information available on their websites, the existing rule allows carriers to provide the fee information in a range. Consumers are harmed when they do not know the specific change or cancellation fee that would apply to them during the itinerary search process, particularly when the ranges provided by some carriers are so wide as to be virtually

[62] *See* 14 CFR 253.7.

useless.[63] Consumers may also find it difficult to ascertain the change, cancellation, and refund policies that apply to the specific ticket they are selecting if the airline does not disclose such information during the booking process. Moreover, change fees, even if not in a range, and change and cancellation policies may not be simple to understand, as fare categories, passenger status, ticket type (*e.g.*, award ticket purchases), and other factors may impact the applicable change and cancellation fees and policies. Further, because the cancellation and change fee information is not provided during the itinerary-search process, consumers would need to interrupt their booking process to search for the information and extend the time needed to complete a booking. The harm that consumers experience is not outweighed by benefits to consumers or competition because, like baggage fees and dimensions, consumer surprise or confusion about applicable change and cancellation fees and policies harms, rather than benefits, competition. The Department believes that the disclosure of passenger-specific or non-passenger-specific change and cancellation fees during the itinerary-search process would promote informed buyers, enhance competition, and lower prices.

In addition, consumers are substantially harmed if they are not provided the following additional disclosures about change and cancellation policies before purchase on an online platform: (1) any prohibitions or conditions that limit a consumer's ability to change or cancel a ticket; (2) whether the consumer's reservation can be cancelled within 24 hours of purchase without penalty or whether it can be held at the quoted fare for 24 hours without payment, provided the reservation is made one week or more prior to a flight's departure;[64] (3) the form of the refund or credit that would be provided; (4) that the consumer is responsible for any fare differential on a changed ticket, if applicable; and (5)

[63] *See, e.g.,* United Airlines, Upgrades and Optional Service Charges (original page accessed Feb. 29, 2024) (showing "Other Flight Changes and Cancellations" as "$0 to $1,000 per traveler, based on applicable fare rules"); Delta Air Lines, Change or Cancel Overview (original page accessed Feb. 29, 2024) (showing potential change and cancellation fees of "$0–400" for non-refundable fares); American Airlines, Optional Service Fees (original page accessed Feb. 29, 2024) (showing change fees of "up to $750"). Website screenshots available in docket at *https://www.regulations.gov/docket/DOT-OST-2022-0109.*

[64] This rule requires that the carrier disclose its 24-hour cancellation or hold policy on the last page of the booking process as this is the point in the purchase process at which this disclosure is most relevant to consumers.

whether the consumer will receive a refund of the difference in fare if the consumer changes their flight and selects a less costly replacement flight. Disclosure of change and cancellation policy terms, such as whether the consumer would be required to pay a fare differential for a ticket change and whether the consumer can receive a refund in the original form of payment, may impact the consumer's decision on whether to purchase the selected itinerary or wait until the consumer is more certain of their travel plans. While important, these disclosures of the details of the change and cancellation policies are less critical at the time of itinerary search than the change and cancellation fees themselves. Accordingly, the Department is of the view that, unlike fees, it is sufficient to disclose change and cancellation policies before ticket purchase to avoid engaging in an unfair practice.

The Department also concludes that the practice of not disclosing change and cancellation fees with an airfare in response to a consumer's itinerary search and change and cancellation policies before ticket purchase on an online platform is deceptive. Without proper notice, consumers acting reasonably would be misled with respect to the change and cancellation fees and policies that apply to their ticket and may believe that changes or cancellations are possible at no fee or at a reduced fee. As noted above, many carriers changed their ticket change policies during the COVID–19 public health emergency, and such changes were publicly promoted by the carriers. A reasonable consumer may believe that he or she can change a ticket free of charge when that might not be the case, or he or she may choose to purchase a fare type that does not allow changes, believing erroneously that a change is allowed. Comments by consumer advocates and individuals suggest that consumers do consider change and cancellation fees and policies when making purchasing decisions, particularly during emergency situations such as a pandemic or potential severe weather events such as hurricane seasons.[65] The change and cancellation fees and policies are therefore material because they could affect the consumer's decision on whether to purchase an airline ticket

and if so, which airline to select. As such, the Department concludes that the failure to disclose change and cancellation fees during the itinerary-search process and change and cancellation policies before ticket purchase on an online platform is deceptive.

(ii) Ticket Agents

The Department concludes that a ticket agent commits an unfair practice in the sale of air transportation when it discloses an airfare in response to a consumer's itinerary search without providing accompanying information on applicable change and cancellation fees and fails to provide change and cancellation policies before ticket purchase on an online platform. The practice is unfair because it causes or is likely to cause substantial injury, which is not reasonably avoidable, and the harm is not outweighed by benefits to consumers or competition.

The Department currently requires that carriers disclose change and cancellation fees and policies on or with the ticket, but current regulations do not require ticket agents to disclose such fees and policies during the ticket purchase process. As such, consumers purchasing tickets from certain ticket agents may be unaware of the change and cancellation fees and policies that would apply to them if they were to proceed with the purchase of a ticket. The Department understands that a substantial number of consumers purchase their tickets through ticket agents.[66] The practice of not disclosing these fees while consumers select an itinerary and fare causes substantial injury in that consumers may not be aware of the change and cancellation fees that apply to a particular fare being offered, and they may then select a fare without adequate notice that they could incur significant fees to change or cancel their tickets. In addition, consumers incur substantial injury if they are not provided the following disclosures about change and cancellation policies before purchase on an online platform: (1) any prohibitions or conditions that limit a consumer's ability to change or cancel a ticket; (2) whether the consumer's reservation can be cancelled within 24 hours of purchase without penalty or whether it

can be held at the quoted fare for 24 hours without payment, provided the reservation is made one week or more prior to a flight's departure;[67] (3) the form of the refund or credit that would be provided; (4) that the consumer is responsible for any fare differential, if applicable; and (5) whether the consumer will receive a refund of the difference in fare if the consumer changes their flight and selects a less costly replacement flight. Disclosure of change and cancellation policy terms, such as whether the consumer would be required to pay a fare differential for a ticket change and whether the consumer can receive a refund in the original form of payment, may impact the consumer's decision on whether to purchase the selected itinerary or wait until the consumer is more certain of their travel plans. While important, these disclosures of the details of the change and cancellation policies are less critical at the time of itinerary search than the change and cancellation fees themselves and any prohibitions on the ability to change and cancel a ticket, which must be disclosed at that point. Accordingly, the Department is of the view that, unlike fees, it is sufficient to disclose change and cancellation policies before ticket purchase to avoid engaging in an unfair and deceptive practice. These harms are not reasonably avoidable if the ticket agent does not provide disclosures on cancellation or change fees when it provides an airfare in response to a consumer's itinerary search and policy information before purchase on an online platform. Ticket agents often refer consumers to carrier web pages that contain fee information, but this information is allowed to be expressed as a range rather than a specific applicable number.[68] This means that many consumers cannot determine the change and cancellation fees that would apply to them. Also, it is disruptive and time-consuming for consumers purchasing from ticket agents to navigate away from the ticket agents' online platform to the carrier's website to search for the information. Change and cancellation policies and fees may be difficult to understand, as fare categories, passenger status, ticket type (e.g., award ticket purchases), and other factors such as where the passenger is flying may impact the applicable change and cancellation fees and policies. The harm that consumers

---

[65] *See* comments submitted in the docket for the 2014 NPRM, which can be accessed at *https://www.regulations.gov/search?filter=DOT-OST-2014-0056*. *See also, e.g.,* Minutes or webcast (at 2:15:55) of the January 12, 2023, ACPAC meeting, *available at https://www.transportation.gov/resources/individuals/aviation-consumer-protection/aviation-consumer-protection-advisory-committee.*

[66] *See, e.g.,* remarks by a representative of ASTA at the ACPAC's June 28, 2022, meeting. The representative stated that 44% of air tickets were sold by travel agencies (excluding OTAs), 39% were sold on airline websites, 12% were sold by OTAs, and 5% are sold through offline direct channels. Meeting minutes can be found at *https://www.regulations.gov/document/DOT-OST-2018-0190-0073.*

[67] This rule requires that the ticket agent disclose whether it has a 24-hour cancellation or hold policy on the last page of the booking process as this is the point in the purchase process at which this disclosure is most relevant to consumers.

[68] *See, e.g.,* fn. 61, above.

experience is not outweighed by benefits to consumers or competition because, like baggage fees, consumer surprise or confusion about applicable change and cancellation fees after airfare purchase harms, rather than benefits, competition. The Department believes that the disclosure of passenger-specific or non-passenger-specific change and cancellation fees during the itinerary-search process and policies before ticket purchase on an online platform would promote informed buyers, enhance competition, and lower prices.

The Department also concludes that the practice of not disclosing change and cancellation fees with an airfare in response to a consumer's itinerary search and policies before ticket purchase on an online platform to be deceptive. Without the required notice, consumers acting reasonably would be misled with respect to the change and cancellation fees and policies that apply to their ticket and may believe that changes or cancellations are possible at no fee or at a reduced fee. As noted above, many carriers changed their ticket change policies during the COVID–19 public health emergency, and such changes were publicly promoted by the carriers. A reasonable consumer may believe that his or her ticket may be changeable free of charge when that might not be the case, or he or she may choose to purchase a fare type that does not allow changes, believing erroneously that a change is permitted. Comments by consumer advocates and individuals suggested that consumers do consider change and cancellation fees and policies when making purchasing decisions, particularly during emergency situations such as a pandemic or potential severe weather events such as hurricane seasons. The change and cancellation fees and policies are therefore material because they could affect the consumer's decision on whether to purchase an airline ticket and if so, which airline to select. As such, the Department concludes that the failure to disclose change and cancellation fees during the itinerary-search process and policies before ticket purchase on an online platform is deceptive.

(c) Percentage-Off Discounts

After careful consideration of the comments submitted in this rulemaking, the Department has concluded that, when the terms "flight," "ticket," or "fare" are used in a percentage-off advertisement, it is an unfair and deceptive practice for an airline or ticket agent to not apply the percentage off the

total cost of the ticket. Additionally, the Department has concluded that, when the term "base fare" is used in a percentage-off advertisement, it is an unfair and deceptive practice for an airline or ticket agent to not apply the percentage off the full fare amount excluding all government taxes and charges.

These types of percentage-off advertisements are deceptive as they mislead reasonable consumers on a material matter. A reasonable consumer seeing an advertisement for a 25% discount off a flight, a ticket, or a fare would believe that he or she is receiving 25% of the entire ticket based on a common understanding of those terms as supported by comments discussed in section E. That reasonable consumer would be misled if he or she were to find out that the 25% off discount applied to only a portion of the ticket price. Similarly, a reasonable consumer seeing an advertisement for a 30% discount off a "base fare" would believe that he or she is receiving 30% off the full fare excluding all government taxes and fees based on a common understanding of that term as supported by comments discussed in section E. That individual would be misled if he or she received a 30% off only a portion of the carrier-imposed mandatory charges. The percentage discounts are a material matter because they affect the price that consumers pay for the air transportation.

These types of percentage-off advertisements are also unfair as they have potential to cause substantial harm to consumers that is not reasonably avoidable and not outweighed by countervailing benefits to consumers or competition. Consumers may be substantially harmed because they are likely to encounter higher charges than expected if a seller advertises an appealing offer by stating "50% off a flight" or "50% off a base fare" so consumers will click on the advertisements only to find out that it is 50% off only a small portion of the ticket, which can multiply if a consumer relies on the promotional discount for multiple passengers on an itinerary or for an individual passenger traveling on a higher cost itinerary. The harm is not easily avoided due to a lack of clarity in the advertising language that carriers use. The harm that consumers experience from this practice is not outweighed by benefits to consumers or competition because the lack of clarity about the offered fare harms, rather than promotes, competition.

(d) Data Sharing

This final rule requires U.S. and foreign air carriers to provide any entity required to disclose critical ancillary fee information directly to consumers useable, current, and accurate information of the fee rules for critical ancillary services if the carrier provides fare, schedule, and availability information to that entity. The information provided by carriers to these entities must be sufficient to ensure compliance with any applicable disclosure requirements. The failure of a carrier to provide critical ancillary fee information to entities required to disclose this information to consumers is an unfair practice. Approximately half of air travel tickets are sold by ticket agents.[69] There is likely substantial harm to consumers if an entity required to disclose accurate critical ancillary fee information to consumers is unable to do so due to the carrier's failure to provide such information to that entity. Consumers are substantially harmed under these circumstances because consumers must then spend additional time searching to find the total cost of travel and consumers may spend additional funds on air transportation that could have been avoided if the consumer had the critical ancillary fee disclosed to them. This harm is not reasonably avoidable, as consumers would have to leave the ticket purchase process to review fees provided in each carrier website. In addition, once at a carrier website, consumers will likely not be able to determine the fee for changing and canceling a reservation as carriers provide that information in a range.[70] Consumers will also likely have difficulty determining the fee for transporting a carry-on bag, a first checked bag, and second checked bag because baggage fee structures are often complex and require charts and calculators to show the cost of fees. This harm is not outweighed by benefits to consumers or competition as the sharing of critical ancillary service fee information enables consumers to access critical ancillary fee information from a larger variety of ticket purchase

[69] ACPAC Meeting Minutes (June 28, 2022), p. 13 at *https://www.regulations.gov/document/DOT-OST-2018-0190-0073.* In its written comment, ASTA stated that 48 percent of total sales and aggregate spending were sold by travel agencies in 2019. *https://www.regulations.gov/comment/DOT-OST-2022-0109-0083.*

[70] *See* fn. 61 (showing that some airlines provide a large range for change or cancellation fees, with United, for example, quoting "$0 to $1,000 per traveler").

vendors, which improves, rather than harms, competition.

(e) Additional Unfair or Deceptive Practices

Additional discussion of unfair and deceptive practices identified in this final rule is provided in sections E (1)(c) (failure of a carrier or ticket agent that sells air transportation to make critical ancillary fee disclosures at the first page of its website or other online platform to which a consumer is directed after searching for flights on a metasearch site where that information is not provided); E (3)(d) (failure of a carrier or ticket agent to disclose that the purchase of a seat is not required for travel particularly when consumers are provided seats to choose where many require a fee to reserve); E (10)(a) (failure of a ticket agent that sells air tour packages to disclose that additional baggage fees may apply when a passenger books an air tour package without an identifiable carrier and the failure to disclose the passenger-specific fees for a carry-on bag, first checked bag, and second checked bag when the carrier is known); and E (10)(c) (failure of a ticket agent to display baggage fees in text form on the e-ticket confirmation that has traditionally applied to carriers).

(f) Stakeholder Comments and DOT Responses

*Comments:* Airlines and airline associations disagreed with the Department's proposed determination that not providing fee disclosures at the beginning of the ticket purchase process was an unfair and deceptive practice. Several airline commenters asserted that the Department did not provide adequate justification that consumers experienced or would likely experience substantial injury, as required by the analysis of an unfair practice. Spirit Airlines asserted that it already displays ancillary fees during the booking process, and that 95% of its customers advance past baggage selection pages, showing that concerns about injury are unfounded. A4A stated, "Every A4A passenger air carrier displays or makes available at first search results the ancillary fee information that DOT proposes for a consumer conducting an anonymous search in the direct channel via rollovers or links." [71] A4A also noted that the Department did not differentiate its unfair and deceptive practice analysis between airlines and ticket agents in the NPRM, and the

organization asserted that the rulemaking should be withdrawn with respect to airlines because consumer harm was avoidable. A4A, IATA, the National Air Carrier Association (NACA), and others asserted that the number of ancillary fee consumer complaints cited by the Department is too small to conclude substantial harm, and that the complaints do not evidence a lack of transparency. IATA and other airline associations asserted that consumers already understand that ancillary services are available for a fee, and because they have information on fees before they purchase tickets, there is no substantial harm. Similar statements were made by airline representatives at the ACPAC meeting held on December 8, 2022. At that meeting, a representative of IATA stated that the Department did not provide evidence that consumers do not know the price imposed for baggage before purchasing a ticket.

Airlines also asserted that the proscribed practices were not likely to mislead a consumer acting reasonably under the circumstances, as required by the analysis of a deceptive practice. Multiple airlines noted, for example, that because ancillary fees are already on airline websites, it was not reasonable to conclude that the non-display of fees during the initial itinerary search was deceptive. A4A commented that the Department did not use the right standard for a consumer "acting reasonably," as part of its deceptive practice analysis, and the organization asserted that the Department should instead use enforcement processes rather than rulemaking to address problematic fee disclosure practices.

Individual commenters and multiple State attorneys general asserted that airlines were treating consumers unfairly regarding fees and that consumers were likely to be misled by current disclosures. Some of these individual commenters expressed frustration about the ticket purchase process, noting that when they attempt to buy a ticket they view as being a particular cost, the total cost increases when fees are later added. One commenter noted that some consumers would realize they could not afford the total cost of a trip had they known about bag fees when they selected their ticket. One commenter noted that it would be extremely rare for a passenger to travel without any baggage at all. Another commenter self-identified as a frequent traveler and stated that understanding and paying for ancillary fees was confusing and frustrating, particularly on third-party applications. Multiple

State attorneys general commented that they hear every day from consumers who are deceived by "junk fees" and have launched education campaigns to protect consumers from hidden fees, junk fees, and drip pricing. The State attorneys general also noted that their offices receive numerous complaints about airlines' lack of disclosures of baggage and change and cancellation fees. FlyersRights stated that because airlines have increased the number and cost of ancillary fees, consumers are misled into believing that the cost of air travel will be cheaper than it is. The organization added that ancillary fees are often necessary for travel and used to be included in the base fare.

The Department received mixed comments from ticket agent representatives on its assertion that it is an unfair and deceptive practice not to provide disclosure of critical ancillary service fees before ticket purchase. The United States Tour Operators Association (USTOA) commented that the Department did not adequately demonstrate consumer harm, adding that consumers are aware that there are baggage fees and that there were few consumer complaints. As a metasearch entity, Google expressed its view that the Department did not explain how consumers were harmed by not having fee disclosures until the ticket purchase stage of the booking process and that consumers are aware of fees. Google also noted that the Department's sampling of consumer complaints did not show that the fee was not disclosed, but that consumers were surprised by the amount of the fees or the applicability of fees. However, ASTA commented that consumers are confused from airlines' unbundling their ancillary services, and that ancillary service fees remain difficult for consumers to discover and are hard to understand when they are found. ASTA added that ancillary fees are revealed too late in the search process to permit effective comparison shopping. Skyscanner stated that it shared the goal of enhancing competition and avoiding the unfair and deceptive practice of failing to inform consumers of the full cost of travel.

Ticket agents also commented on ensuring that they had access to ancillary fee data from airlines. One ticket agent commenter noted that consumers using third-party websites to purchase tickets may not have access to fee data and that lack of data provisioning is an unfair and deceptive practice. One metasearch entity commented that requiring data sharing with metasearch companies would reduce the risk that the transportation

---

[71] Comment of A4A, pages 17–18, *available at https://www.regulations.gov/comment/DOT-OST-2022-0109-0090.*

will be sold to consumers in an unfair or deceptive manner. As for airlines' view on data sharing, at the ACPAC meeting held on December 8, 2022, the airline representative noted the Department did not provide an unfair and deceptive practice analysis for its proposal on the sharing of fee information to ticket agents.

*DOT Response:* The Department has carefully considered the public comments on this issue and has determined that the practices identified in this rulemaking meet the elements of an unfair and deceptive practice. Those entities opposing the Department's position generally asserted that the Department did not provide sufficient evidence of substantial injury, that the Department relied on a small number of consumer complaints, that the consumer harm is avoidable as the fees are presented on airline websites, and that consumers are aware that ancillary fees exist. Other comments opposing the Department's position stated that consumers are not interested in ancillary fees when booking tickets and that the Department did not conduct an unfair and deceptive practice analysis regarding its data-sharing proposal. The Department disagrees that there is insufficient evidence of substantial injury. Consumer complaints are only one metric that the Department uses to gauge whether an unfair or deceptive practice is occurring. The Department also relies on the statements of consumer advocates, all of which have consistently expressed concern about consumer confusion over ancillary fees throughout the years that rulemaking has been contemplated on this subject. The Department finds it reasonable to rely on the statements of the many consumer advocates, State attorneys general, and consumer organizations as representative of the views of consumers, and, when further confirmed by consumer complaints, to determine that substantial harm is occurring or is likely to occur. These positions by consumers were reaffirmed in their comments to the NPRM. Comments submitted by members of the public in this rulemaking also clearly evidence that consumers are surprised by the amount of ancillary fees charged when they purchase tickets.

The Department also disagrees that the consumer harm is reasonably avoidable. While the fees for baggage and other ancillary services are provided on airline websites, such fees are not disclosed on ticket agent websites and are difficult to ascertain prior to ticket purchase. Ancillary fees, except for baggage, may be expressed in a range, and baggage fee structures are often complex and require charts and calculators to show the cost of fees. Some fees may also not be applicable to passengers who purchase tickets on one airline's website for flights that will be operated by a different airline.

The Department also disagrees with the premise that consumers are well-informed about airline fees. While many consumers may be aware of the existence of fees, a large number of consumers do not know the amount of the fees that will apply to them, given the complexity of fee structures. Comments from consumers affirm this belief, and Google and others acknowledged this fact in their comments. Having fee disclosures up front during the booking process would mitigate the consumer surprise at the level of fees to be imposed. The Department disagrees with the assertion that consumers not purchasing baggage fees during ticket purchase (or otherwise skipping pages that disclose baggage information) is indicative that they are not interested in baggage fees. Consumer advocates and commenters have noted that baggage is a critical ancillary service, and the decision not to purchase baggage services during the ticket purchase process does not mean that the consumer will not purchase a bag later or that the amount of the fee is not important to the consumer.

Regarding the airline representative's statement at the December 8, 2022, ACPAC meeting that the Department did not conduct an unfair or deceptive analysis of the data sharing proposal in the NPRM, the Department has determined in this final rule that failure to disclose baggage and change and cancellation fees to consumers as specified in the rule is an unfair and deceptive practice. The Department has also determined that the failure for a carrier to provide critical ancillary fee information to any entity required to disclose this information to consumers that displays or sells the carrier's flights directly to consumers to be an unfair practice. The Department's analysis complies with its regulations, which require an analysis supporting a conclusion that a practice is unfair or deceptive to consumers pursuant to 14 CFR 399.75(c). At the ACPAC meeting, the Department responded to the airline representative by noting that data sharing is related to the disclosure of fees because, without data sharing, the disclosure of fees would not be possible for a large segment of consumers. The Department provides its analysis of how the failure to share critical ancillary fee information is an unfair practice in section D (1)(d).

Finally, the Department disagrees with the suggestion that it should pursue enforcement action under its unfair and deceptive practices authority, rather than conducting a rulemaking. As stated by the Department at the December 8, 2022, ACPAC meeting, the airline representative's suggestion that the Department take enforcement action instead of conducting rulemaking would be difficult if the current regulation permits or does not address the practices that are of concern. The Department issues this regulation to address the inadequacy in the current regulation.

*(2) Other Authorities*

In carrying out aviation economic programs, including issuing this final rule under 49 U.S.C. 41712, the Department is required to consider the factors identified in 49 U.S.C. 40101 as being in the public interest and consistent with public convenience and necessity. Under 49 U.S.C. 40101(a)(4), the Department is required to consider the availability of a variety of adequate, economic, efficient, and low-priced services without unreasonable discrimination or unfair or deceptive practices as being in the public interest. Under section 40101(a)(9), it is also in the public interest to prevent unfair, deceptive, predatory, or anticompetitive practices in air transportation. The Department is also required by section 40101(a)(12) to consider as being in the public interest encouraging, developing, and maintaining an air transportation system relying on actual and potential competition to provide efficiency, innovation, and low prices.

Except for Southwest Airlines, airline commenters generally asserted that the Department's rulemaking would harm competition by, in their view, making it more difficult for consumers to view travel options. Ultra low-cost carriers also believed that the rule would undermine their business model of unbundling ancillary services from the cost of airfare. Airlines expressed the view that the popularity of unbundled offerings showed that consumers preferred those models and not that they were being deceived. Southwest Airlines stated that the number and complexity of fees by airlines made comparison shopping more difficult, and it commented that it was appropriate for the Department to reduce the complexity of disclosures.

Some ticket agents such as USTOA and metasearch entities such as Google stated that the existing marketplace provided transparency and that the rule would diminish consumer choice and competition. In contrast, others such as

ASTA commented that ancillary service fees are not accessible in a timely manner and that identifying the total travel cost is complex, confusing, and needlessly time-consuming for consumers. Travel Tech noted that, because ticket agents do not universally receive information on critical ancillary service fees from airlines, some ticket agents are currently unable to display those fees at any point in the booking process. Skyscanner commented that it strongly supports the Department's goal of making critical ancillary fees more transparent for consumers. Some ticket agents also noted that a lack of transactability of ancillary fees on ticket agent websites would disincentivize consumers from purchasing air travel on those websites.

Consumers generally stated that the rule would facilitate price comparison, encourage competition, and prevent airlines from using hidden fees to gain an unfair advantage. Consumer advocacy groups asserted that market competition requires transparency and informed consumers, with consumers benefiting from the availability of reliable fee information from multiple sources. One individual stated that the rule would reduce options and make travel less affordable.

After considering the public comments, the Department has determined that this rule serves the public interest as articulated above. This rule improves the transparency of airline pricing through the increased disclosure of fees for critical ancillary services during the itinerary search process. As carriers vary on their policies for such fees and such information is often not provided during the purchase process, consumers of air transportation may have difficulty understanding the actual and potential costs of accessing the air transportation between different carriers. By improving this transparency, this rule allows for better understanding of airline ticket pricing, of which these fees are often a critical component, thereby encouraging price competition. The Department acknowledges concern about screen clutter and a potential reduction in travel options being displayed to consumers; as such, the Department has adjusted its disclosure requirements from those proposed in the NPRM to allow for more flexibility in the manner of display of information and to reduce the potential for the harms identified by the commenters.

To answer the concerns of carriers, the Department believes that this rule does not undermine the business model of unbundled offerings. The rule does not prohibit such a model, and by improving the disclosure of fees associated with ancillary services, the Department believes that the rule helps to improve the model by making it more transparent to consumers. We do note that the unbundled model has proliferated in the marketplace, but we do not agree with commenters' assertion that this is evidence that the model is preferred by consumers and not that they are being deceived by airlines' current disclosure practices. The Department has presented its analysis of how a failure of carriers or tickets agents to provide the disclosures required in this final rule represents an unfair or deceptive practice.

We are also not persuaded by ticket agents' concern that a lack of transactability of ancillary fees would disincentivize purchases on ticket agents' websites. As noted in sections E (3)(c) and E (7), this final rule does not require the disclosure or transactability of family seating fees. The Department is considering issues related to family seating in a separate rulemaking.[72] This rule also does not require ticket agents to make the fees for a first checked bag, second checked bag, and carry-on bag transactable on ticket agent websites. Due to the post purchase price increase prohibition in 14 CFR 399.88, airlines are currently prevented from increasing the baggage fees that apply to a consumer's booking after the time of the consumer's ticket purchase. We have seen little evidence that consumers are choosing to forgo using ticket agent websites as a direct result of not being able to purchase baggage fees on those websites. These circumstances have predated this rule, and the Department does not believe that the addition of new critical ancillary fee disclosures during the purchase process will change that behavior.

## E. Comments and DOT Responses

### (1) Covered Entities

The Department proposed to cover U.S. air carriers; foreign air carriers; ticket agents that sell airline tickets, whether traditional brick-and-mortar travel agencies, corporate travel agents, or OTAs; and metasearch sites that display airline flight search options directly to consumers. The Department proposed that GDSs would not be covered by the proposal as GDSs arrange for air transportation but do not sell or display a carrier's fare to consumers.

This final rule covers U.S. and foreign air carriers as proposed. It also covers ticket agents that sell or display airline tickets, except for corporate travel agents, which are excluded from coverage for the reasons explained later in this document. This rule does not make a determination on whether metasearch entities and aggregators that advertise, but do not sell, airline tickets, are ticket agents and would thus be covered by this rule. However, if the Department were to determine in a separate rulemaking[73] that metasearch entities and aggregators are ticket agents as defined in 49 U.S.C. 40102(a)(45), then they would be covered by this rule as well.[74] The Department's response to comments about which entities should be covered by this final rule and explanations for all modifications from the NPRM are described in the sections that follow. Discussion of which operations and online platforms of covered entities are covered by this final rule is provided in section E (2).

### (a) U.S. and Foreign Air Carriers

*Proposal:* The Department proposed fee and policy disclosure of critical ancillary services by U.S. and foreign carriers during the booking process when fare and schedule information is provided. In addition, the Department proposed to require that the carriers provide the fee information for critical ancillary services to ticket agents that sell or display the airlines' fare and schedule information.

*Comments:* A4A stated that "DOT data does not demonstrate the existence of any significant problems with airline ancillary-fee transparency, and therefore this NPRM as applied to airlines should be withdrawn." According to A4A, the regulation of airlines is unnecessary because airlines already disclose fees for critical ancillary services. A4A added that any unfair or deceptive practices occur on indirect channels (*e.g.*, OTAs, metasearch sites, "traditional" travel agencies, and travel management companies). An individual commenter stated that the rule appeared to be focused on problems with disclosures by large U.S. carriers, suggesting that the rule should not cover other entities like foreign carriers and small network carriers.

---

[72] See *https://www.transportation.gov/regulations/report-on-significant-rulemakings.*

[73] Air Transportation Consumer Protection Requirements for Ticket Agents (RIN 2015–AE57), (abstract explains that this rulemaking would address whether to codify in regulation a definition of "ticket agent" and whether to require large ticket agents to adopt minimum customer service standards), Fall 2023 Unified Agenda of Regulatory and Deregulatory Action at *https://www.reginfo.gov/public/do/eAgendaViewRule?pubId=202310&RIN=2105-AE57.*

[74] 49 U.S.C. 40102(a)(45) defines a ticket agent as "a person (except an air carrier, a foreign air carrier, or an employee of an air carrier or foreign air carrier) that as a principal or agent sells, offers for sale, negotiates for, or holds itself out as selling, providing, or arranging for, air transportation."

*DOT Response:* This final rule covers U.S. and foreign air carriers because the issue of lack of transparency of airline ancillary service fees is not limited to indirect channels as asserted by airline commenters or limited to large U.S. carriers as suggested by an individual commenter. The Department wants to ensure that consumers know, when fare and schedule information is provided during the booking process, the fees charged for transporting a first and second checked bag, transporting a carry-on bag, and canceling or changing a flight whether they are purchasing the ticket from an airline or a ticket agent. Approximately 45% of tickets are sold by airlines directly to consumers, and the remainder is sold through ticket agents,[75] so it is important to cover not only ticket agents but also carriers. Further, it is important to ensure that consumers purchasing air transportation from small carriers or foreign air carriers that fly to and from the U.S. are protected from unfair and deceptive practices equal to those purchasing tickets from U.S. carriers and ticket agents. Accordingly, as discussed in section D, the unfair and deceptive practices that the Department is addressing in this final rule relate to ticket agents and carriers regardless of the carrier's size or country affiliation for flights to, within, and from the U.S.

**(b) Ticket Agents That Sell Air Transportation**

*Proposal:* The Department proposed to require all ticket agents that sell air transportation, including corporate travel agents, to disclose to consumers the fees and policies for ancillary services that are critical to a consumer's purchasing decision. The Department solicited comments in the NPRM on whether it should exclude corporate travel agents from coverage of the final rule because the display content for such agents is typically negotiated by the business client involved.

*Comments:* The Department's proposal to apply the transparency requirements regarding critical ancillary services to ticket agents that sell air transportation was challenged only as it relates to corporate travel agents and small ticket agents. Consumer groups, including the U.S. PIRG Education Fund, generally supported covering ticket agents. An individual commenter asked the Department to clarify that OTAs have responsibility for the disclosure of ancillary fees provided on their websites because carriers lack

control over the display of information on those sites. Some airlines and organizations, including Spirit Airlines and A4A, expressed concerns about the accuracy of disclosures on ticket agent websites, and Southwest Airlines supported extending disclosure requirements to ticket agents. Allied Tour & Travel, a small ticket agent, expressed concerns about the burden of compliance for small tour operators that include airfare in a travel package.

Regarding corporate travel agents, multiple ticket agent associations asked the Department to exclude them from the final rule's coverage. These commenters generally stated that the Department should exempt corporate travel agents from the final rule's requirements because ancillary fee disclosures by those agents are the subject of contractual agreement between a business client and the travel agent, with the relevant ancillary services and fees negotiated as part of the contract. The Travel Management Coalition (TMC) testified at the Department's March 30, 2023, public hearing that its customers are frequent travelers, often use the same routes, and are highly familiar with ancillary fee information. In addition, Travel Tech commented that certain ancillary fees, like family seating fees, are irrelevant for corporate clients, and others, including baggage fees and flight change fees, are not a significant consideration in corporate travelers' purchasing decisions. TMC agreed that its customers rarely check bags or travel with children. Further, ASTA noted that the corporate client, not the business traveler, generally pays the cost of transportation, including fees.

These commenters also cited various precedents for treating business travel differently under consumer protection laws. ASTA and Travel Tech stated that the exclusion for corporate travel agents would be consistent with the European Union's framework, and TMC testified that Congress recognized the distinction between corporate and public travel in the FAA Reauthorization Act of 2018 (2018 FAA Act) by creating an exemption from certain customer service requirements if the sale of an airfare was made pursuant to a corporate contract.

Travel Tech, ASTA, and TMC suggested that the Department define "corporate travel agent" for purposes of a regulatory exclusion as a travel agency "engaged in the provision of travel services primarily to business entities pursuant to a written contract for the business travel of such business entities' employees." GBTA instead recommended that the Department

exempt what it termed "private" and "consortia/agency fares" in the final rule. It asked that DOT consider private fares to be "[d]iscounted or lane (fixed fares between two cities/airports) fares negotiated by travel managers that the airline 'files' with [the Airline Tariff Publishing Company (ATPCO)], to be made available to the organization's agencies of record, as documented in the airline contract, for their travelers to book online or offline." GBTA further suggested that the Department define "consortia fares/agency fares" as proprietary fares negotiated by mega agencies and consortia[76] offered to customers as an alternative to published fares.

In contrast, American Airlines urged the Department not to adopt an exception for corporate travel agents. The airline's comment stated that it is unreasonable and potentially infeasible to exempt corporate travel agents because few serve exclusively corporate travelers for corporate travel and consumers increasingly book travel that combines business and personal travel.

*DOT Response:* The Department continues to apply the requirements to disclose critical ancillary service fees and policies to ticket agents that sell air transportation; however, the Department is excluding corporate travel agents from these requirements. In excluding corporate travel agents from coverage of this final rule, the Department is agreeing with commenters that there is no need for DOT to apply transparency rules for corporate travel arrangements that are contractually entered into by sophisticated entities.

In this rule, the Department is adopting the definition of corporate travel agent as proposed by Travel Tech, ASTA, and TMC, with some modifications. This final rule defines corporate travel agent as a ticket agent that provides travel services to the employees of a business entity pursuant to a written contract with that entity for the business travel of its employees. The "ticket agent" need not be a single travel agent to meet the definition in this final rule, but could instead be a consortium of travel agents, as suggested in GBTA's comment.

While some commenters recommended that DOT exclude corporate travel agents if they are primarily engaged in such activity, the

[75] ACPAC Meeting Minutes (June 28, 2022), p. 13 at *https://www.regulations.gov/document/DOT-OST-2018-0190-0073.*

[76] A travel consortium is a collection of independent travel agencies that combine resources to increase their visibility, revenue, and marketing opportunities. The independent travel agencies that are part of a consortia are known as "mega-agencies" and can offer their customers a consortia rate, which is a preferred negotiated or partnership rate.

Department instead adopts a transaction-specific approach and is applying this rule to ticket agents that are not acting as corporate travel agents in the specific transaction at issue. Under the final rule, if a ticket agent acts entirely as a corporate travel agent with respect to a transaction or a corporate flight booking portal, for example, then the rule's ancillary fee disclosure requirements would not apply for that transaction or on that booking portal. Because ticket agents may act as a corporate travel agent with respect to certain clients and also have booking systems available to the general public, this rule does not exclude a ticket agent that sells air transportation from the requirement to display fees or policies for critical ancillary services due to that agent's "primary" activity as a corporate travel agent. This approach ensures information about critical ancillary services are not improperly excluded from leisure travelers who are not covered by a contractual agreement. A transaction-specific approach prevents consumer confusion from the presence of inconsistent information offered on different platforms.

This transaction-specific approach also addresses the concerns raised by American Airlines that few travel agents serve exclusively business clients. Those travel agents that provide airfare sales exclusively to business entities under a written contract for the business travel of the business entities' employees would be fully excluded from the rule's requirements. Those travel agents engaged in a mix of business and non-business sales would need to provide the ancillary fee disclosures required by this final rule to any traveler selecting flights who is not engaged in business travel covered by a written contract.

As for section 427 of 2018 FAA Act, which was cited by TMC in support of its request for an exclusion, it demonstrates that exclusion from consumer protection requirements for sales made pursuant to corporate contracts is not unusual. Section 427 provides protection from enforcement for noncompliance of any customer service standard or requirement in a DOT final rule that requires ticket agents to adopt customer service standards applicable to carriers to the extent "the sale of air transportation is made . . . pursuant to a specific corporate or government fare management contract." While the Department is addressing the issue of whether to require ticket agents to adopt minimum customer service standards applicable to carriers in another

rulemaking,[77] the Department agrees with TMC that section 427 differentiates between corporate and public travel.

Regarding Allied Tour & Travel's comment, the Department has determined that the disclosures required by this rule should apply to ticket agents, regardless of size. Creating different standards based on the ticket agent's size would add to consumer confusion, as noted earlier, due to the presence of inconsistent information on different platforms. In consideration of the potential for varying degrees of burden, however, this final rule provides those ticket agents that meet the SBA definition of a small entity with additional time to comply with the rule's requirements beyond the time permitted for other ticket agents, in recognition that it may take additional time for small ticket agents to comply with new disclosures (discussed in section F).

(c) Metasearch Sites

*Proposal:* The Department proposed to require entities that do not sell airline tickets but display airline flight search options directly to consumers (*i.e.,* metasearch sites) to display critical ancillary service fees when fare and schedule information is provided. The Department proposal treated metasearch entities as ticket agents.

*Comments:* Multiple metasearch entities, CCIA, and Travel Tech expressed their view that metasearch entities do not meet the statutory definition of "ticket agent," and should not be subject to the rule because they do not sell air transportation. Booking Holdings also noted that many parts of the proposed rule, such as the transactability of family seating fees, were inapplicable to metasearch sites as they do not sell tickets. CCIA also raised privacy and security concerns about the possibility that such entities would need to handle personal or payment information, which they do not handle today. Google added that it does not currently collect passenger information and expressed concern that it would need to do so under the proposed rule to verify passenger identities.

Metasearch entities, as well as CCIA and Travel Tech, also overwhelmingly disagreed with the NPRM's proposal that metasearch entities be covered under the rule. CCIA, for example, stated in written comments and at public meetings that metasearch entities should be excluded from the rule's

disclosure requirements because they do not have access to fee information and the rule's disclosure requirements would clutter and negatively impact displays, on which aggregators and metasearch entities compete. Booking Holdings added that a prescriptive approach to metasearch displays will reduce the number of routes offered as part of the initial itinerary search results and have a detrimental effect on competition. It stated that metasearch entities should be afforded flexibility in fee disclosures to ensure they provide innovative and interactive displays for consumers to quickly be able to understand available travel options.

From the airline perspective, Southwest Airlines expressed support for applying fee disclosure requirements to metasearch entities, noting that they are an important source of information and that the disclosure rules should apply to them to mitigate consumer confusion on fees. The airline added that section 427 of the 2018 FAA Act directed the Department to apply consistent consumer protection requirements to all large ticket agents to the extent feasible.

*DOT Response:* The Department recognizes the important role metasearch entities play in providing information to consumers and facilitating comparison shopping. As stated previously, the Department is undertaking this rulemaking pursuant to its authority to prohibit carriers and ticket agents from engaging in unfair or deceptive practices. Under 49 U.S.C. 40102(a)(45), a ticket agent is "a person (except an air carrier, a foreign air carrier, or an employee of an air carrier or foreign air carrier) that as a principal or agent sells, offers for sale, negotiates for, or holds itself out as selling, providing, or arranging for, air transportation." Also as noted by Southwest Airlines in its comment, section 427 of the 2018 FAA Act [78] calls for a consistent level of consumer protection regardless of where consumers purchase airfares and related air transportation services. The Act uses section 40102(a)(45)'s existing definition of "ticket agent" and clarifies that the term includes "a person who acts as an intermediary involved in the sale of air transportation directly or indirectly to consumers, including by operating an electronic airline information system, if the person—(i) holds the person out as a source of information about, or reservations for, the air transportation industry; and (ii) receives compensation in any way related to the sale of air transportation."

[77] *See* Air Transportation Consumer Protection Requirements for Ticket Agents (RIN 2015–AE57) at *https://www.reginfo.gov/public/do/eAgendaViewRule?pubId=202310&RIN=2105-AE57.*

[78] Public Law 115–254 (Oct. 5, 2018).

Section 427 directs the Department to use this definition when issuing its final rule requiring ticket agents to adopt customer service standards.[79] The Department is deferring to that rulemaking its determination of whether metasearch sites that do not sell airline tickets but display airline flight search options directly to consumers are ticket agents that must disclose ancillary fee information required.

During the pendency of that separate rulemaking, although the Department's Office of Aviation Consumer Protection (OACP) has enforced the Department's aviation consumer protection rules against metasearch entities in the past based on its view that metasearch entities are ticket agents,[80] OACP will not enforce the disclosure requirements in this rulemaking against metasearch entities. This enforcement position notwithstanding, the Department encourages airlines and metasearch sites to enter into voluntary agreements to share critical ancillary fee information and for metasearch entities to voluntarily disclose this information to consumers with the fare and schedule information while further regulatory action is under consideration. The Department also notes that the Federal Trade Commission has concurrent jurisdiction over ticket agents and has the authority to both determine whether metasearch entities are ticket agents and take action against ticket agents as well as entities that are not ticket agents irrespective of DOT action.

To ensure consumers have access to critical ancillary service fee information upfront, while the Department considers the status of metasearch entities in a separate rulemaking, the Department is requiring that airlines and ticket agents that sell air transportation disclose critical ancillary service fees on the first page of their website or other online platforms to which consumers are directed after searching for flight options on a metasearch site unless the consumer was already provided accurate fee information on the metasearch site. In many cases, airlines and ticket agents that provide fare, schedule, and availability information to metasearch entities permit the metasearch entity to electronically direct consumers to a page on the airline or ticket agent's website that does not require the consumer to initiate a new itinerary search. Because consumers directed to an airline's or ticket agent's website or other online platform from a separate metasearch site may not have an opportunity to view the critical ancillary service fees that apply to them, this rule requires that airlines and ticket agents display the required critical ancillary service fee information on the landing page on the airline or ticket agent's online platform to which consumers are directed after using a metasearch site. The rule permits an exception in situations where the consumer was provided accurate critical ancillary service fee information on the referring entity's website.

The Department considers it to be an unfair and deceptive practice for a carrier or ticket agent that sells air transportation to fail to make critical ancillary fee disclosures at the first page of its website or other online platform to which a consumer is directed after searching for flights on a metasearch site where that information is not accurately provided. As discussed in section D (1), consumers are substantially harmed if critical ancillary fee information is not provided to them early in the search process, as ancillary fees such as baggage, change, and cancellation fees are critical to consumers' purchasing decisions and may make up a significant portion of the total cost of travel. The harm is not reasonably avoidable because consumers will likely not be able to determine the fee for critical ancillary services even if a consumer expends time and effort by leaving the booking system to try to determine the fees that apply to the itinerary. Typically, carriers provide change and cancellation fees as a range when viewed outside of the booking process. Consumer advocates have also shared with the Department that consumers have difficulty determining the fee for transporting a carry-on bag, a first checked bag, and second checked bag because baggage fee structures are often complex and require charts and calculators to figure out the fees. The lack of fee information is not outweighed by countervailing benefits to competition or consumers. In fact, the lack of information hinders consumers from being able to understand the true cost of their travel and harms competition, rather than benefiting it. The practice is also deceptive because a reasonable consumer would be misled to believing the cost of the travel is lower than what the true cost is if the fees for critical ancillary services are excluded. The disclosure of the fees is material because the fees could affect the consumer's decision on whether to purchase an airline ticket and if so, which airline to select.

If metasearch entities are ultimately deemed to be ticket agents subject to this rule, the Department believes that concerns about screen clutter and impacts on innovation have been adequately addressed by the changes the Department has made to the final rule after considering public comments. As noted in this preamble, the final rule provides increased flexibility on method of display of critical ancillary fees, and it does not require the disclosure or transactability of family seating fees.

Regarding concerns about privacy and security of consumer data by metasearch entities, while fee disclosures must be passenger-specific if the consumer affirmatively provides information regarding their status (*e.g.*, frequent flyer status, military status, credit card holder status), such consumer-supplied information is not required to be validated before fees are displayed. Entities covered by this rule are required to disclose passenger-specific fee information based on the status that a consumer purports to have when conducting an itinerary search, regardless of whether the consumer holds such status. The rule does not require entities to collect passenger name, frequent flyer number, or credit card information, and does not implicate the privacy or security concerns raised by metasearch entities. See discussion on passenger-specific information in section E (5).

### (2) Covered Operations

*Proposal:* The Department proposed to require fee and policy disclosures of critical ancillary services by airlines and ticket agents on websites marketed to U.S. consumers where air transportation is advertised or sold. On whether a website is "marketed to U.S. consumers," the Department noted in the NPRM that the determination would be based on a variety of factors—for example, whether the website is in English, whether the seller of air transportation displays prices in U.S. dollars, or whether the seller has an option on its website that differentiates sites or pages designed for the United States. In addition to the website disclosures, the Department proposed similar disclosures of critical ancillary services by U.S. and foreign carriers for tickets purchased by telephone or in-person for flights to, within, or from the United States. On fee information distribution, the Department proposed to require that airlines provide fee and policy information about critical ancillary services to ticket agents that sell or display airlines' fare or schedule information for air transportation to, from, or within the United States.

[79] *See* Air Transportation Consumer Protection Requirements for Ticket Agents (RIN 2015–AE57) at *https://www.reginfo.gov/public/do/eAgenda ViewRule?pubId=202310&RIN=2105-AE57.*

[80] *See, e.g.,* DOT Order 2022–2–6 (FlightHub Group, Inc., et al.) (Feb. 9, 2022).

*Comments:* Air Canada commented that the scope of the rule was broad, and that covering websites marketed to U.S. consumers could result in small ticket agents in foreign jurisdictions leaving the U.S. market because they cannot afford the upfront costs. The airline also expressed concern regarding possible conflicts with foreign consumer protection laws such as those in the European Union.

Among ticket agent and metasearch stakeholders, Travel Tech and Skyscanner expressed agreement with the Department that the rule should apply only to those websites designed for use by U.S. consumers. Skyscanner also suggested that the rule's definition of a "consumer" should be limited to consumers physically located in the United States when searching for or purchasing tickets. Similar to Air Canada, Skyscanner argued that covering consumers not physically in the United States risks legal conflict with consumer protection regulations in other countries.

Booking Holdings said that the proposed disclosures can be required only when a passenger searches for air transportation and added that air transportation as defined by statute does not apply to flights wholly between two foreign points which it interprets as meaning that passengers in the United States who search for flights between two foreign points are not entitled to receive the disclosures set forth in this rule. Skyscanner called for clarification on whether the rule would apply to foreign carriers serving non-U.S. points on flights carrying a U.S. carrier code, expressing the view that foreign carrier flights between non-U.S. points should not be subject to this rule when not carrying a U.S. carrier code, even if the flight can be booked on a website marketed to U.S. consumers.

*DOT Response:* After carefully considering the public comments, the Department has decided to require fee and policy disclosures of critical ancillary services by airlines and ticket agents if they market to consumers in the United States. Under these circumstances, the final rule requires airlines and ticket agents to disclose the fees for critical ancillary services on airlines' or ticket agents' websites and other online platforms such as mobile applications (apps). It also requires airlines and ticket agents to disclose critical ancillary fees to consumers during an in-person or telephone discussion about an airline's fare and schedule if they market to U.S. consumers. The Department has used the phrase "marketed to U.S. consumers" and similar terminology in

other aviation consumer protection and civil rights regulations applicable to websites.[81]

In one of these rulemakings, the Department explained that the characteristics of a "website that markets air transportation to the general public inside the United States includes, but is not limited to, a site that: (1) contains an option to view content in English, (2) advertises or sells flights operating to, from, or within the United States, and (3) displays fares in U.S. dollars."[82] The Department further explained "that non-English (*e.g.,* Spanish) websites targeting a U.S. market segment would also be covered; whereas websites that block sales to customers with U.S. addresses or telephone numbers, even if in English, would not."[83] Similarly, in this rulemaking, the Department stated that it would consider a variety of factors to determine whether a website is marketed to U.S. consumers, including whether the website is in English, whether the seller of air transportation displays prices in U.S. dollars, or whether the seller has an option on its website that differentiates sites or pages designed for the United States.[84] This final rule applies the same factors in determining whether tickets are marketed to U.S. consumers in-person and by phone. This final rule's applicability to online and offline platforms marketed to U.S. consumers is consistent with the Department's longstanding position.

We have also considered the comments on the scope of air transportation for tickets that include flight segments between two foreign points. Congress authorized the Department to prevent unfair or deceptive practices or unfair methods of competition in air transportation,[85] which includes interstate air transportation[86] and foreign air

transportation.[87] The phrase "when any part of the transportation is by aircraft" is used in the definition of foreign air transportation, which evidences an understanding that foreign air transportation is not limited to a single flight segment between the United States and a foreign country, but that it can be composed of "parts," including trips with stopover points and/or flights between two foreign points, provided that the passenger's overall journey is between a place in the United States and a place outside the United States. However, the Department agrees with commenters that flights between two foreign points with no connection to the United States are not foreign air transportation, and the requirements in this rule do not apply to such flights. The Department has determined that "foreign air transportation" includes journeys to or from the United States with brief and incidental stopover(s) at a foreign point without breaking the journey.

For purposes of this final rule, we define a break in journey to mean a deliberate interruption by a passenger of a journey between a point in the United States and a point in a foreign country where there is a stopover at a foreign point scheduled. The Department determines whether a stopover is a deliberate interruption depending on various factors such as whether the segment between two foreign points and the segment between a foreign point and the United States were purchased in a single transaction and as a single ticket/ itinerary, whether the segment between two foreign points is operated or marketed by a carrier that has no codeshare or interline agreement with the carrier operating or marketing the segment to or from the United States, and whether the stopover at a foreign point involves the passenger picking up checked baggage, leaving the airport, and continuing the next segment after a substantial amount of time. For example, a passenger that is traveling on a single ticket that originates or terminates in the United States but also includes travel between two foreign points on a flight marketed with a U.S. carrier code would be considered traveling in foreign air transportation. We believe this approach fully

---

[81] *See, e.g.,* 14 CFR 259.6, 259.7, and 382.43(c), and existing regulation 14 CFR 399.85(d).

[82] 78 FR 67882, 67886 (Nov. 12, 2013).

[83] *Id.*

[84] 87 FR 63718, 63725 (Oct. 20, 2022).

[85] 49 U.S.C. 40102(a)(5) defines "air transportation" as foreign air transportation, interstate air transportation, or the transportation of mail by aircraft.

[86] 49 U.S.C. 40102(a)(25) defines "interstate transportation" as the transportation of passengers or property by aircraft as a common carrier for compensation, or the transportation of mail by aircraft between a place in a State, territory, or possession of the United States and (i) a place in the District of Columbia or another State, territory, or possession of the United States; (ii) Hawaii and another place in Hawaii through the airspace over a place outside Hawaii; (iii) the District of Columbia and another place in the District of Columbia; or (iv) a territory or possession of the United States and another place in the same territory or

possession; and when any part of the transportation is by aircraft.

[87] 49 U.S.C. 40102(a)(23) defines "foreign air transportation" as the transportation of passengers or property by aircraft as a common carrier for compensation, or the transportation of mail by aircraft, between a place in the United States and a place outside of the United States when any part of the transportation is by aircraft.

addresses the extraterritoriality concerns raised by some commenters.

Regarding comments suggesting that the Department's requirements apply only to consumers residing in the United States, we disagree. The Department's authority to prevent unfair or deceptive practices or unfair methods of competition in air transportation is not limited to aviation consumers who are residents of the United States. The Department acknowledges Air Canada and Skyscanner's concern about the potential for conflict with international requirements. However, there has not been evidence provided that covering consumers not physically in the United States risks legal conflict with consumer protection regulations in other countries as the commenters assert. Further, although the protection of this rule is not limited to consumers who reside in the United States, this rule only applies to airlines and ticket agents if they market to consumers in the United States.

In response to Air Canada's concern that small ticket agents in foreign jurisdictions may leave the U.S. market, the Department is of the view that entities that participate in the U.S. market by marketing to U.S. consumers must comply with the same consumer protection requirements to ensure consumers know the fees charged for critical ancillary services upfront regardless of where consumers purchase air fares and related transportation services. This helps to mitigate the potential for surprise fees that can add up and quickly overcome what may, at first, look like a cheap ticket.

*(3) Critical Ancillary Services*

*Proposal:* The Department proposed to require carriers and ticket agents disclose upfront fee and policy information for all ancillary services critical to a consumer's air transportation purchasing decisions. The Department proposed to treat the following ancillary services as critical: transporting a first checked, second checked, and/or carry-on baggage, changing or canceling a reservation, and obtaining adjacent seating when traveling with a young child (*i.e.,* family seating), but it did not propose a definition of "critical ancillary service." The Department solicited comment on whether its proposed list of critical ancillary fees should be expanded or limited, how to address future adoption by airlines of additional ancillary service fees, and how to ensure their disclosure to the extent that they are of critical importance to consumers.

*General Comments:* Several airlines and associations questioned the

Department's basis for selecting those ancillary fees classified as "critical" in the NPRM and not others. For example, United Airlines stated that the list of ancillary fees that the Department proposed to consider critical was "arbitrary and perplexing" and added that it was unclear why DOT had proposed to treat the selected ancillary service fees as critical and not others, such as "advanced seat assignments, preferential seating, charges for boarding passes, and charges for basic onboard refreshments like water, coffee, and sodas." Similarly, Air Canada listed "advanced seat selection, access to in-flight entertainment, in-flight meals, and lounge access" as other fees that could be disclosed and stated that "to meet the goal of allowing consumers to have full cost information . . . all ancillary fees of every kind would have to be included on the first page," which it acknowledged would be "impossible." Finally, IATA asked the Department "to set forth in greater detail [its] determination that these [proposed] optional services are indeed 'critical.' "

A few airline commenters also stated that the selection of fees would disadvantage ultra-low-cost carriers (ULCCs). For example, United Airlines stated, "[w]hether intentional or not, the Department's choice of 'critical' ancillary fees seems to arbitrarily favor carriers who bundle those particular services and disfavors other airlines, particularly [ULCCs]," adding that the "rulemaking ultimately could cause a global increase in ticket prices by incentivizing all carriers to include those services in the cost of a ticket even though most passengers do not use the services." Frontier Airlines also expressed a similar view at the Department's March 30, 2023, public hearing and in its written comments. Frontier Airlines added that, in its view, unbundling is more transparent, economically efficient, and lower cost for consumers, who do not need to pay for ancillary services they will not use.

A comment from FlyersRights and a joint comment from multiple groups representing consumers recommended that, instead of requiring separate disclosure of ancillary fees, the Department require ticket sellers to allow consumers to select their desired ancillary services and then provide a single total fare inclusive of the selected ancillary services. The joint comment stated that its proposal would allow consumers to "compare search results more immediately and accurately," avoiding clutter and unnecessary calculations by consumers. Consumer groups also suggested that the Department require disclosure of

ancillary service fees that may in the future become more prevalent or may be of particular importance to consumers.

Comments regarding each of the ancillary services that the Department proposed to consider critical to consumers' purchasing decisions and comments on additional ancillary services are discussed in sections E (3)(a) through E (3)(d).

*DOT Response:* The Department has determined that it is appropriate to provide a definition of "critical ancillary service" in this final rule. This final rule defines critical ancillary service to mean "any ancillary service that is critical to consumers' purchasing decisions" and identifies transporting the first checked bag, second checked bag, and carry-on bag and changing and cancelling a reservation as critical ancillary services. In addition, the Department addresses the potential for future adoption by airlines of additional ancillary service fees that may be critical to consumers' purchasing decisions by including in the definition of critical ancillary service "any other services determined, after notice and opportunity to comment, to be critical by the Secretary."

Regarding the impact of this rule on ULCCs, the Department does not agree with some commenters' view that this rule will unfairly disadvantage ULCCs. Rather than placing ULCCs at a competitive disadvantage, the Department expects that this rule will promote competition by making fees for critical ancillary services more transparent for consumers. This will allow consumers to evaluate whether to purchase air transportation on a given carrier, including a ULCC, with the benefit of more complete up-front pricing information. Given the benefits of the "unbundled" ULCC model that Frontier and others touted in their comments, improved transparency should not cause ULCCs to fundamentally alter such a business model (*i.e.,* changing from an unbundled model to a bundled model). Moreover, nothing in this final rule requires them to do so.

The Department is not adopting in this final rule the recommendation of some consumer organizations to require airlines and ticket agents to display a total fare that is inclusive of all ancillary fees selected by the consumer. Currently, some airlines apply different baggage fees depending on when and where the ancillary service is purchased (*e.g.,* in advance, at the airport, etc.), which may make display of a single fare, inclusive of baggage fees, impracticable. In addition, requiring a ticket agent to display a total "fare" that

includes baggage that cannot be purchased with the ticket on its site could result in consumer confusion about the cost of the fare purchased and what it includes.[88] Further, change and cancellation fees, which also may vary based on the circumstances of the change or cancellation for any given ticket, may be less useful incorporated into the fare presented because the consumer is unlikely to know at the time of ticket purchase whether they will change or cancel their ticket, and the applicability of certain fees may be mutually exclusive (*e.g.,* a fee to cancel a ticket 30 days in advance and a fee to cancel a ticket on the day of travel cannot both be imposed).

(a) Transporting First Checked Bag, Second Checked Bag, and Carry-On Bag

*Proposal:* The Department proposed to treat fees for a first checked, second checked, and a carry-on bag as critical ancillary fees that airlines and ticket agents must disclose to consumers with fare and schedule information. This proposal was intended to replace the existing requirement for carriers and ticket agents to provide a generic notice during the booking process that baggage fees may apply and where the consumer can find these fees on the carrier's website.

In proposing to treat fees for a first checked bag, second checked bag, and carry-on bag as critical, the Department noted that consumer commenters to the Department's 2014 NPRM most commonly identified these baggage fees as critical, and such fees continue to serve as a leading source of consumer complaints regarding ancillary fees to the Department.[89] The Department further explained that the cost of baggage fees is often material to consumers and likely to affect their purchasing decisions. In addition, the Department noted that, although the 2011 final rule improved consumer access to baggage fee information by requiring airlines and ticket agents to display the fees for first checked, second checked, and carry-on bags on their websites, airlines and ticket agents often disclose those fees in static form in charts that are confusing to consumers and may be provided outside of the booking flow. The Department also noted that consumers continue to report

confusion regarding the total cost of baggage fees in connection with complex itineraries, interline tickets, and codeshare flights.

*Comments:* Industry commenters were split on whether the fees for first checked bag, second checked bag, and carry-on bag are critical to consumer's purchasing decisions. Airlines and airline associations generally took the position that such fees were not critical. Some ticket agents agreed with the Department's preliminary conclusion that fees for first checked bag second checked bag, and carry-on bag are critical; other ticket agents disagreed.

Industry commenters who stated that fees for first checked bag, second checked bag, and carry-on bag are not critical to consumers' purchasing decisions asserted that such fees are already available under existing industry practices and regulatory requirements and that consumers are aware of the existence of baggage fees. For example, Air Canada stated that "baggage fee information is already transparent and fully disclosed on a carrier's website where passengers have easy access to relevant information," citing to its own general baggage fee disclosures. Frontier Airlines noted that it discloses ancillary fee information to consumers during the booking process before purchase. Similarly, American Airlines commented that it currently provides itinerary- or passenger-specific baggage fees before purchase, and IATA stated at the Department's March 30, 2023, public hearing that one large international carrier found that 98 percent of the visits to that airline's websites exposed passengers to the pages with fees on baggage, seat selection, and refund policies, while the remaining two percent of consumers did not go far enough in the booking flow to see these fees. At that hearing, A4A added that many consumers are members of loyalty programs and are already aware of the ancillary structures of their preferred carriers. Further, Air Canada commented that the decrease in checked baggage and increase in carry-on baggage since the addition of checked baggage fees—documented in a GAO study that the Department cited in the NPRM—"supports a logical conclusion that consumers are evidently aware of checked-baggage fees." Air Canada also stated, however, that "[c]alculation of baggage fees is a complex process and the display of this information on the first page where fares are shown cannot be calculated in certain instances until the carriers are chosen, such as on a multi-carrier itinerary." IATA raised similar concerns

about the complexity of calculating these fees.

These commenters added that, in their view, the number of complaints related to baggage fee disclosures and the number of passengers who travel without baggage demonstrate that such fees are not critical. For example, Frontier Airlines asserted that the number of baggage fee complaints received by the Department was "de minimis." Similarly, IATA testified at the Department's March 30, 2023, public hearing that in 2022, 3.64 percent of airline complaints related to baggage, with a vast majority pertaining to baggage fee refunds, and Booking Holdings reported that approximately 0.1 percent of the U.S. complaints received by Priceline in 2022 related to baggage fees. In addition, A4A testified at the Department's March 30, 2023, hearing that the lack of civil penalties against U.S. airlines demonstrated the absence of a market failure requiring additional regulation. Frontier Airlines further stated in its hearing testimony and in written comments that over 40 percent of Frontier's passengers do not pay any seating and baggage fees, fewer than 30 percent purchase a first checked bag, fewer than five percent purchase a second checked bag, and fewer than 20 percent purchase a carry-on bag. Further, American Airlines commented that "the majority of travelers on American do not check *any* luggage, and less than a quarter of travelers on American [Airlines] actually have to pay for any checked bags."

A lack of use by consumers of Google's baggage filter tool was also cited by A4A in its testimony at the Department's March 30, 2023, hearing as evidence that baggage fees are not critical to consumers' purchasing decisions. Google had commented that only 1.3 percent of the consumers conducting a search on Google Flights use a feature that enables consumers to integrate bag fees into the displayed costs for flights. Google provided this data to support its suggestion that the Department "consider deferring the disclosure [of ancillary service fees] until after a specific itinerary has been selected." Google did not assert that transporting baggage is not a critical ancillary service. Further, in a supplemental response, Google presented the results of a 2018 survey it conducted of U.S. consumers which showed that 54% of people decide about baggage for travel prior to ticket purchase.

Similarly, other industry commenters who agreed with the Department's preliminary conclusion that fees for first

---

[88] This final rule does not require baggage fees to be transactable by ticket agents for the reasons discussed in section E (7).

[89] *See* Number of Consumer Complaints Received by the U.S. Department of Transportation Office of Aviation Consumer Protection Regarding Ancillary Fees, 2019–May 31, 2023, available in docket at *https://www.regulations.gov/docket/DOT-OST-2022-0109.*

checked, second checked, and carry-on baggage are critical to consumers' purchasing decisions generally stated that baggage was the most common type of ancillary service used by consumers. For example, Travel Tech stated that ''baggage fees are the most important ancillary fees'' for most passengers because ''[a]lmost all airline passengers travel with some amount of baggage, whether carry-on or checked, and baggage fees often constitute a practical limit on what consumers can carry with them on trips or what they can bring back from a destination.'' Though it agreed that baggage fees are important to consumers, Travel Tech testified at the Department's March 30, 2023, public hearing that, based on a survey it conducted, 90 percent of U.S. adults are aware of the possibility of paying additional fees for optional services beyond the cost of their airline ticket. But Travel Tech acknowledged that the study did not ask whether consumers were aware of the amount of such fees. Also supporting the importance of baggage fees, Skyscanner reported that its internal user research demonstrated that ''many users are much more concerned about baggage allowances and fees than any single other type of ancillary fee,'' with 84 percent of surveyed users stating it was important to know whether a ticket price includes checked baggage. Similarly, Google reported that in a survey it conducted of U.S. consumers in 2018, 71 percent planned to check one bag, six percent planned to check more than one bag, and 21 percent did not plan to check any baggage.

Groups representing consumers and some individual consumers also supported the Department's proposal to treat fees for a first checked bag, second checked bag, and carry-on bag as critical and to require improved disclosures of those fees. For example, at the Department's March 30, 2023, hearing, an American Economic Liberties Project (AELP) representative stated that at the nonprofit organizations where he worked including AELP, he heard from many air travelers who were unaware of fees charged by the ULCCs, including fees for carry-on baggage. This representative further testified that while awareness of checked bag fees has risen, carry-on baggage fees continuously confound travelers and that both consumer organizations where he recently worked receive many complaints from consumers about carry-on and checked baggage fees. This representative cited one instance in which a passenger on Spirit Airlines reported that he had to leave his carry-on bag in his car at the airport because he did not have enough money for the carry-on baggage fee and assumed that only checked bags incurred fees. The Department notes that in response, Spirit Airlines commented that AELP did not provide a date for this incident and stated that it did not appear to be consistent with current consumer knowledge about unbundled fares. The AELP representative added that many travelers fly less than once a year and do not understand the intricacies of flying and are confused by ancillary fees. In addition, FlyersRights testified that improved disclosure of the ancillary fees proposed in the NPRM would decrease consumer confusion and allow airlines to compete based on the total cost of a ticket.

Similarly, most individual consumers who commented on this aspect of the proposal requested improved baggage fee disclosures for reasons including that, in their view, it is rare for consumers to travel with no bags at all, baggage fees can significantly increase the total cost of air travel, and improved disclosures would enable comparison shopping. For example, one consumer expressed being surprised with fees for checked baggage and stated that requiring disclosure of baggage fees when airlines and ticket agents first provide itinerary search results ''would be immensely helpful in comparing prices via airfare website searches'' and cited his experience purchasing a flight on a ticket agent's website, only to discover after purchase that undisclosed baggage fees made the overall cost of travel higher than on another airline that the consumer had passed over during the search process.

Finally, AARP generally supported the Department's baggage fee disclosure proposal but also asked DOT to prohibit first checked bag fees entirely, and members of the Commissioned Officers Association of the U.S. Public Health Service (USPHS) asked DOT to encourage airlines to waive baggage fees for all members of the uniformed service, including the USPHS.

*DOT Response:* The Department has determined that fees for a first checked, second checked, and carry-on bag are critical to a consumer's purchasing decision. The Department disagrees with industry commenters' assertion that the first checked bag, second checked bag, and carry-on bag are not critical, and that their disclosure is unnecessary. Consumers have voiced concerns that the fees for these bags can significantly increase the total price of the airfare beyond what was offered at the time of itinerary search. While estimates of the percentage of consumers who travel with a first checked bag, second checked bag, or carry-on bag vary among commenters, most comments support the conclusion that many consumers travel with a first checked, second checked, and/or carry-on bag. Statements by Travel Tech and others that most consumers travel with at least one type of baggage are supported by Google's comment that its survey reflects that 71 percent of U.S. consumers plan to check a bag on an upcoming trip. Skyscanner's internal survey and comments from consumer advocates and individual consumers provide further support for the conclusion that these fees are critical to consumers' purchasing decisions. Given this information, the Department is not persuaded by airlines' arguments that fees for a first checked bag, second checked bag, and carry-on bag are unimportant to consumers based on the percentage of consumers conducting a search on Google Flights for baggage information and the number of passengers who travel without baggage.

In addition, as discussed in section B, GAO has documented that baggage fees have shifted consumers' purchasing behavior by encouraging consumers to bring only a carry-on bag to avoid checked bag fees. Air Canada cited this GAO study as support for its view that passengers are aware of the existence of baggage fees, and Travel Tech similarly reported that its own survey indicated that 90 percent of consumers were aware that ancillary fees may be charged. However, neither the GAO study nor any of the comments submitted provide evidence that consumers are aware of the amount of the fees for first checked, second checked, and carry-on baggage at various airlines. Indeed, the complexity that Air Canada and IATA observed that carriers face in calculating baggage fees is likely even more burdensome to consumers who try to calculate the fees applicable to their itineraries based often on static information provided by carriers and ticket agents.

In addition, some airlines now charge passengers for carry-on baggage. Indeed, on some carriers, the fees for a carry-on bag may be more costly than a first checked bag, which may surprise consumers who are accustomed to carrying on bags without charge.[90] These developments further demonstrate the need for carriers and ticket agents to disclose the fees for a

---

[90] *See* Comments of Spirit Airlines at 12; *see also* Enhancing Transparency of Airline Ancillary Service Fees Regulatory Impact Analysis RIN 2105–AF10, Table 1, *available at https:// www.regulations.gov/document/DOT-OST-2022-0109-0002.*

first checked bag, a second checked bag, and a carry-on bag to consumers so that consumers understand how baggage fees may affect the total cost of their airfare and are able to determine which carrier's flight option best suits their circumstances.

The Department concludes that existing required disclosures do not adequately address the harm to consumers. Carriers and ticket agents are currently not required to provide fees for a first checked bag, a second checked bag, or a carry-on bag in a manner that is readily available when consumers are considering a given fare and itinerary. Instead, fees are often provided in static charts that confuse consumers and do not provide adequate information about the fees that apply based on the consumer's passenger-specific information. The fact that some carriers may voluntarily provide passenger-specific baggage fee information required by this new rule is not a reason for the Department not to require its disclosure by all ticket agents and airlines.

The Department rejects airline commenters' argument that the number of complaints related to baggage fee disclosures and lack of civil penalties for baggage fee violations demonstrate that such fees are not critical. As explained in section B, the number of complaints is only one consideration used to determine whether the Department should address an unfair or deceptive practice through regulation. Also, the Department does not view the lack of civil penalties against U.S. carriers under existing regulatory requirements to demonstrate that a regulation is not needed. The lack of civil penalties under existing rules could instead provide further support for the Department's conclusion that its concerns with existing ancillary fee disclosures are not adequately addressed by existing regulations.

The Department is not adopting recommendations by AARP to prohibit fees for a first checked bag and by the Officers Association of the USPHS to encourage airlines to waive fees for its members because those recommendations are beyond the scope of this rulemaking.

(b) Changing and Cancelling a Reservation

*Proposal:* In the NPRM, the Department identified fees for changing or canceling a reservation as being critical to consumers when they choose among air transportation options. The Department proposed to require carriers and ticket agents to disclose change and cancellation fees and policies to

consumers during the booking process when fare and schedule information is provided.

In proposing to treat these services as critical, the Department shared its view that not disclosing to passengers upfront the significant fees that they would incur should they need to change or cancel the reservation is an unfair and deceptive practice. The Department explained that carriers are currently not required to provide consumers with change or cancellation fee information until after ticket purchase. In addition, the Department noted that although carriers may have separate web pages that list change and cancellation fees, this information is permitted to be provided in a range. The Department added that, even if not provided in a range, change and cancellation fees may not be simple to understand, as fare categories, passenger status, ticket type, and other factors may impact the applicable change and cancellation fees. Further, the Department explained that carriers are currently permitted to display change and cancellation fees outside the booking flow, which disrupts passengers' searches and costs them time. Finally, the Department reported that change and cancellation fees are among the top three types of ancillary service complaints it receives.

*Comments:* Groups representing consumers generally supported the Department's proposal to consider change and cancellation fees to be critical to the consumer's purchasing decision and to require airlines and ticket agents to display such fees to consumers. A joint comment from multiple groups representing consumers noted that improved disclosure of change and cancellation fees ''would benefit consumers, particularly because many travelers may not budget for such fees when booking flights.'' This comment further observed that, based on data from the Department's Bureau of Transportation Statistics (BTS), air carriers collected nearly $3 billion in revenue from these charges in 2019.[91] The commenter asserted that while some airlines had modified their change and cancellation policies due to COVID–19, the changes were limited, with many airlines still applying these fees to the lowest-tier fares. In addition, FlyersRights testified at the Department's March 30, 2023, public hearing that disclosure of the critical ancillary fees identified in the NPRM would decrease consumer confusion

and improve competition in the market. AARP also supported the proposed requirement for carriers and ticket agents to display change and cancellation fees but asked the Department to work to reduce or eliminate change and cancellation fees.

In contrast, airlines and their associations generally opposed the Department's proposal to treat ticket changes and cancellations as critical ancillary services. These commenters asserted that such services are not critical because few passengers change or cancel flights, and complaints regarding change and cancellation fees represent a small percentage of the overall number of complaints submitted to the Department. In addition, airlines and their associations stated that airlines already provide disclosure of change and cancellation fees on their websites, consumers are already aware of the potential costs associated with changing or cancelling a flight, and many carriers have removed these fees since the emergency of the COVID–19 pandemic. Among these commenters, American Airlines noted that 15 percent of its passengers change or cancel flights, and Frontier testified at the Department's March 30, 2023, hearing that fewer than 10 percent of its passengers paid change or cancellation fees. A4A testified at the same hearing that the cancellation fee complaints to the Department included in the docket do not appear to be related to transparency and represent a small percentage of the overall number of passengers, and so, in its view, the mandatory display of those fees is unnecessary.

Ticket agents and their associations offered different views on whether change and cancellation fees are critical to consumers' purchasing decisions and should be displayed. Amadeus stated that change and cancellation fees are critical to consumers' purchasing decisions, and Travel Tech supported disclosure of these fees before purchase. However, the U.S. Travel Association stated that the fees identified by the Department ''are incidental and not 'critically important' to air transportation.'' In addition, at the Department's March 30, 2023, public hearing, Skyscanner expressed concern that disclosing only a fixed change fee without also disclosing the applicable fare difference, which would necessarily be unknown at the time of purchase, would provide incomplete information to consumers and cause confusion. Air Canada made a similar argument in its written comments.

Three of the four ACPAC members expressed the view that ticket change

[91] *Citing* ''Reservation Cancellation/Change Fees by Airline 2021,'' *Bureau of Transportation Statistics.* May 2, 2022, *https://www.bts.gov/newsroom/reservation-cancellationchange-fees-airline-2021.*

and cancellation fees were critical to consumers. The ACPAC Chair, who is also the member representing state governments, stated that the ability to change and cancel a ticket was more important to consumers now due to an increase in flight cancellations and the potential for an increase in infectious disease numbers. The ACPAC had several recommendations related to ticket change and cancellation, which are discussed in later sections.

*DOT Response:* The Department has determined that the fees imposed on a consumer to change or cancel a ticket (*i.e.,* passenger-initiated changes or cancellations)[92] are critical to a consumer's purchasing decision, and this final rule maintains the proposed requirement that airlines and ticket agents must disclose these fees to consumers. The Department is not persuaded by industry commenters who stated that change and cancellation fees are not critical, and disclosure is unnecessary. The Department agrees with the commenters who stated that change and cancellation fees can pose a significant, unexpected financial burden to consumers and that improved transparency will reduce consumer confusion and promote competition.

As noted in section B, the number of complaints is only one consideration used to determine whether the Department should address an unfair or deceptive practice through regulation. Nor do the calculations by some airlines that 10–15 percent of their passengers change or cancel flights suggest that change and cancellation fees are not critical given the significant financial cost that change and cancellation fees impose to those passengers who are subject to them. In addition, existing disclosure requirements do not address this issue. As the Department noted in the NPRM, existing regulations do not require airlines or ticket agents to disclose specific change and cancellation fees during the booking process before ticket purchase. There are no existing rules for ticket agents to provide change and cancellation fees, and the existing rules allow airlines to provide change and cancellation fees in ranges rather than specific amounts, making it difficult for consumers to determine the fee that would apply to their ticket.

The Department is not persuaded that it should defer regulation in this area because some carriers have eliminated change and cancellation fees. These

carriers could re-impose such fees in the future. Further, some carriers that have eliminated change and cancellation fees have not done so for all their flights. For example, these carriers may charge change or cancellation fees for international flights that do not originate from designated locations. Also, many passengers who purchase tickets in the lowest fare categories continue to be subject to either change and cancellation fees or outright prohibitions on changing or cancelling their reservations.

The Department agrees with those commenters who noted that providing change fee information without information about the requirement to pay a fare difference may create consumer confusion. Because the amount of any fare difference cannot be calculated until a replacement flight is selected, the amount of the fare difference will necessarily be unknown at the time of initial ticket purchase. To reduce any potential for consumer confusion, this final rule requires airlines and ticket agents to disclose in the summary of its change policies that a fare difference may apply, if that is the case, and to make other related disclosures before ticket purchase. These requirements are discussed further in section E (4)(b).

*(c) Obtaining Adjacent Seats for Families Traveling With Young Children*

*Proposal:* The Department proposed that a fee for a child 13 or younger to be seated adjacent to an accompanying adult in the same class of service is a critical ancillary fee that airlines and ticket agents must disclose to consumers with the fare and schedule information. Under the proposal, if the carrier does not impose a fee for children 13 or under to be seated next to an accompanying adult, no seat fee disclosure would be required for the carrier's flights. If the carrier does impose a fee to make an advance seat assignment for a child 13 or under, the NPRM noted that the carrier could comply with the proposed rule by enabling consumers to indicate whether they were traveling with a child prior to initiating a search, or by displaying seat fees for all itinerary searches, regardless of whether a consumer indicated that he or she would be traveling with a child.

*Comments:* The overwhelming majority of commenters opposed the Department's family seating fee disclosure proposal in the NPRM. Hundreds of individuals and multiple consumer advocacy organizations, including the U.S. PIRG Education Fund, opposed the proposal on the basis

that the Department should prohibit family seating fees for air travel instead of requiring fee disclosure. Individual commenters expressed concern with the safety of minors and the comfort of families and other passengers when children 13 or younger are seated away from an accompanying adult on an aircraft. Consumer advocates raised similar concerns. For example, AELP testified at the Department's March 30, 2023, public hearing that there are serious health and safety issues with seating young children alone and stated that the Department should not be guided by the quantity of complaints it receives on family seating. The few consumer advocates that supported the Department's proposal similarly recommended that the Department ultimately limit or prohibit family seating fees, with AARP noting that it viewed the proposed disclosures as "an essential first step" but also asking the Department to take further action to reduce or eliminate such fees in the future. A joint comment from multiple State attorneys general supported improved seat disclosures but asked DOT to modify its proposal to require that initial search results provide the lowest fee, if any, to book two adjacent seats, along with an additional disclosure if adjacent seats are unavailable.

Many industry commenters raised concerns about the expense and technical challenges of providing dynamic seat fees at the first page of search results and the cost of establishing direct, real-time connections between ticket agents and airlines necessary to facilitate such disclosures. IATA stated that the Department's family seating proposal would impose a greater burden on airlines than the proposals to require disclosure of baggage, change, and cancellation fees "because the search [for adjacent seating] is twofold: the fees for each seat on each flight presented in an itinerary as well as a search to determine whether there are two or more seats together at the time of the initial search." ATPCO explained that "a channel would need at or near real-time seat maps and seat pricing for every possible airline's flight for every itinerary evaluated at the time of the shopping request" to provide seat fees at first search. Skyscanner explained that determining a family seating fee would require a complex search of highly dynamic seat fees of varying costs and a query of availability, suggesting that, as an alternative, the Department should require disclosure of the cost of a standard seat and not at the time of first

---

[92] When referring to change or cancellation fees or policies, this rule is referring to consumer- or passenger-initiated changes or cancellations of tickets. This rule does not address changes or cancellations initiated by carriers.

search. Among other commenters, Air Canada and IATA stated that GDSs are currently unable to support the distribution of dynamic seat fee information. Industry commenters also expressed concerns that providing family seating fees at the time of first search would overwhelm consumers and provide information that would be irrelevant to many passengers who are not traveling with children. Several industry commenters also stated that consumers rarely consider seats relevant at the beginning of their itinerary search, with Google citing a user survey it had conducted in support of that position.

Airlines and their representatives generally opposed all aspects of the Department's family seating proposal. Airlines stated that current airline policies generally already provide for family seating without fees; the display of a ''family seating fee'' may confuse passengers about the need to purchase a seat to guarantee seating next to a young child; and what these commenters characterized as the low number of family seating complaints and low number of passengers traveling with young children demonstrated no problem with existing disclosures. American Airlines asserted that it could not disclose family seating fees because ''they do not exist'' separate from advance seating fees for all other passengers and noted its efforts to seat young children with an accompanying adult.

Amadeus, Travelport, and Travel Tech asked that DOT expand its family seating proposal to require airlines to either share all seat fees or the fees for the cost of an adjacent seat generally, without regard to whether the passenger is traveling with a child 13 years old or younger. None of those commenters, however, supported displaying seat fees on the first page of search results.

At its January 12, 2023, meeting, the ACPAC recommended that the Department's proposal regarding the disclosure of family seat fee information should be retained in any final rule that may be adopted.

*DOT Response:* DOT has decided not to move forward with its proposal to require carriers and ticket agents to disclose applicable fees for passengers 13 or under to be seated next to an accompanying adult on an aircraft. Instead, the Department is pursuing a separate rulemaking to address the ability of a young child to sit adjacent to an accompanying adult at no additional cost beyond the fare.[93]

In addition to pursuing a new rulemaking, the Department has taken other steps to encourage airlines to ensure that children 13 or younger are seated adjacent to an accompanying adult at no additional cost subject to limited conditions. On July 8, 2022, the Department's OACP issued a notice urging airlines to do everything they can to allow young children to be seated next to an accompanying adult with no additional charge.[94] On March 6, 2023, the Department launched its Airline Family Seating Dashboard, that highlights whether airlines guarantee fee-free family seating,[95] and on March 10, 2023, the Department sent a proposal to Congress recommending legislation to require fee-free family seating subject to limited exceptions.[96]

Given these actions by the Department to enable parents to sit next to their young children without paying fees, the Department does not see value to requiring airlines and ticket agents to display dynamic family seating fees in this final rule. In addition, the Department does not expand disclosure requirements to seat fees or adjacent seat fees more generally, as requested by some commenters, for the reasons discussed in section E (3)(d).

**(d) Consideration of Additional Ancillary Services**

**(i) Seat Selection**

*Proposal:* The Department explained in the NPRM its tentative view that ''disclosure of an advance seat assignment fee at the beginning of a booking process is generally not needed because airlines are required to provide a seat with the cost of the air transportation.'' [97]

*Comments:* Comments from some ticket agents and groups representing consumers, along with a few individual consumers, requested that the Department consider all seating fees to be critical, not only the fees for family seating as proposed. Some of those commenters identified additional

groups of passengers for whom adjacent seat assignments are, in their view, critical. For example, Amadeus stated that adjacent seating fees may be critical for caregivers or family members of individuals with disabilities or the elderly. Travel Tech similarly identified individuals traveling with the elderly as well as ''a newly-wed couple on a 17-hour honeymoon flight or business partners who need to sit together to work during the flight.'' The U.S. PIRG Education Fund expressed its support for ''up-front disclosure of adjacent seating fees involving adult relatives, friends or colleagues.''

In addition, some of these commenters identified reasons that consumers may wish to select their seats when traveling alone. Among those commenters, Travel Tech stated that this may include ''passengers who need to sit near the front of the plane to make a connecting flight or passengers who need to be near the restroom for health reasons.'' FlyersRights commented that consumers may want to select seats to have more legroom or to sit near the front of the plane or an emergency exit. GBTA stated that seat selection could be considered critical for business travelers.

On the other hand, AARP agreed with the Department's preliminary assessment in the NPRM that disclosure of general seat selection fees at the beginning of the booking process was not critical. Instead of requiring disclosure of seating fees, AARP requested that DOT require a clear disclosure ''wherever advance seat selections are made available, that consumers do not need to pay an additional fee unless they want to reserve a particular seat.'' AARP recommended this addition to reduce consumer confusion, explaining that ''customers are often provided with a limited range of seats to choose from, many or all of which require a fee to reserve'' and ''may believe that there are no 'free' seats available and may purchase an advance seat reservation out of concern that they will not be provided with a seat.''

As discussed above, airlines and other industry commenters raised concerns about the costs and technological challenges of displaying dynamic seat fees in the context of the Department's family seating proposal. These concerns would be equally applicable to required disclosure of adjacent seating fees or individual seating fess more generally. In addition, consistent with its comments on family seating fees, American Airlines specifically asked the Department not to expand its list of

---

[93] *See* Fall 2023 Unified Agenda for rulemaking titled ''Family Seating in Air Transportation'' (RIN 2105–AF15) at *https://www.reginfo.gov/public/do/eAgendaViewRule?pubId=202310&RIN=2105-AF15.*

[94] *See https://www.transportation.gov/individuals/aviation-consumer-protection/family-seating/June-2022-notice.* That notice was issued in response to section 2309 of the FAA Extension, Safety and Security Act of 2016, which required DOT to review U.S. airline family seating policies and, if appropriate, establish a policy directing air carriers to establish policies enabling a child 13 or under to be seated next to an accompany family member, subject to certain limitations.

[95] *See https://www.transportation.gov/airconsumer/airline-family-seating-dashboard.*

[96] *See https://www.transportation.gov/sites/dot.gov/files/2023-03/Bill_Family%20Seating%20Proposal_final.pdf.*

[97] 87 FR 63726.

covered critical ancillary fees to include seating fees more generally.

*DOT Response:* The Department has considered the comments stating that seating fees are critical to consumers purchasing decisions. Given that the cost of air transportation includes a seat and the lack of clarity about the importance of seat selection fees to consumers, the Department is not requiring carriers or ticket agents to disclose seating fees as required critical ancillary service fees in this final rule. In making this determination, the Department also took into account the concerns raised by industry commenters about the challenges of displaying dynamic seating fees discussed in section E (3)(c). The Department intends to monitor this issue for possible future action if warranted. Regarding passengers with disabilities, the Department notes that carriers are already required to provide seating accommodations that meet passengers' disability-related needs under the Air Carrier Access Act and its implementing regulation, 14 CFR part 382. These required accommodations include an adjoining seat for a personal care attendant who performs a function for a passenger with a disability that is not required to be performed by airline personnel, a reader for a passenger who is blind or has low vision, an interpreter for a passenger who is deaf or hard-of-hearing, or a safety assistant, if needed.

Finally, the Department agrees with AARP that the option to purchase seats could confuse consumers, who may think that a seat purchase is necessary. The Department has determined that it is a deceptive practice in violation of section 41712 for a carrier or ticket agent to fail to disclose that the purchase of a seat is not required for travel, particularly when consumers are provided seats from which to choose where many, if not all, of those seats require a fee to reserve. Without a clear disclosure, a reasonable consumer being offered seats to reserve where many of these seats must be purchased would be misled to believe that an advance seat assignment purchase is required to have a confirmed seat on the flight. The lack of disclosure that consumers will be assigned a seat without additional payment is material as this omission is likely to result in consumers unnecessarily paying a fee for a seat. Accordingly, this final rule requires airlines and ticket agents to make the following disclosure clearly and conspicuously when a consumer is offered a seat selection for a fee: "A seat is included in your fare. You are not required to purchase a seat assignment to travel. If you decide to purchase a

ticket and do not select a seat prior to purchase, a seat will be provided to you without additional charge when you travel."

(ii) Other Ancillary Services

*Proposal:* The Department did not propose ancillary fees, beyond transporting a first checked, second checked, and/or carry-on bag, changing or canceling a reservation, and obtaining adjacent seating when traveling with a young child, to be critical. However, the Department sought comment on whether the ancillary services proposed to be critical in the NPRM should be expanded or limited.

*Comments:* Airline commenters generally opposed expanding the ancillary services to be considered critical to a consumer's purchasing decision. The Department received only limited support for adding other specific ancillary fees to the list of ancillary services proposed to be covered as critical in the NPRM. A few individual commenters asked the Department to include fees for food and a drink as well as in-flight wi-fi as critical ancillary service fees. In addition, GBTA stated that wi-fi and priority boarding could be considered critical for business travelers. Finally, the Aircraft Owners and Pilots Association asked that the rule be expanded to cover all general aviation parking fees and the location of parking aprons at airports. Comments suggesting the Department limit the ancillary services proposed to be critical are discussed in section E (3)(d)(iii).

*DOT Response:* The Department declines to expand in this final rule the list of specific critical ancillary fees beyond those identified in its proposal as the record does not support considering fees for food, drinks, wi-fi, priority boarding, or parking fees as critical ancillary service fees as suggested by a few commenters. As discussed in the next section, the Department may determine that additional ancillary fees are critical after notice and an opportunity for comment. The Department maintains the existing requirement that airlines must disclose the fees for all ancillary services on their websites. Carriers and ticket agents are encouraged to provide consumers with a clear and conspicuous link to this existing website during the booking process before ticket purchase. Airlines will continue to be allowed to provide the fees for ancillary services, aside from baggage, in a range on this page. Consumers will be provided the specific fees that apply to them for all critical ancillary services when the fare and schedule information is provided following an itinerary search.

(iii) Future Ancillary Services

*Proposal:* The Department solicited comment on whether its proposed list of critical ancillary fees should, among other things, address future adoption by airlines of additional ancillary service fees. The Department also asked how to ensure their disclosure to the extent that they are of critical importance to consumers.

*Comments:* Multiple consumer groups asked the Department to require airlines and ticket agents to display additional ancillary service fees in the future to the extent that the fees become more prevalent or are of particular importance to consumers. FlyersRights suggested the Department require carriers and ticket agents to display any fee that comprises two percent of all reporting carriers' revenue or five percent of any single airline's revenue, stating that its proposal was intended to address its concern that "airlines may innovate new ways to break up the base fare into additional ancillary fees." Similarly, a joint comment from multiple groups representing consumers asked the Department to require disclosure of fees that exceed two percent of a covered entity's revenue according to BTS reporting and to adopt a regular review schedule to periodically update the covered ancillary fees with feedback from consumer advocates. In addition, multiple State attorneys general requested that the Department adopt an open-ended provision requiring disclosure of "fees associated with any products or services that a reasonable traveler might foreseeably consider necessary."

On the other hand, American Airlines opposed any expansion of the list of critical ancillary fees from the NPRM. It stated that expanding the list would "further complicate the search queries, slowing the return of search results and cluttering displays" and provide minimal, if any, benefit to consumers. American Airlines asked the Department to rely on enforcement actions, rather than regulation, to address any innovations in ancillary fees that result in significant consumer complaints.

*DOT Response:* Based on the comments received, the Department has not identified any fees beyond fees for transporting a first checked bag, a second checked bag, and a carry-on bag and fees for changing and cancelling a ticket that are currently critical to consumers' purchasing decisions. The Department agrees with those commenters who stated that the Department should have a method for regulating fee transparency for any

ancillary services critical to consumers' purchasing decisions in the future. The Department disagrees, however, with those commenters who suggested that the Department should establish a fixed interval to reevaluate the fees for critical ancillary services. The Department receives regular feedback from stakeholders, including through the ACPAC, and monitors trends in consumer complaints filed with the Department. If these or other sources suggest that disclosure of additional ancillary services fees early in the purchasing process is needed based on evolving industry practices, the Department can provide notice and take comment at that time. The regularity with which the Department hears from stakeholder groups renders it unnecessary to establish a fixed time interval for re-evaluating ancillary fees.

The Department is also not persuaded by comments urging the Department to require disclosure of ancillary fees that reach a certain threshold of airline revenue because carriers could design their fee structures in a manner to avoid any pre-established threshold. In this final rule, the Department is not limiting ancillary services that are critical to those that meet a certain threshold but instead adopting a definition of critical ancillary service that includes ''any other services determined, after notice and opportunity to comment, to be critical by the Secretary.'' Multiple State attorneys general also recommended establishing an open-ended provision when defining critical ancillary fee. This final rule differs from their recommendation in that it provides the public an opportunity for comment before the Department delineates additional critical ancillary fees. The Department believes that effective and meaningful public engagement before determining additional ancillary services that are critical will lead to a better result.

*(4) Methods for Disclosing Critical Ancillary Service Fees and Policies*

(a) Website Disclosure of Fees

*Proposal:* The Department proposed to require that the fees for ancillary services that are critical to a consumer's purchasing decision be disclosed the first time that an airfare is displayed to consumers using airlines' or ticket agents' websites. More specifically, the Department proposed to require airlines and ticket agents disclose the first and second checked bag fees, the carry-on bag fee, the change and cancellation fees and the family seating fee at the first point in a search process where a fare and schedule is listed in connection

with a specific flight itinerary. The Department further proposed to prohibit display of fees for critical ancillary services by links and rollovers but requested comment on whether to allow these methods.

The Department further proposed to require carriers and ticket agents to indicate that a particular fare category prohibits the checking of a bag or the carriage of a carry-on bag, if that is the case, and any applicable penalty to transport the item, whenever fare and schedule information is provided during the itinerary search process. The Department also proposed to require carriers and ticket agents to disclose whether ticket changes or cancellations are allowed, which could be provided via a pop-up or link adjacent to the pertinent change or cancellation fee.

*Comments:* Industry commenters expressed near-universal opposition to the requirement to display fees for critical ancillary services without the use of links or rollovers when an airline or ticket agent first provides schedule and fare information in response to an itinerary search. These commenters expressed concerns about the costs, technological feasibility, and impacts on website clarity and function if airlines and ticket agents are required to display all proposed critical ancillary fees (first checked bag, second checked bag, and carry-on bag, ticket changes and cancellations, and family seating) without the use of links or rollovers when airlines and ticket agents first provide schedule and fare information.

Many industry commenters stated that display of all critical ancillary fee information required under the proposal on a single page without the use links or rollovers would result in airlines and ticket agents displaying fewer itinerary results and would overcrowd web pages. For example, Frontier Airlines stated that under existing regulations, it could display four or five itinerary options on the first page of search results, but estimated that under the proposal, it would only be able to display one or two results per page. Frontier Airlines further expressed concern that crowded displays would block out or minimize information that it views as more relevant to consumers, including additional flight options and base fares. Similarly, United Airlines estimated that it would be able to display only half of the number of flight options to consumers under the proposal compared with its current website. Booking Holdings stated that a first-page display requirement for all ancillary fees proposed could reduce the number of itinerary results it could display on a single page from 12 under

existing regulations to only one or two. Booking Holdings expressed concern that the NPRM's proposal to require carriers or ticket agents to display all critical ancillary fees when fare and schedule information is first provided would result in consumers spending additional time scrolling or ''giving up'' on their search and selecting a less optimal flight than they would under existing disclosures. Finally, the U.S. Travel Association stated that, under the proposal, customers would need to scroll through multiple pages of results, increasing the time needed to consider available ticket options.

Many industry commenters, including Frontier Airlines, Google, Booking Holdings, and others explained or provided visual displays of how search results would appear on their websites under the proposal in written comments or at the Department's March 30, 2023, public hearing. For example, Google provided an example where both vertical and horizontal scrolling was needed to show all ancillary fee information proposed at the first page of search results. Amadeus also testified at the hearing that providing all critical ancillary fees required by the proposal at the first point in the search process where schedule and fare information is provided would reduce the number of flight options that could be displayed and, correspondingly, reduce the inter-brand competition that the indirect channel provides.

In addition, industry commenters raised concerns that, in their view, displaying all required ancillary fees at the first page of search results would slow website loading times significantly and degrade the consumer experience, resulting in consumers abandoning carrier and ticket agent websites. For example, American Airlines estimated that its current search takes three to five seconds to process and load but believes displaying all proposed critical ancillary fees on the first page would take 45 seconds to process and load. In addition, Spirit Airlines stated that providing all proposed ancillary fees would take seven times as long to load as its current site and could require nine minutes of transaction time. Further, United Airlines expressed concern about the effect that slower loading times would have on sales, stating that half of consumers abandon websites that take more than six seconds to load and over 50 percent expect a website to load in three seconds or less. At the Department's March 30, 2023, hearing, IATA cited studies stating that for every second of loading performance, there is an equivalent drop in customer presence and sales. Booking Holdings

stated that "the calls for data under the proposal could potentially be in the hundreds of thousands (especially for itinerary results that include multiple carriers or multiple passengers)," and, while its current system runs similar queries, it does so only "after a passenger selects a flight option, thus reducing the search queries to that one flight itinerary, instead of thousands of potential flight itineraries." In addition, Travel Tech commented that every second added to website load times results in a seven percent loss in sales and 11 percent fewer page views.

Further, industry commenters stated that the proposed rule would require airlines and ticket agents to provide ancillary fee information at a time that is not optimal for consumer decision making and that the timing and method for displaying ancillary fees is best left to industry expertise. Among those commenters, Spirit Airlines commented that it conducted a survey of consumers who abandoned booking and found that less than one percent abandoned the booking path because bag prices were not displayed at the beginning of search, which it stated demonstrates that "[a]lmost all customers who decide not to fly Spirit are unbothered by ancillary fees being provided later in the booking path." Further, Spirit Airlines stated that it showed a sample web display complying with the NPRM to "independent testers," who preferred Spirit's current site and stated that they preferred to select the flight first and then select from baggage and seating options. Air Canada stated that its current practice of providing consumers with a full price breakdown of all charges on a summary page before booking is "more informative and useful for consumers" than the Department's proposal because it lists all charges, not only those ancillary fees that the Department deems critical. In addition, Booking Holdings represented that its customers prefer concise information at the first page of search results and that ancillary fee information is more helpful after consumers select a specific itinerary. A4A testified that display of ancillary fees at the time of first search could confuse consumers that such fees are mandatory and cause consumers to abandon their travel due to the perceived expense or to purchase ancillary services that are unnecessary for their travel. Further, NACA stated that providing ancillary fee information at the time fare and schedule information is first provided would overwhelm ULCC consumers, adding that selecting one ancillary at a time makes the booking process easier and

that the unbundled model "inherently requires enhanced disclosure and education, which the ULCCs already provide." NACA also noted that E.O. 14036 instructed the Department to consider initiating a rulemaking to ensure disclosure of ancillary fee information, including change and cancellation fees, "at the time of ticket purchase," but it did not require the Department to initiate a rulemaking or to require disclosure at the first point in a search process where a fare is listed in connection with a specific flight itinerary.

Google provided some statistical data related to its position that baggage fees are more relevant to consumers later in the booking process. Google reported that 1.3 percent of consumers conducting a search on Google Flights use a feature allowing them to integrate bag fees into the displayed costs for flights before a specific itinerary has been selected. At the Department's public hearing in March 2023, Google testified that this statistic supported its position that baggage information may be relevant to consumers later in the search process, rather than at the point of initial search. Google also provided the results of a study of U.S. consumers it conducted in 2018. It cited this study as evidence that consumers prefer to think about baggage fees later in the booking process, with 21 percent of consumers in the survey stating that they start thinking about baggage while searching for flights but 23 percent of consumers in the survey stating that do not start thinking about baggage until the time of flight booking. In addition, according to the results reported by Google, 19 percent of consumers "decide about baggage" at the time of flight search, but another 35 percent do not decide about baggage until the time of flight booking.

A4A provided testimony on the costs of the proposal at the Department's March 30, 2023, public hearing, stating that the proposal to require display of all critical ancillary fees on the first page of search results would require an overhaul of the entire air fare "ecosystem." A4A further testified that the costs would be exorbitant and exceed the technical capacity of airline systems, which it added are not currently built to retrieve and display the amount of fee information required. Many other industry commenters provided similar testimony or written comments. Additional discussion of the economic impacts of the final rule is provided in the Regulatory Notices section of this document.

Some industry commenters also raised specific concerns with the

technical ability to calculate and display fees for a first checked bag, a second checked bag, and a carry-on bag at the first page where airlines or ticket agents provide fare and schedule information in response to a search without the use of rollovers or links. IATA stated that this proposed requirement is "unreasonable" and added that the calculation of baggage fees is "not trivial, particularly with multi-carrier itineraries, and neither airlines nor agents today are capable of undertaking the calculation on what could be more than 100 itineraries presented on an initial search page." IATA added that, in its view, the costs of the requirement would outweigh any benefits. Similarly, Air Canada stated that the calculation of baggage fees "is a complex process," particularly for multi-carrier itineraries, and that the development of "ancillary service packages or subscriptions that allow passengers to, among other services, have unlimited checked baggage after paying an annual fee or the bundling of baggage fees with those of meals or Wi-Fi" would make displaying baggage fees on the first page of search results more challenging.

A few industry commenters recommended that, if the Department decides to require airlines and ticket agents to display any ancillary fees when fare and schedule information is first provided, it should do so only for the fees for first checked, second checked, and carry-on baggage. For example, Travel Tech stated that if the Department chose to adopt "any prescriptive rules," those requirements "should be limited to requiring that only critical baggage fees . . . be displayed on the first search results page." Travel Tech added that "[b]y so limiting the amount of information required to be displayed on the first search results page, DOT can largely avoid the information overload and page clutter problems" identified in its comments. Skyscanner made similar comments, stating that it recommended "that no display requirement mandating a specific location for the display of ancillary fee information should be imposed," but continuing that "if such a rule is imposed, it should require that only baggage fees be displayed on the first page of ticket search results." Skyscanner added that its recommendation was based on its internal user research indicating "that many users are much more concerned about baggage allowances and fees than any single other type of ancillary fee," with 84 percent indicating "it was important to know whether a ticket price includes checked bags."

Industry commenters, including IATA, also stated that the complexity of calculating multiple change and cancellation fees for multiple itineraries would be technologically infeasible (particularly for multi-carrier itineraries), result in significantly slow website loading, and be extremely costly to implement. For example, IATA commented that the cost of calculating multiple change and cancellation fees ''for every itinerary at the initial search cannot be justified in terms of search time saved by passengers.''

Instead of first page display of fees for critical ancillary services in text form, industry commenters generally requested more flexible display of these fees. Alternatives recommended by these commenters included the Department allowing the display of fee information later in the booking process; the use of links, pop-ups, rollovers, and other methods; and the display of fee information outside of the booking process. For example, individual airlines also recommended that the Department allow links and rollovers. United Airlines suggested that the Department permit disclosures through links, pop-ups, banners, landing pages, and acknowledgements. American Airlines explained that links and rollovers ''would allow consumers to access the fee information as needed on an individual basis and avoid overwhelming consumers by flooding them with information at the first shopping point.''

Similarly, ticket agent representatives such as Travel Tech recommended allowing critical ancillary fee information to be displayed using pop-ups and links. Booking Holdings recommended that the Department allow airlines and ticket agents to display fees by hovering over or clicking a link or allowing disclosures on the second page of the booking process after a flight is selected. Further, Google stated that more flexibility in display would better serve consumers, and expounded that rollovers, hyperlinks, and pop-ups would give disclosures to consumers in a readable and customizable format. Hopper and other commenters advocated for display at any time before ticket purchase. At the Department's March 2023 public hearing, Amadeus advocated for allowing more flexible displays such as hyperlinks, mouseovers, pop-ups, expandable text, and other shortcuts to facilitate faster and cost-efficient implementation across the industry. According to Amadeus, those methods help avoid performance issues and reduce the number of transactions, extending computing resources and

improving the time necessary to provide search results. In addition, Air Canada asked the Department to clarify when ''fare and schedule information is first provided'' if it chose to finalize the proposal. The carrier also asked the Department to allow carriers to display required ancillary fee disclosures ''external to the booking process.''

Specific to change and cancellation fee disclosures, Amadeus asked the Department to allow display of minimum and maximum change and cancellation fees, rather than all potentially applicable change and cancellation fees. IATA suggested that carriers could include a link on the initial search page to clear language on whether the carrier imposes change or cancellation fees and what factors are considered in setting that fee. Skyscanner recommended that DOT require display of one change fee and not on the first page of search results.

In their comments and public hearing testimony, multiple groups representing consumers expressed support for the Department's proposal to require airlines and ticket agents to display critical ancillary service fees when fare and schedule information are first displayed in response to a consumer search. FlyersRights commented that the proposal would achieve better price transparency for consumers. In addition, at the Department's March 30, 2023, public hearing, FlyersRights testified that current market conditions reward those airlines that hide the ball at the expense of more transparent airlines and asserted that one airline's website requires many clicks from the first page where schedule and fare information is displayed before a consumer reaches the web page where static baggage fees are disclosed. Further, a joint comment from multiple groups representing consumers supported the Department's proposal to prohibit the use of links and rollovers to display fees for critical ancillary services. The U.S. PIRG Education Fund added that in its view, fee information should be provided before beginning the booking process, not once it has begun, and expressed concerns about drip pricing. Finally, the ACPAC Chair, representing state and local governments, stated at the January 12, 2023, ACPAC meeting that the Department's proposal was ''fair'' in permitting airlines and ticket agents to display baggage policies, but not baggage fees, in links and pop-ups based on her belief that the average flyer better understands what constitutes an oversized bag than the actual bag fee amounts.

A few organizations representing consumers, however, expressed concern

about the potential for consumer confusion under this aspect of the Department's proposal. AARP was generally supportive of the Department's proposal, noting that not providing critical ancillary fee information when a fare is provided would inhibit the ability of consumers ''to make an informed decision about which price and itinerary combination best suits their need,'' and adding that if fees are disclosed at the end of the booking process ''that consumer is much less likely to re-start the process of comparison shopping, leading to a less than optimal outcome.'' But AARP further recommended that any ''disclosures must be made in such a way as to minimize visual clutter and confusion and be easy to read and comprehend.'' In addition, Travelers United testified at the Department's March 30, 2023, public hearing that more disclosure was preferable but also expressed concern in its written comment that ''DOT is seriously underestimating the technology needed for this NPRM as it stands now. Perhaps limiting it to only baggage may provide enough information to deal with today's competition and prepare for the coming age of AI [artificial intelligence].''

Individuals also expressed differing views. For example, one individual stated that how and when airlines display the elements of a total fare should be left to airlines and suggested that consumers could purchase from a different airline should a particular airline provide a confusing display. However, another took the position that baggage fees are the most important charges to consumers and displays with this information would not confuse consumers or be excessive. This commenter noted that airlines already provide first and business class fares that many consumers will never use.

The ACPAC solicited information on the appropriate timing of disclosure for critical ancillary service fees at its December 2022 meeting. At that meeting, the ACPAC member representing consumers observed that to minimize problems with drip pricing, consumers should have information on critical ancillary service fees early in the process. However, he also noted that providing early information on all ancillary fees could lead to consumers being overwhelmed. Specifically, he opined that baggage fees, change/cancellation fees, and seat reservation fees were the biggest ''pain points'' for consumers that should be disclosed early. Similarly, a consumer advocacy organization suggested that fees for carry-on and checked bags, as well as change/cancellation fees and on-time/

cancellation statistics, should be displayed on the first page where a price is quoted.[98]

At its January 12, 2023, meeting, the ACPAC recommended that the Department adopt its proposal to require change and cancellation fee information be displayed during the itinerary search process and not just before ticket purchase. The ACPAC member representing consumers noted that change and cancellation fees impact consumers' buying decisions when shopping for an airline ticket, and that if the disclosures are not made early in the purchase process, consumers would not have change and cancellation fee information on all the options available to them when making a purchasing decision. The ACPAC member representing airlines expressed his concern that disclosure of the baggage and change and cancellation fees during the itinerary search process would present too much information to consumers and advocated for links or pop-ups to be permitted for the display of baggage and change and cancellation fee information if there is a requirement to display such fee information.

The ACPAC also recommended at its January 12, 2023, meeting that the Department require ticket agents and metasearch entities to display airlines' change and cancellation fee information in a consistent manner to avoid creating confusion for consumers. The ACPAC member representing airports explained that a ticket agent should not be allowed to display an itinerary for one airline that shows the total change or cancellation fees for a group of travelers, while the itinerary for another airline shows the change or cancellation fees on a per passenger basis. Travel Tech commented that the ACPAC recommendation goes beyond the proposals of the NPRM and fails to recognize that ticket agents do not receive data from airlines consistently and lack the resources to implement this recommendation.

Regarding the Department's proposal that consumers be informed when fare and schedule information is provided if the fare category does not permit traveling with a first checked bag, a second checked bag, or a carry-on bag or permit changing or cancelling a reservation, various commenters expressed support for it and stated that clear disclosure upfront of these prohibitions is necessary to avoid consumer harm. Southwest Airlines explained that basic economy fares are

increasingly common and likely to appeal to occasional, less savvy budget travelers, making early disclosure that these tickets cannot be changed or canceled and that passengers cannot travel with a carry-on bag or checked bag if that is the case especially necessary. Southwest Airlines added that because the least expensive basic economy tickets often are at the top of search results, it is particularly important to provide complete and timely notice of such restrictions on all distribution channels. FlyersRights and Travelers United recommended that the Department require a clear disclosure for fares that prohibit ticket changes or cancellations, similar to the disclosure proposed for fares that prohibit baggage.

*DOT Response:* This final rule requires airlines and ticket agents to clearly and conspicuously disclose accurate fees for all critical ancillary services (*i.e.,* a first checked bag, a second checked bag, a carry-on bag, ticket change, and ticket cancellation) on the airline's or ticket agent's website at the time fare and schedule information is initially provided when a consumer conducts a search for air transportation. The Department acknowledges the concern of airline commenters that ancillary packages or subscriptions that allow passengers to have unlimited checked baggage for an annual fee or bundle baggage fees with other ancillary services such as wi-fi or food would make displaying baggage fees on the first page of search results more challenging. The Department is clarifying that, while airlines and ticket agents must disclose the standalone fees for critical ancillary services required under this rule, they are not required to disclose the ancillary service packages or bundles that include one or more critical ancillary services but may do so if they choose.

The Department disagrees with those commenters who stated that the Department should allow fee information for critical ancillary services to be displayed later in the booking process, after consumers have already spent time selecting an itinerary based on incomplete fee information. The challenges cited by Air Canada and IATA that industry faces in calculating baggage fees favors requiring airlines and ticket agents to disclose these fees to consumers, rather than placing the burden on consumers to make complex calculations. Regarding Air Canada's request for clarification of the meaning of ''when fare and schedule information is first provided,'' that phrase means the first point at which a fare is quoted for a particular flight itinerary. This first point will typically be the first page of

search results provided in response to a consumer's itinerary search. The Department disagrees with A4A that displaying baggage fee information when schedule and fare information is first provided will confuse consumers that payment of such fees is mandatory. Many industry commenters touted their ability to design innovative and clear web displays, and the Department expects that the industry will use those skills to meet the disclosure requirements of this rule in a manner that mitigates the potential for consumer confusion. The Department acknowledges NACA's statement that E.O. 14036 does not require the Department to mandate disclosure of critical ancillary fees at the first point in the search process where a fare is listed in connection with a specific flight itinerary. For the reasons discussed in this preamble, however, the Department has determined that disclosure of critical ancillary fees at that point is necessary to mitigate unfair and deceptive practices and that the requirements in this final rule are consistent with the E.O.

The Department does not adopt the alternatives to providing itinerary- and passenger-specific change and cancellation fees recommended by some industry commenters, such as requiring airlines and ticket agents to display the factors used by the airline to set the relevant change and cancellation fees (rather than the fees themselves), a single change or cancellation fee (rather than all change and cancellation fees), or minimum and maximum change and cancellation fees. Each of those recommended alternatives would result in disclosure that is insufficiently precise to advise consumers of the true cost of selecting a particular itinerary.

In response to the ACPAC recommendation, the Department notes that this final rule does not mandate change and cancellation fee disclosures to be displayed in a consistent manner or use standardized definitions. The Department is of the view that, so long as the required information is presented in a clear and conspicuous manner, there is no identified consumer harm from ticket agents developing their own displays. The Department believes that the requirement in this rule to disclose a summary of the applicable change and cancellation policies will be sufficient to clarify any potential inconsistencies in the presentation of such fees. Should the Department determine in the future that a problem regarding the consistency of critical ancillary service fee disclosures exist, the Department may revisit this issue. The requests by AARP and others that the Department work to

---

[98] Presentation of FlyersRights, *available at https://www.regulations.gov/document/DOT-OST-2018-0190-0046.*

eliminate change and cancellation fees are beyond the scope of this rulemaking.

The Department acknowledges concerns raised by commenters about the cost and technological feasibility of providing all critical ancillary fee information in text form where an airline or ticket agent first provides fare and schedule information in response to a consumer's itinerary search. To address these concerns, the Department is providing additional flexibility for ticket agents and airlines in how they disclose the required fees. This final rule requires that fees be "clearly and conspicuously" disclosed but does not limit the display of critical ancillary fees to only static text next to the fare. While the final rule continues to prohibit display of fees for critical ancillary services by links, the Department is not prohibiting the use of pop-ups or other methods to avoid the page clutter problems that commenters identified. To further explain this requirement, the final rule defines "clear and conspicuous" to mean that a disclosure is difficult to miss (*i.e.,* easily noticeable), easily understandable by ordinary consumers, and presented in a manner that allows ordinary consumers to determine the true cost of travel. In other words, it should be readily apparent to a consumer that fee information is available, the process for calling up such information should be uncomplicated, and the fee information should be understandably presented. Also, the fees themselves and how to access them should not be hidden or involve significant effort to ascertain by the consumer. Further, the consumer's booking process should not be disrupted in such a way that causes the consumer to have to start over their search process from the beginning or to lose their location on the page being viewed. The rule prohibits airlines and ticket agents from displaying critical ancillary fees by hyperlink because displaying fees in that manner would disrupt the consumer's search.

To evaluate whether a disclosure is clear and conspicuous, the Department intends to consider the clarity of the fee disclosure (whether in text or through a pop-up, in expandable text, or by other means); the font size used for the disclosure compared with other text on the page; and the placement of the disclosure on the page, among other information. Provided that the fees for critical ancillary services are disclosed in a manner that meets the regulatory criteria of clear and conspicuous and not provided by hyperlink, airlines and ticket agents have the flexibility to display or disclose these fees through various methods, including in text form

on the page with the fare, through a pop-up, or other method that does not navigate the consumer away from the page and place on the page being viewed at the time the user action is taken, or through expandable text on the page where the fare is displayed. The Department concludes that these modifications from the proposal will better enable industry to use innovative web design to display fees in a manner that is technologically feasible while still ensuring that consumers are provided with critical information about the true cost of travel at the time of itinerary search. Given the increased flexibility afforded by this final rule compared to the initial proposal, as sought by many commenters, the Department concludes that compliance should be feasible and reduce the potential for slow loading times or cluttered or confusing displays for consumers.

Also, as proposed, the Department is requiring that airlines and ticket agents disclose to consumers if a particular fare category prohibits the checking of a first or second checked bag or the carriage of a carry-on bag and display the penalty, if applicable, for carrying on or checking the item. The Department is also adopting its proposal to require carriers and ticket agents to disclose upfront whether ticket changes or cancellations are allowed. The Department agrees with commenters who stated that it is particularly important for airlines and ticket agents to disclose that a given fare prohibits changes and cancellations if that is the case. Under this final rule, airlines and ticket agents are required to disclose that a particular fare category prohibits a first checked bag, a second checked bag, a carry-on bag, ticket change, or ticket cancellation, if that is the case, when fare and schedule information is provided during an itinerary search. The disclosures must be clear and not mislead consumers into believing that the fee for a particular fare category is zero, when in fact a bag or ticket change or cancellation is simply prohibited.

Finally, we note that this rule's disclosure requirements for critical ancillary fees and policies must also be reflected in carriers' customer service plans. By adding an assurance in their plans, carriers commit to consumers that they will meet the minimum standards set forth in this rule regarding the disclosure of critical ancillary fees and policies. This customer service commitment is merely reinforcing new requirements imposed elsewhere in this final rule.

(b) Website Disclosure of Policies

*DOT Proposal:* The Department proposed to require airlines and ticket agents disclose, along with the fare and schedule information, the policies applicable to transporting a first checked bag, a second checked bag, and a carry-on as well as changing and cancelling a reservation, taking into account the consumer's passenger-specific information, if provided. For baggage, the Department proposed that carriers and ticket agents must display the weight and dimension limitations that a carrier imposes for each checked and carry-on bag, with passenger-specific adjustments if applicable. For ticket changes and cancellations, the Department proposed to require carriers and ticket agents provide a summary of the ticket change and cancellation policies applicable to the consumer's chosen itinerary and fare category, considering the consumer's passenger-specific information, if provided. The Department proposed to allow carriers and ticket agents to display policy information for baggage, ticket changes, and ticket cancellations using links or pop-ups adjacent to the display of the pertinent fee.

In the NPRM, the Department explained that these brief policy summaries should include clear, adequate notice of the rules applicable to the chosen itinerary and fare category, including whether ticket changes or cancellations are allowed (as well as when and in what circumstances they are allowed), the form that refunds or airline credits may be provided (*e.g.,* travel voucher or a credit to the original form of payment), any prohibitions or conditions that may limit the ability to change or cancel a ticket, and other information. The Department did not propose specific requirements for how carriers and ticket agents should address the need for passengers to pay a fare difference between the old and new ticket prices in the event of a change but requested comment on that issue. The Department also asked about consumer confusion from the material change in fare that occurs with many ticket changes being a larger component of the overall price relative to the change fee itself.

*Comments:* Air Canada asked for additional clarification, including "whether baggage fees that must be displayed also include additional costs associated with those bags. For example, is it an obligation to display excess baggage and overweight fees or is it appropriate that these fees are charged at the airport when the baggage is dropped off?"

On the method of displaying baggage policy information, the ACPAC recommended that the Department retain its proposal that pop-ups and links are acceptable for specific information about size and dimension allowances for baggage in any final rule. At the January 12, 2023, ACPAC meeting, the ACPAC Chair, who is the member representing state and local governments, stated that it should be acceptable to provide baggage size policies by link because the average flyer has an understanding of what constitutes an oversized bag. The member representing airports agreed, adding that much baggage comes in standard sizes. Travel Tech also supported this proposal.

For policies applicable to changes and cancellations, among industry commenters, IATA objected to the requirement for air carriers and ticket agents to provide a brief summary of the applicable change and cancellation policy, stating that "[a]irlines are under no obligation to provide passengers explanations as to why they are imposing fees on passengers who decide on their own not to use a particular ticket." Representing consumers, FlyersRights asked the Department to require that airlines and ticket agents display information on whether any refund provided would be as a cash or a cash equivalent, non-expiring travel credits or vouchers, or expiring travel credits or vouchers, and whether those amounts would be for the entire ticket price less the change or cancellation fee or discounted.

The Department received a few responses to its request for comment on the issue of fare differentials. Air Canada noted that most of the cost to change a flight would be due to the fare differential. Other commenters noted that, given that fare differentials may be a part of the cost to change tickets, it was not possible to disclose the full cost of a ticket change at the time of ticket purchase, since the full cost may not be known until the consumer changes their ticket. In addition, Travelport stated that "fare differentials due to dynamic pricing are common knowledge," and deemed a requirement to disclose that a fare differential may apply "unnecessary." In contrast, FlyersRights requested that the Department require disclosure that a fare differential may apply and whether the airline or ticket agent would refund the fare difference if the replacement flight was less costly than the originally purchased flight.

Regarding the method of displaying policy information on ticket changes and cancellations, the ACPAC recommended that the Department retain its proposal that change or cancellation policy information may be displayed by links or pop-ups in any final rule. The ACPAC also recommended that the Department provide greater clarification on the specific location rollovers or pop-ups should be placed for consumers to view additional change or cancellation policy information. Travel Tech commented that the Department should permit disclosure of change and cancellation policies by links or pop-ups as proposed. In addition, Travel Tech opposed the ACPAC recommendation regarding the specific location rollovers or pop-ups should be placed and asserted that the Department should allow flexibility instead.

*DOT Response:* The Department largely maintains the proposed requirements for the disclosure of baggage and ticket change and cancellation policies applicable to the itinerary, taking into account the consumer's passenger-specific information, if affirmatively provided.[99]

The Department is adopting its proposal requiring that the weight and dimension limitations that the carrier imposes for first and second checked bags and carry-on bags be disclosed, with passenger-specific adjustments, if applicable. The Department has determined that the failure to provide weight and dimension information before ticket purchase is an unfair practice, as discussed in section D (1)(a). The Department is not requiring that airlines and ticket agents disclose the fees for excess and overweight baggage as part of the required disclosure on weight and dimension limitations.

The Department makes clear in this final rule that the disclosure of baggage, change, and cancellation policies must be accurate as well as clear and conspicuous. Unlike the fees themselves, however, the Department allows as proposed the use of links for these policies. Allowing the option for airlines and ticket agents to provide these disclosures by hyperlink was recommended by the ACPAC and supported by public comment. Further, to reduce screen clutter, the Department is allowing summaries of applicable baggage, change, and cancellation policies to be disclosed any time before ticket purchase, rather than requiring them to be disclosed contemporaneously with the fees as proposed. The Department is persuaded by commenters that providing the policy information later in the purchasing process will not harm

---

[99] Passenger-specific requirements are discussed in section E (5).

consumers. The Department concludes that the requirement to provide these policies in a clear and conspicuous manner, as defined in this final rule and further explained in section E (4)(a) of this preamble, provides adequate information regarding where and how baggage and change and cancellation policies must be disclosed, while maintaining flexibility for airlines and ticket agents to develop their own consumer-friendly displays.

Regarding change and cancellation policy summaries, the Department disagrees with IATA's interpretation of the NPRM proposal. The Department did not propose to require carriers to disclose "why they are imposing" change and cancellation fees, but instead proposed that carriers and ticket agents should disclose, among other information, whether ticket changes and cancellations are permitted, the conditions under which change and cancellation fees would apply, and the form of any refund provided. The Department is adopting this proposal in this final rule.

More specifically, given that the Department's conclusion that change and cancellation fees are critical to a consumer's purchasing decision, the Department is identifying in this final rule the types of information that must be included in the summaries of change and cancellation policies. First, the Department agrees with those commenters who stated that it is particularly important for airlines and ticket agents to disclose that a given fare prohibits change and cancellations if that is the case (as discussed in section E 4(a)), and so this final rule requires any prohibitions or conditions that may limit a consumer's ability to change or cancel a ticket to be clearly and conspicuously provided in the summary of the change or cancellation policy. In addition, the final rule requires, as suggested by FlyersRights, that airlines and ticket agents disclose the form of the refund or credit that would be provided in the event a change or cancellation is permitted. Finally, the change and cancellation summary must include notice that the consumer is responsible for any fare differential if that is the case. As noted by Air Canada, a large portion of the cost for a passenger to change their flight in many cases could be the fare differential. Given the potentially significant cost of fare differentials, the Department concludes that it would be deceptive to disclose a change fee without also disclosing that the passenger may also be required to pay the difference in fare. As such, the Department does not believe that this disclosure is

unnecessary, as urged by Travelport, and, accordingly, the final rule requires this additional disclosure. Further, the Department agrees with FlyersRights that the airline or ticket agent must disclose whether it will refund the difference in fare if the consumer changes their flight and selects a less costly replacement flight. This disclosure must be provided in the change policy. The Department has determined that the failure to provide the change and cancellation policy information required by this rule before ticket purchase is an unfair and deceptive practice, as discussed in section D (1)(b).

(c) Mobile Site and App Disclosure of Fees and Policies

*Proposal:* The Department proposed to require disclosure of fees and policies for ancillary services critical to a consumer's purchasing decision at the first point in a search process where a fare is listed in connection with a specific flight itinerary on airlines' and ticket agents' websites, including mobile websites. In the NPRM, the Department noted that consumers increasingly use mobile devices to book travel, and so it is important that the same disclosures provided on airlines' and ticket agents' desktop websites are also provided on mobile websites. While the Department did not propose to require critical ancillary fee and policy disclosures on airlines' and ticket agents' mobile apps, it sought comment on whether to extend the proposal to mobile apps and whether there are any practical distinctions between information accessed on mobile websites and mobile apps.

*Comments:* Multiple commenters provided data through their written comments and at the Department's March 30, 2023, public hearing regarding the frequency with which consumers book air travel on mobile websites and apps. AELP testified that 70 percent of consumers research travel on mobile devices. IATA provided the same statistic in its comments and further noted that 44 percent of online bookings were completed on mobile devices, citing a 2022 report. Priceline testified that more than half of its business is from mobile customers, Google stated that 68 percent of its users browse on mobile devices, and Hopper reported that its entire business is conducted "exclusively through the Hopper mobile app." A joint comment from multiple consumer groups noted that the top five free travel apps that sell airline tickets through the Apple operating system, iOS, have a combined 13.6 million user ratings, demonstrating

that such apps have reached millions of consumers.

Industry commenters opposed both the proposed requirement that airlines and ticket agents disclose all critical ancillary fees at the first page of search results on mobile websites and the extension of that proposal to cover mobile apps. These commenters noted that challenges with screen clutter are particularly acute on mobile devices and apps, which have limited screen space, and stated that the proposed requirement would likely limit the number of search results provided or require excessive scrolling on mobile apps and websites. In addition, Air Canada asserted that ATPCO was never designed to work in conjunction with mobile apps and therefore there is an inherent level of disconnect in the transferability of information between ATPCO and mobile apps. Further, Travel Tech stated that accommodating screen readers for individuals with disabilities on mobile devices would be more difficult given the volume of information required at the first page of search results under the proposal.

Some industry commenters, including Frontier Airlines, Campbell-Hill Aviation Group (on behalf of A4A), Sprit Airlines, and Google, provided visual illustrations to demonstrate the challenges of displaying first checked, second checked, and carry-on bag fees, change and cancellation fees, and family seating fees on the first page of mobile search results. For example, in Google's presentation at the Department's March 30, 2023, public hearing, it provided a sample mobile display it had created which it stated would require both horizontal and vertical scrolling for a consumer to see all ancillary fees required by the NPRM at the first page of search results.

A few commenters stated that challenges in displaying information on mobile devices would only continue to grow with continued technological evolution. For example, Amadeus testified that in the future more consumers will book air travel through mobile devices or other devices, such as wearables, with very small screens that might provide search results in the form of a voice message. Similarly, IATA noted that consumers are "increasingly conducting ticket searches via voice recognition, with the only major impediment being too much information to sort through." IATA stated that a requirement that all ancillary fee data be provided on the initial search page would inhibit consumer-friendly innovation. Travelers United expressed concern about the Department's ability to adapt its rule to

future technology such as artificial intelligence. This comment observed that by the time the rule takes effect, "new technology will be leading us in a different direction."

American Airlines and Hopper submitted comments addressing how the functionality of mobile devices differs from traditional desktop websites. American Airlines stated that carriers provide similar functionalities for mobile devices as for desktop websites and that those mobile functionalities "allow the consumer to view or hide information at the consumer's choosing, even if a mobile device does not have a cursor." This comment further explained: "in lieu of 'hovering,' [for mobile devices] American [Airlines] will provide a dropdown arrow which the consumer can click to display or hide the relevant information. These dropdown arrows are familiar and intuitive to consumers and provide the same benefits as rollovers." Hopper commented that rollovers, hyperlinks, and non-adjacent disclosures are ineffective on mobile websites and apps, but other comparable methods can be implemented by travel agencies for mobile websites and apps if the final rule "is not overly proscriptive." Hopper stated that "using expandable native results boxes" is "an effective approach" for mobile devices.

Industry commenters suggested different approaches for whether and how the final rule's requirements should apply to mobile apps and websites. American Airlines favored applying the same requirements to desktop and mobile displays, noting that different disclosures would be costly to develop and "far more confusing for the consumers who would receive different disclosures depending on the portal they use." Other industry commenters asked the Department to either exclude mobile apps from the final rule entirely or to allow more flexibility or more limited disclosures on mobile devices. For example, NACA recommended permitting links to critical ancillary fee information on mobile apps given limited screen space. Air Canada asked that DOT not extend the rule's requirements to mobile apps, other than a possible disclosure that "additional fees may apply" or directing the passenger to the carrier's website. Observing that "mobile apps are not scaled-down versions of desktop websites but rather use display formats that are uniquely designed to make information more accessible," Travel Tech asked DOT to exclude mobile apps from the final rule to allow engineers to develop innovative displays for apps.

Like Travel Tech, Hopper requested "flexibility for agents to design new and innovative methods for serving their customers on mobile devices." Hopper asked that both mobile websites and apps be excluded from any requirement to provide disclosure at the first page of search results and that disclosure instead be required prior to the time of purchase for mobile devices and apps.

Among groups representing consumers, AARP and a joint comment from multiple consumer groups supported covering mobile apps in the final rule. However, Travelers United expressed concern about the possibility of screen clutter on mobile devices. The joint comment from multiple consumer groups urged the Department to cover mobile apps to avoid excluding from fee disclosures the millions of consumers who book flights via mobile apps. That comment further noted that "mobile apps are just as capable of disseminating airlines' unfair and deceptive commercial practices" as mobile websites or desktop websites and have expanded reach due to push notifications. Finally, this comment explained that many consumers, especially those who are younger or low income, are likely to rely on smartphones as their primary internet connection, and so the final rule should cover mobile applications to avoid "disproportionately exclud[ing] these populations." AARP suggested that DOT could allow opt-outs or links and rollovers for mobile devices.

The few individual commenters who addressed coverage of mobile apps recommended different approaches. Individuals recommending that the Department cover mobile apps stated that covering mobile apps was necessary given increased use of those apps by consumers, to avoid misleading and confusing consumers by providing different information on various platforms, and because mobile apps provide a more "accessible" interface for users than mobile websites. One individual commenter, however, expressed concern about screen clutter on mobile apps due to the proposed requirement to display all critical ancillary fee data at the first page of search results.

*DOT Response:* Under this final rule, airlines and ticket agents must provide the same disclosures for critical ancillary service fees and policies on all online platforms. As commenters explained, consumers now widely use mobile websites and apps to shop for and purchase air transportation. The Department agrees with commenters who stated that it would be confusing to have different critical ancillary fee

requirements for mobile apps than for mobile and desktop websites. Further, the Department concludes that excluding airline and ticket agent apps from this rule's requirement to disclose ancillary fee data that the Department has determined is critical to consumers' purchasing decisions would not sufficiently protect consumers who use mobile apps to purchase air transportation.

Several commenters noted that methods of consumer search are evolving to include wearable devices, artificial intelligence, and voice recognition technology. To adequately cover desktop websites, mobile websites, mobile apps, and other technologies in this final rule, the Department uses the term "online platform" This term is defined as "any interactive electronic medium, including, but not limited to, websites and mobile applications, that allow the consumer to search for or purchase air transportation from a U.S. carrier, foreign carrier, or ticket agent."

The Department makes modifications from the proposal in this final rule that mitigate the concerns raised by commenters about the volume of information required to be disclosed at the first point in the search process where a fare is listed in connection with a specific flight itinerary. This final rule does not require airlines and ticket agents that sell air transportation to display family seating fees, which the Department had proposed. In addition, while fees for critical ancillary services must still be disclosed at the first point in the search process where a fare is provided in connection with a specific flight itinerary, this final rule provides significant flexibility to airlines and ticket agents regarding the method of displaying that information so long as it is displayed in a clear and conspicuous manner and not by hyperlinks. This allowance includes the option to use expandable native results boxes or dropdown arrows on mobile websites and apps, which as described in comments from American Airlines and Hopper, is the type of flexibility that would permit airlines and ticket agents to produce innovative, consumer-friendly ancillary fee displays without overwhelming consumers, unduly cluttering search results, or limiting the number of search results. These same flexibilities apply to desktops, mobile apps, and other online platforms. Further, to reduce screen clutter, the Department is allowing summaries of baggage, change, and cancellation policies to be disclosed any time before ticket purchase, rather than requiring them to be disclosed

contemporaneously with the fees as proposed.

*(d) In-Person and Telephone Disclosure of Fees*

*Proposal:* The Department proposed disclosure of critical ancillary service fees for tickets purchased by telephone or in-person like those proposed for online purchases. Under the proposal, ticket agents and airlines would be required to disclose to consumers shopping in-person or by phone the fees for first checked, second checked, and carry-on bags, ticket changes and cancellations, and family seating that apply to an itinerary for which a fare is quoted to the consumer. The Department proposed to require ticket agents and carriers to provide this ancillary fee information for offline transactions when schedule information is provided during the "information" and "decision making" portion of the transaction. The Department explained its proposal would not allow ticket agents and carriers to wait to provide this information until after the consumer has decided to make a reservation or purchase a ticket. The Department solicited comment on alternative options for providing fee information on the phone or in person (*e.g.*, explaining that fees may apply and referring the consumer to the carrier or ticket agent's website, provided that the website is accessible to consumers with disabilities).

*Comments:* The ACPAC recommended that the Department retain its proposal to require disclosure of fees for a first checked bag, a second checked bag, and a carry-on bag when a fare is quoted to a consumer during an in-person or telephone inquiry. The ACPAC did not adopt as a recommendation a suggestion from ticket agents that DOT modify its proposal to require bag fees and ticket change and cancellation fees to be provided "upon request" for offline transactions. At the January 12, 2023, ACPAC meeting, the member representing consumers expressed concern that the suggestion by ticket agents to provide baggage fees only upon request could lead to consumers having an incorrect understanding of the cost of the itinerary selected, and the member representing airport operators noted that the ticket agent suggestion regarding baggage fees appeared to conflict with the proposed requirement that ticket agents must refund baggage fees not disclosed during the ticket purchase process. Regarding change and cancellation fees, the ACPAC member representing consumers stated that consumers in offline transactions

should not have less information than those who transact online, and the member representing state and local governments noted that seniors and low-income individuals may not have access to or knowledge of online booking tools and stated that those individuals were no less deserving of or interested in fee information than those searching online.

Similarly, AARP supported DOT's proposal to require airlines and ticket agents to provide critical ancillary fee information at the time that schedule information is provided to the consumer for offline transactions. AARP stated that ''due to disability, lack of access, or simply preference, some consumers will seek fare information by phone or in person'' and noted that these same factors ''would likely inhibit [those consumers] from looking for the fee disclosures online.'' An individual commenter similarly requested that the Department require disclosure of critical ancillary fee information during phone bookings, stating that disclosure is necessary for accessibility and equal access to information for consumers using offline booking channels. This commenter stated that the alternative of referring offline consumers to a website for ancillary fee information improperly places the burden on consumers to obtain fees when the burden should rest with sellers of air transportation.

Industry commenters generally opposed the proposal to require affirmative disclosure of first checked, second checked, and carry-on bag fees, change and cancellation fees, and family seating fees at the time that fare and schedule information is provided during offline transactions. These commenters expressed concerns about the effect that the proposed offline disclosures would have on the ability to maintain reasonable wait times and assist passengers in a timely manner, with IATA noting that such concerns would be particularly acute when serving travelers at the ticket counter. Airlines further stated that the requirement to provide potentially dozens of critical ancillary fees would confuse and overwhelm passengers, and Air Canada asserted that it is likely that consumers preferring phone or in-person services are not looking to compare prices. ASTA estimated that the proposed disclosures would add at least 20 seconds to each offline transaction by ticket agents at an estimated cost of $21.3 million per year in ''talk time'' for agents.

Industry commenters recommended alternatives to the Department's proposal for offline disclosures. Ticket agents and their associations generally

suggested that DOT should require airlines and ticket agents to provide ancillary fee disclosures ''upon request,'' rather than affirmatively. For example, ASTA stated that requiring ancillary fee disclosures for offline transactions only upon request ''would allow ticket agents to use their professional judgement as to the fee-related information their clients need when such information is not specifically requested,'' with different levels of information appropriate for seasoned and infrequent travelers. TMC suggested that the Department allow airlines and ticket agents to direct consumers to an online source for fee information, such as ''an airline's website, a corporate travel booking tool, or other available reference.'' Similarly, some airlines and their associations asked the Department to allow carriers to advise passengers that additional fees may apply and direct passengers to an airline website for detailed ancillary fee disclosures. IATA asked that DOT allow disclosure that additional fees may apply ''either to begin the call or during the time the customer is holding for an agent.'' GBTA recommended that the Department consider requiring disclosure of a ''total likely price'' after the agent obtains information on whether the consumer plans to check a bag.

*DOT Response:* After carefully considering the comments, the Department is modifying its proposal for offline transactions in this final rule to require airlines and ticket agents to disclose critical ancillary fees to consumers who request them following disclosure that such fees apply to the searched itinerary. Specifically, the airline or ticket agent must disclose in an offline transaction that baggage fees, change fees, and cancellation fees apply when a fare is quoted with an itinerary if that is the case, and ask the consumer if they wish to hear the specific baggage fees, change or cancellation fees, and any other critical ancillary service fees that apply. If the consumer requests information about a single or multiple critical ancillary fees, then the airline or ticket agent must disclose the requested information that applies to the fare and itinerary quoted, adjusted based on any passenger-specific information provided by the consumer.

The Department agrees with comments stating that requiring disclosure of critical ancillary fee information for all possible flight options to all offline consumers at the time that schedule information is provided might significantly increase hold times and delay airlines and ticket agents in assisting consumers.

Therefore, the Department is permitting such offline disclosures to be made upon the consumer's request, provided that affirmative notice is given that a fee applies to the quoted itinerary. The Department disagrees with comments asking that it authorize airlines and ticket agents to refer passengers who seek booking assistance offline to critical ancillary fee information in online sources or that it should allow ticket sellers to provide this information only upon request without any affirmative disclosure required. While carrier websites must be accessible for passengers with disabilities,[100] the Department agrees with AARP that the same factors that lead some consumers to seek offline information about schedules and fares may also inhibit those consumers seeking critical ancillary fee information online, and so the recommendation to refer consumers to online sources would not appropriately address the needs of passengers. In addition, because fees for change and cancellation are often provided as a range on airline websites, finding the specific applicable change or cancellation fee for an itinerary quoted offline would be impracticable.

The Department's requirement that sellers of air transportation inform consumers in offline transactions that bag fees and change and cancellation fees apply to a particular itinerary is intended to provide consumers notice that a specific itinerary being quoted to them carries additional fees for these ancillary services. It is not sufficient to provide a generic disclosure that ''additional fees may apply,'' as recommended by IATA. Such a statement provides little useful information to consumers searching for the total cost of an itinerary and does not indicate what fees apply or the amount of those fees. The Department found that a similar notice in online search tools, as required by existing regulation, was equally insufficient. As provided in this final rule, the requirement is to provide a statement that bag fees, change fees, and cancellation fees apply to a specific itinerary being quoted, *if that is the case.* If, for the quoted itinerary, there is no additional charge for the consumer to check one or two bags or to bring on-board a carry-on bag, or to change or cancel the ticket, then no statement about these fees need be made in association with the quoted itinerary. If, however, a fee for one or more critical ancillary services applies to the quoted itinerary, then, under the requirement in this rule, the airline or ticket agent must

---

[100] 14 CFR 382.43(c).

notify the consumer that an additional fee applies for baggage or change or cancellation and permit the consumer to request the fee information. If the consumer requests fee information for any critical ancillary service, the airline or ticket agent must disclose it.

The requirement in this rule strikes the appropriate balance between minimizing delays in assisting passengers at the ticket counter or by phone and ensuring that consumers receive critical ancillary fee information. The Department does not adopt GBTA's proposal to permit airlines and ticket agents to quote a "total likely price" based on whether a consumer plans to check a bag because that proposal does not address all critical ancillary fee information nor would the allowance for a "likely" price quote allow a passenger to assess the true cost of air travel.

*(5) Passenger-Specific and Anonymous Search Fee Disclosures*

*Proposal:* The Department proposed to require passenger-specific or anonymous itinerary search disclosure of critical ancillary service fees, based on the consumer's choice, whenever fare and schedule information is provided. For searches where the passenger elects to provide passenger-specific information to the carrier or ticket agent, such as frequent flyer status, payment method, or military status, the Department proposed to require carriers and ticket agents display the fees for critical ancillary services in the form of passenger-specific charges for the itinerary. The Department proposed to treat a search as passenger-specific if a user provided passenger-specific information to the airline or ticket agent before conducting the search "including when conducting previous searches if the information is cached, or if the user conducts a search while logged into the search website and the operating entity of that website has passenger-specific information as part of the user's profile." [101] If the consumer conducting a search elects not to provide passenger-specific information to the carrier or ticket agent (*i.e.,* the consumer conducts an "anonymous itinerary search"), then the Department proposed to require carriers and ticket agents to display the fees for critical ancillary services as itinerary-specific charges.

*Comments:* The ACPAC recommended that the Department maintain its proposal to require airlines and ticket agents to display passenger-specific baggage and change and

cancellation fees in any final rule. At the January 12, 2023, meeting, the ACPAC member representing airlines stated that providing passenger-specific fees increases the complexity of the search process. He urged ACPAC members to consider the amount of information required to be presented to consumers under the NPRM and the impact these disclosures could have on the speed of providing search results to consumers given the number of ancillary fees required to be displayed at the time schedule and fare information is first provided.

In their written comments and hearing testimony, other industry commenters also opposed the requirement to provide passenger-specific fees for critical ancillary services. These commenters stated that passengers who have status with an airline already know about the benefits associated with their status, and so the disclosure would have little benefit for those consumers. The commenters added that it was impractical for consumers to provide ticket agents with all possible loyalty numbers before conducting a search. They further added that it was technologically infeasible to comply with the passenger-specific requirement, particularly on the first page of search results, with many citing concerns about technology for ticket agents to validate the passenger's status before displaying passenger-specific fees. For example, Booking Holdings stated that "to enable passenger-specific displays that would need validation from airlines (*e.g.,* frequent flyer account status and credit card affinity status) or third parties (*e.g.,* military status), would be technically prohibitive." Booking Holdings added that, without validation of information provided by the consumer, there is a risk that online travel agents would provide incorrect information to consumers about applicable fees.

Similarly, American Airlines testified at the Department's March 30, 2023, public hearing about challenges with validating passenger status using the EDIFACT platform and stated that querying and displaying passenger-specific fees at the first page of search results would affect the reliability and speed of search results. American Airlines further acknowledged in its comments, however, that it currently provides passenger-specific information "to the extent technologically feasible," including seat and bag fees for passengers with status logged in to the airline's website and military personnel who access the American Airlines site through a military booking channel. Echoing concerns raised by other

commenters, American Airlines stated that other passenger-specific fee information is impracticable to provide at the first page of search results because it cannot be validated at that time, citing the example of military status for individuals booking travel outside of an official military booking channel. In addition, Google expressed concern about consumer privacy if metasearch entities were required to collect and share customer data with airlines and ticket agents to comply with the passenger-specific search requirement.

Ticket agents uniformly expressed concerns about the volume of queries they would need to conduct to provide passenger-specific information. For example, USTOA commented that "the volume of data transmission necessary to provide for the level of specificity [for passenger-specific fees] contemplated under the proposed rule is unmanageably large and complex," noting that there are currently 47 different co-branded credit cards for "major" U.S. airlines, with various policies across airlines regarding when the airline waives the passenger's bag fee (*e.g.,* some credit cards entitle a passenger's travel companion to a free bag, while others do not). Similarly, Sabre commented that the proposed rule required passenger-specific information for too many passenger characteristics and added that it was unclear that the list of passenger-specific criteria in the NPRM was exhaustive. In addition, Sabre expressed concern that the requirement to provide passenger-specific ancillary fee information could lead to providing inapplicable fee information if only one passenger in a travel party has status or if status is lost between the time of booking and travel. Further, Travel Tech stated that "ticket agents would need to receive a huge volume of data from airlines for this proposal to work, but systems to exchange vast amounts of passenger-specific status information between airlines, agents and GDSs do not currently exist." Given the concerns raised by ticket agents, Booking Holdings requested that DOT not require passenger-specific disclosures, at least until new systems could be developed, and asked the Department to modify the proposal to require airlines and ticket agents to inform passengers how fees may differ based on frequent flyer privileges, military status, and other factors, instead of providing specific fees.

A joint comment from multiple consumer groups stated that the options for anonymous and passenger-specific searches "will be beneficial to consumers, allowing them to customize

---

[101] 87 FR 63736.

their purchasing process.'' This comment further stated that any additional time necessary to implement passenger-specific requirements should not be used to delay the implementation timeline for the rest of the NPRM's requirements. Travelers United stated that passenger-specific characteristics can make a significant difference in determining the total price of an airfare but noted that the complexity of ancillary fee structures makes providing that information on a single page ''difficult, if not impossible with current technology.''

*DOT Response:* This final rule maintains, with modifications, the requirement for airlines and ticket agents to provide passenger-specific fees for critical ancillary services if the consumer elects to provide passenger-specific information, and to provide itinerary-specific fees for critical ancillary services if the consumer does not do so. The Department clarifies that the list of information specific to the passenger provided in the rule text— frequent flyer status, military status, and credit card status—is illustrative and not exhaustive. Because variation in fees within each carrier depends on the status of the passenger, fares provided without additional disclosure of the critical ancillary fees specific to the passenger fail to provide consumers with adequate notice of the total cost of the air transportation. Disclosure of the passenger-specific fees will promote informed buyers, enhance competition, and lower prices.

The Department disagrees with comments stating that the complexity of airline policies for assessing passenger-specific fees or the number of queries that must be conducted to produce passenger-specific fees counsels against adopting a passenger-specific fee requirement. Ancillary fee structures that ticket agents or airlines find complex to administer are likely to lead to consumer confusion regarding fees. The costly and time-consuming burdens of determining passenger-specific fees are currently borne by consumers, a key harm that the Department seeks to remedy in this final rule, and makes disclosure of such fees necessary, even for experienced travelers with airline status. In addition, this final rule allows additional flexibility for industry beyond what was proposed, which will reduce the burdens to airlines and ticket agents in disclosing passenger-specific fees for critical ancillary services.

Further, many of the commenters who opposed the requirement to provide passenger-specific fees appear to believe that the proposal would require airlines and ticket agents to validate the

passenger-specific information provided by the consumer before displaying itinerary search results. Those comments misunderstood the Department's proposal. Neither the NPRM nor this final rule would require an airline or ticket agent to verify passenger-provided information before disclosing critical ancillary fees when schedule and fare information is provided. To address this misunderstanding, in this final rule, the Department clarifies that the disclosure of critical ancillary fees to consumers may be based on information provided by consumers. If a consumer elects to provide passenger-specific information to the carrier or ticket agent, that consumer has a responsibility for ensuring the information provided is accurate. An airline or ticket agent that relies on the information provided by a consumer when disclosing the critical ancillary service fees applicable to that consumer would not be in violation of the requirement for the fee information to be accurate should the consumer provide inaccurate information (*e.g.,* incorrect frequent flyer account status or credit card affinity status). An airline or ticket agent may elect to verify passenger-provided information at the point that the critical ancillary service is purchased rather than at the time of itinerary search. While this may result in the passenger later being charged a different fee than what was disclosed during the initial search (*e.g.,* if the passenger entered erroneous passenger-specific information), such harm is reasonably avoidable by the consumer providing the airline or ticket agent with accurate passenger-specific information.

The Department concludes that it is feasible for airlines and ticket agents to provide passenger-specific information as required by this final rule. American Airlines' comment suggests that it already provides much of the passenger-specific ancillary fee information required by the rule, providing strong evidence that the proposal can be implemented. In addition, many consumers, including those with a beneficial status, may choose to conduct an anonymous itinerary search, limiting the potential burden on carriers and ticket agents to conduct passenger-specific adjustments in the aggregate. The barrier that American Airlines identified to passenger-specific fees (*i.e.,* the need for validation of passenger data before the display of fees) is not required for compliance, and the Department expects this fact to further mitigate the concerns of regulated entities regarding potential burdens. In addition, the Department has made

several changes and clarifications from the NPRM that address concerns commenters raised about the feasibility of the proposed passenger-specific fee requirement. First, the Department has extended the period for compliance with the final rule's requirements, as discussed in section F, to allow additional time for data sharing and implementation of the final rule's requirements. In addition, this final rule does not require airlines and ticket agents to disclose or transact family seating fees, a key area of technical concern for many industry commenters. Further, this final rule provides flexibility in how fee information is displayed so long as the information is accurate, clear, and conspicuous, rather than limiting these disclosures to a display in static text as proposed. The Department expects that these changes will greatly reduce the technological burdens of disclosing passenger-specific fee information when schedule and fare information is provided in response to a consumer's search.

Because this final rule does not require ticket agents to validate passenger-specific data, the privacy concerns raised by Google do not apply. The Department nonetheless concludes that privacy concerns could be implicated if an airline or ticket agent treats an itinerary search as ''passenger-specific'' based on information not affirmatively provided by the passenger for that search, such as a search based on cached information. Under this rule, a consumer is entitled the option to conduct an anonymous itinerary search, which does not consider any passenger-specific information. A consumer should not see a specific fee or ticket price tailored to the consumer if the consumer elects to conduct an anonymous itinerary search. If such a search did, in fact, take into account passenger-specific information not affirmatively provided by the passenger for that search, the Department may take the view that the consumer was not afforded an anonymous itinerary search, which would be a violation of this regulation. Accordingly, this final rule defines a search as passenger-specific only when the search is based on information affirmatively provided by the passenger to the airline or ticket agent for purposes of that search.

*(6) Opt-Out Provisions*

*Proposal:* The Department did not propose to permit airlines and ticket agents to enable consumers to opt out of receiving fee information for any critical ancillary services during the search process. Instead, the Department sought comment on whether to allow carriers

and ticket agents to provide consumers an opt-out option from receiving ancillary service fee information that would otherwise be required. The Department explained that opt-out options could potentially include the choice to opt out of seeing all baggage fee information that would otherwise be required to be displayed (first and second checked bag and carry-on bag), to opt out of seeing fee information related to changing or canceling a reservation, to opt out of seeing seat fee information for a child traveling with an adult, or to opt out of seeing some of those fees.

*Comments:* Industry commenters generally supported permitting consumers to opt out of critical ancillary fee disclosures. These commenters stated that experienced travelers aware of airline ancillary fees may want to opt out of disclosures and that allowing consumers to opt out would provide a more efficient search with customized results for consumers. Spirit Airlines commented that a binary choice of whether a consumer wishes to view ancillary fee information provided at the start of the search process avoids any concern about "click wrap" tactics that do not represent a meaningful choice for consumers. Among industry commenters who recommended variations on this general approach, Booking Holdings recommended that consumers be required to affirmatively opt in to receive critical ancillary fee disclosures, stating that its recommendation was based on studies that demonstrate that schedule and fare are the most important factors in a consumer's decision. Google supported either an opt-out or opt-in provision for metasearch sites.

Groups representing consumers and individual commenters recommended different approaches. AARP recommended allowing opt outs in limited circumstances, stating, for example, it may be acceptable to allow "a traveler to opt out of certain disclosures (such as a single traveler opting out of adjacent seating fee disclosures)" on a mobile app where screen space is limited, but it added that any circumstance in which opt outs are permitted "should be the exception rather than the rule." One individual supported allowing consumers to opt out of ancillary fee disclosures based on concern about information overload from disclosure of all critical ancillary fees at the first page of search results. Another opposed opt outs with the view that opt outs improperly empower airlines and ticket agents to frame the question to the user about whether to forgo the otherwise-required

information. That individual instead recommended that fees be "zeroed out" when both the airline and consumer have reason to believe based on information from the initial fare search or customer profile that the consumer does not need a particular ancillary service.

For first checked, second checked, and carry-on baggage, the ACPAC recommended that consumers should be given the opportunity to indicate how many bags they will be traveling with early in the itinerary search process, and the fees applicable to the consumers' selections should then be displayed. This recommendation was proposed by the ACPAC Chair who stated that she did not believe that her recommendation was an opt-in or an opt-out. The ACPAC member representing airlines viewed this proposal as an opt in by consumers and stated that the recommendation was contrary to the Department's proposal. This member expressed concern about how regulating the search landing page could impact efficient search options currently available to consumers.

At the Department's March 30, 2023, public hearing, NCL supported the same approach recommended by the ACPAC, and FlyersRights made a similar recommendation in its written comments. Travel Tech objected to the ACPAC recommendation on the basis that, in its view, the recommendation was outside the scope of the NPRM. Travel Tech further commented that the ACPAC recommendation would require ticket agents to redesign their websites to include a bag inquiry, which would require significant resources. Travel Tech asked that ticket agents be provided with flexibility to adopt this method at their option.

Regarding change and cancellation fees, the ACPAC recommended that the Department should not provide the option for consumers to opt out of receiving change and cancellation fee information. The ACPAC member representing airport operators stated that because change and cancellation fees are not an *a la carte* item that consumers select but instead operate as penalties, the Department should require their display with no opt-out allowance.

*DOT Response:* The Department agrees with AARP that enabling opt outs from disclosure of ancillary fees that DOT has determined are critical to consumers' purchasing decisions "should be the exception rather than the rule." Accordingly, this final rule requires airlines and ticket agents to disclose change and cancellation fees to all consumers before ticket purchase

without any opt-out allowance. It also prohibits airlines and ticket agents from enabling consumers to opt out of receiving fee information for a first checked bag, a second checked bag, or a carry-on bag during the search process with one exception. In response to the recommendation by the ACPAC, the Department is allowing an exception to the requirement to disclose fees for transporting a first checked bag, second checked bag, and carry-on bag on online platforms in circumstances where a consumer affirmatively indicates that no one in their booking party plans to travel with a first checked bag, a second checked bag, or a carry-on bag.

More specifically, under the final rule, a carrier or ticket agent is excepted from the requirement to disclose bag fees with the fare and schedule information if (1) an airline or ticket agent asks its consumers if they intend to travel with a carry-on bag or checked bags; and (2) consumers affirmatively indicate that no one in the booking party intends to travel with a carry-on bag or first or second checked bags. The Department notes that if consumers affirm that they are not traveling with any bags, then the carrier or ticket agent does not have to disclose any of the bag fees. If consumers affirm that they are not traveling with a checked bag, then the carrier or agent is not required to disclose the fees for first or second checking bags. If consumers fail to provide an affirmation, then the carrier and ticket agent must display all the required bag fees. The Department is making this exception available to carriers and ticket agents should they prefer it to providing fees for a first checked bag, a second checked bag, and a carry-on bag in all instances when fare and schedule information is provided. A carrier or ticket agent that elects to use this exception must still provide the baggage weight and dimension information discussed in section E (4)(b) before ticket purchase so that a consumer has access to information about whether their travel plans are consistent with a particular carrier's weight and dimension limitations.

In contrast to baggage fees, consumers are unlikely to know at the time of booking that they would later need to cancel or change a flight and are unable to opt-out of these fees on an informed basis. As explained in the NPRM, change and cancellation fees can be significant and, in some cases, higher than the original fare paid by the consumer. Accordingly, this final rule does not allow airlines and ticket agents to enable consumers to opt out of disclosure of change and cancellation fees.

*(7) Transactability*

*Proposal:* The Department proposed to require airlines and ticket agents that impose a fee for children 13 or under to be seated next to an accompanying adult to enable the purchase of family seating at the point of ticket purchase (*i.e.,* transactability). The Department explained that transactability is necessary because consumers are not able to save the seat or lock in the price for adjacent seating at the time of ticket purchase. The Department did not prescribe a particular way for the regulated entities to comply. It noted that, to ensure that a consumer receives family seating information as part of the itinerary search results and accompanying fare quotations, a carrier or ticket agent could decide to enable consumers to disclose that a passenger 13 or under will be traveling prior to initiating an itinerary search. The Department also stated that a carrier or ticket agent could alternatively decide to display seating fees for all itinerary searches, regardless of whether a consumer disclosed that a passenger was 13 or under.

In contrast, the Department did not propose to require fees for a first checked, second checked, or carry-on bag or a ticket change or cancellation to be transactable at the point of purchase. The Department explained that it has not identified evidence of consumer harm resulting from a lack of transactability of baggage, change, or cancellation fees because these fees cannot increase after ticket purchase. In addition, the Department observed that there is no change or cancellation fee to transact at the point of ticket purchase because the consumer would not know at that time that they will cancel or change the ticket.

*Comments:* Ticket agents, including GDSs, and their associations generally requested that the Department require transactability of all critical ancillary fees, not only fees for children 13 or younger to be seated adjacent to an accompanying adult. Representatives of the travel technology industry also made this recommendation at the June 2022 ACPAC meeting.[102] Among the concerns expressed by Amadeus, Travelport, Travel Tech, and others were that the inability to purchase ancillary services from ticket agents would drive consumers away from ticket agents, harm the ability of consumers to comparison shop, and

result in consumers spending additional time to purchase ancillary services on airline websites after purchasing fares from ticket agents. These commenters stated that consumers might pay more to purchase ancillary services at a later time if the Department elects not to require transactability of all critical ancillary fees. For example, Travel Tech stated that, if airlines are able to quote different baggage fee amounts depending on when the passenger pays for the bag (*e.g.,* a higher fee applies if paid closer to the flight date or at the airport instead of at the time of booking), then the lack of transactability for a first checked, second checked, and carry-on bag could still result in a passenger paying more than they would at the point of ticket purchase.

Some ticket agents, including GDSs, and associations also asked the Department to expand the proposed requirement for transactable family seating fees to include all seat fees. For example, Booking Holdings asked DOT to require transactability of all seat fees if DOT maintained the proposed requirement that family seating fees be transactable because the ''significant expense of building the required technology would be offset by greater functionality for most consumers'' if the proposal were expanded. Amadeus asserted that there was a particularly strong argument for transactability of all seat fees due to availability and price changes. However, the U.S. Tour Operators Association (USTOA) and others stated that ticket agents currently lack the technology to make seat fees transactable.

Airlines and metasearch providers urged the Department not to require transactability of any critical ancillary service fee including family seating fees. For example, IATA and Southwest submitted comments opposing transactability requirements for any ancillary fees. These commenters expressed concern that airlines and ticket agents operate through contractual arrangements and stated that airlines should not be required to contract with third parties to sell airlines services. IATA testified at the Department's March 30, 2023, public hearing that travel agent websites would require new digital connections to airlines to display transactable seat fees, which would require years of information technology development. Metasearch providers Skyscanner and Google expressed concern that the proposed rule's transactability requirement would alter the nature of their business by requiring metasearch sites to sell seating.

*DOT Response:* The Department has decided not to impose any requirement in this final rule that ancillary fees be transactable at the point of ticket purchase. As discussed in section E (3)(c), the Department is not moving forward with its proposal to require carriers and ticket agents disclose fees for young children to be seated next to an accompanying adult on an aircraft and is instead pursuing a separate rulemaking to prohibit these fees.[103] Additionally, as discussed in section E (3)(d), given that the cost of air transportation includes a seat and the lack of clarity about the importance of seat selection fees to consumers, the Department is not requiring carriers or ticket agents to disclose seating fees as required critical ancillary service fees in this final rule. Further, the Department continues to be of the view that the lack of transactability of baggage, change, or cancellation fees does not harm consumers.

The Department is not persuaded by comments asserting that consumers might pay more to purchase ancillary services if the Department elects not to require transactability of all critical ancillary service fees. The Department has identified transporting a first checked, second checked, and/or carry-on bag and changing or canceling a reservation as critical ancillary services. The fee rules for these critical ancillary services do not change after a consumer has purchased a ticket. The fees that are disclosed to the consumer during the booking process will be those fees that apply to the ticket. Because the fee schedules for critical ancillary services are effectively frozen at the time of ticket purchase—which may include disclosing that fees will be higher if paid at the airport rather than at time of booking so long as that is disclosed up front—requiring transactability of critical ancillary service fees at the point of ticket purchase would provide little value, as consumers would be able to pay for critical ancillary services in the time and manner of their choosing. Through the fee disclosures required by this rule, consumers should be aware, for example, that a bag fee may be higher on the day of travel, if that is the case, so they can plan accordingly.

Also, as noted in the NPRM, because consumers would not know that they will cancel or change a flight at the time of ticket purchase, there is nothing to transact for those fees at the time of purchase. As with baggage fees,

---

[102] *See* presentations of ASTA, Travel Tech, and Amadeus, and Skyscanner, *available at https://www.transportation.gov/airconsumer/ACPAC/June2022Meeting/webcast* (June 2022, Day 1 afternoon session).

[103] *See* Fall 2023 Unified Agenda for rulemaking titled ''Family Seating in Air Transportation'' (RIN 2105–AF15) at *https://www.reginfo.gov/public/do/eAgendaViewRule?pubId=202310&RIN=2105-AF15.*

increases beyond the fees that were disclosed at the time of ticket purchase are prohibited for change or cancellation fees, and so there is no consumer harm from not requiring change or cancellation fees to be transactable at the point of ticket purchase.

The Department disagrees with commenters that the lack of a requirement to make critical ancillary fees transactable on ticket agent websites will drive consumers away from ticket agents. This rule maintains the status quo on the transactability of ancillary fees. A significant percentage of airline ticket sales are handled by ticket agents today, even in the absence of a regulatory requirement that ancillary fees be transactable on ticket agent websites, and ticket agents will continue to have the option under this final rule to enter into contractual agreements with carriers to sell ancillary services.

*(8) Data Sharing*

*Proposal:* The Department proposed to require airlines that provide fare, schedule, and availability information to ticket agents to sell or display the carrier's flights directly to consumers, to provide such ticket agents useable, current, and accurate information of the fee rules for a first checked bag, a second checked bag, one carry-on bag, canceling a reservation, and changing a reservation. The Department also proposed that such airlines provide family seating fee rules to ticket agents and enable these fees to be transactable by ticket agents. The intention of the proposal was for ticket agents to have access to critical ancillary service fee information sufficient to enable the ticket agents to disclose such fees to consumers.

Under the proposal, carriers would not be required to distribute ancillary service fee information to any ticket agent to whom the carrier does not choose to distribute its fare, schedule, and availability information. If a carrier did not share fare information with a ticket agent, then this proposal would not require that carrier to share ancillary service fee information with that ticket agent. The proposal left open the method by which carriers could choose to distribute fee information to ticket agents. The Department did not propose to require carriers use GDSs to distribute fee information to ticket agents. Each carrier would determine for itself whether to distribute critical ancillary service fee information through GDSs as most carriers already use GDSs to

distribute fare and schedule information.[104]

*Comments:* Industry comments on this issue were extensive. While airlines generally agreed that the rule should not require that they use GDSs to distribute fee information to ticket agents that sell or display directly to consumers, some airlines also expressed concern regarding the proposed requirement to distribute information. Ticket agents, on the other hand, expressed the view that airlines should be required to distribute information to any entity to which the airlines distribute fare and schedule information, including GDSs.

The ACPAC deliberated on the subject of data sharing, and although it did not make a recommendation on whether or how the data should be shared, the ACPAC member representing consumers commented that he did not see how ticket agents could display fees if the fee information was not provided to them.[105] The ACPAC members representing airlines and airports supported the Department's proposal on not requiring airlines to share fee information with GDSs, with the member representing airlines expressing agreement with the Department's rationale to not interfere with contractual relationships.[106] During deliberations, the member representing airlines commented that airline contractual relationships are the result of bargained-for terms, and he cautioned the committee from weighing into those relationships and giving one party veto power over the other in negotiations. The member representing airports noted that the sharing of data is the foundation for all other disclosure recommendations regarding ticket agents. The ACPAC's recommendation on data sharing was for the Department to clarify and refine what is meant by "useable, current, and accessible in real-time" and "non-static dynamic fashion" when describing how data is to be shared by airlines to ticket agents.

In written comments, IATA, A4A, the National Airlines Council of Canada, and several other airlines supported the proposal's lack of a mandate on

providing fee information to GDSs. IATA also commented that airlines should not be required to share data with metasearch companies that are not authorized agents of the airline. IATA noted two available options for establishing agent-airline connections sufficient to present dynamic bag fee information: direct connect, where the agent or agency enters into a direct connection with an airline, or IATA's New Distribution Capability (NDC), essentially an XML-based technical standard for use in airline distribution where an airline shares its NDC application programming interface with the ticket agent or the agent's technology provider. On NDC, American Airlines added that NDC provides more information and better customization than GDSs. IATA stated that some online ticket agents contract directly with ATPCO for fee information rather than relying on GDSs. IATA expressed concern about the capabilities of GDSs, stating that GDSs would need to divert IT resources away from improving the passenger booking experience to instead deliver ancillary fee information. It noted that GDSs had trouble implementing the requirements of the 2011 final rule, due to its outdated system EDIFACT, and that GDSs have not met their commitments to support the NDC. IATA also stated that a requirement to use GDSs would give the three major GDS companies the ability to extract exorbitant fees from airlines and artificially extend the use of an outdated network. A4A added its view that GDSs generally resist carrier innovation in product offerings, and American Airlines agreed that GDSs lack technological capabilities.

Some individual airlines and an individual commenter opposed any requirement to distribute ancillary fee information to ticket agents. Air Canada stated that the rule would force carriers to manage GDSs and how their information would be displayed on other channels, and the individual commenter asserted that airlines would be put in the position of being called to task for problems caused and errors made by third parties. Frontier Airlines stated that it uses proprietary technology and algorithms incompatible with GDSs, and any requirement that it provide data to ticket agents would require rebuilding the airline's distribution capabilities. Southwest Airlines stated that it does not generally contract with ticket agents and that the decision on whether to contract with a ticket agent should be left to the airline. The individual commenter also stated that the proposal was contrary to the

---

[104] The Department has also discussed the airline distribution system in prior rulemakings. *See, e.g.,* 79 FR 29970, 29975 (May 23, 2014), *available at https://www.govinfo.gov/content/pkg/FR-2014-05-23/pdf/2014-11993.pdf* and 82 FR 7536 (Jan. 19, 2017), *available at https://www.govinfo.gov/content/pkg/FR-2017-01-19/pdf/2017-00904.pdf.*

[105] *See* Aviation Consumer Protection Advisory Committee—January 12, 2023, Meeting Minutes, *available at https://www.regulations.gov/document/DOT-OST-2018-0190-0111.*

[106] No recommendations were made on this specific question, as two of the four ACPAC members were prepared to abstain from voting on this issue.

Airline Deregulation Act by forcing airlines to conduct business with OTAs and GDSs, even though the carrier's own business plan and IT system may be designed only for direct sales to the customer.

Ticket agents, including GDSs, generally asserted that the rule should require airlines to distribute fee information to GDSs. Travel Tech, for example, stated that the rule should include GDSs as ticket agents, and it added that it would support requiring fee information to be provided to all intermediaries to which an airline provides fares for distribution, including ATPCO and GDSs. Travel Tech noted that airlines already provide fare data to GDSs, and it disagreed with airlines' expressed concern that GDSs were wedded to old technology and will abuse market power. According to Travel Tech, the requirement to display passenger-specific baggage fees is infeasible for ticket agents, and not requiring the use of GDSs will add to development time and costs. Travel Tech and others noted that significant resources would be required for travel agencies to negotiate separately with each airline, with Travelport noting that this may cause agencies to shut down. Travel Tech added that GDSs are the only entities capable of distributing ancillary fee data in the short-term. The organization asserted that NDC is not an adequate replacement for GDSs. Amadeus expressed disagreement with IATA's assertion that its technology was outdated or that GDSs would need to divert resources away from making technological improvements to meet the requirements in the rule. Amadeus added that requiring that airlines share data with GDSs would not delay implementation of the NDC, and that the NDC and EDIFACT would need to coexist for some time, with NDC still in its infancy. Other ticket agent associations and individual ticket agents, such as ASTA and Hopper, as well as GDSs, agreed with the viewpoint that airlines should be required to distribute fee information to GDSs.

Metasearch entities supported the objective of having access to airline fee information, but they noted several concerns. Skyscanner stated that it supported the sharing of ancillary fee information with metasearch entities, noting that the requirement would address a longstanding lack of fee disclosure by airlines and ensure that metasearch sites can display fee information. Skyscanner also stated that it depends on direct connect arrangements and ATPCO and GDSs as the primary source of its data, and that the information sharing requirements

should be extended to include those latter entities. Google agreed that fee information should be provided to all intermediaries and distribution channels that may be relied upon by consumer-facing entities. Skyscanner also urged the Department not to permit airlines to impose restrictions on the way their fee information is used by the recipients of the information.

Several commenters expressed viewpoints on the terms "useable, current, and accessible in real-time" and "non-static, dynamic fashion," as referenced in the NPRM. Travel Tech expressed agreement with the ACPAC recommendation to clarify the meaning of these terms, and it believed that these changes should not require expensive or costly manipulation for the display of fees. Travel Tech also expressed the view that airlines should be encouraged to work toward data uniformity or standardization, with Travelport adding that airlines can more efficiently bear the cost of standardizing their own data rather than individual ticket agents. Sabre stated that airlines should be made to distribute ancillary fee information in a standardized machine-readable format across all channels they already use to distribute fares, including GDSs. USTOA expressed concern that terms like "useable" would be susceptible to differing interpretations, and it agreed that a lack of industry standards for furnishing information to ticket agents would impose increased compliance costs and practical burdens. Skyscanner stated that fee data is not "useable" if it requires costly processing or other manipulation before it can be displayed.

Multiple commenters, including Travel Tech, Bookings Holdings, and Skyscanner, expressed concern about being held responsible for inaccurate or incomplete fee data provided by airlines. Travel Tech noted, for example, that ticket agents should not be responsible for failing to display information not provided by airlines and should not be barred from providing flight information because airlines have not provided accurate fee data. Skyscanner urged the Department to clarify that metasearch sites and other entities will not be held responsible if airlines fail to provide covered fee information, which would prevent these entities from displaying the information to consumers, and it also believes that it should be allowed to display fare, schedule, and availability information even if it has not received accompanying ancillary fee information from the airline.

*DOT Response:* After carefully considering the comments on this issue,

the Department is requiring airlines to share critical ancillary fee information with any entity that is required by law to disclose critical ancillary service fee and policy information directly to consumers.[107] The Department agrees with commenters, including members of the ACPAC, regarding the need for airlines to share fee information with ticket agents for those ticket agents to make the required fee disclosures. In the Department's view, the requirement for fee data sharing is necessary to enable ticket agents to disclose fees to consumers when providing fare and schedule information. The Department provides its analysis of how the failure to share critical ancillary fee information is an unfair practice in section D (1)(d). In this final rule, as discussed in section E (1), the Department is requiring ticket agents to disclose critical ancillary service fees and policies to consumers. The Department is excluding corporate travel agents from these requirements and deferring to another rulemaking its determination on whether metasearch sites that do not sell airline tickets but display airline flight search options directly to consumers are ticket agents that must disclose ancillary fee information required. Accordingly, this final rule does not require airlines to share critical ancillary service fees with corporate travel agents. It also does not require sharing of information with metasearch entities unless and until metasearch entities are required to disclose that information to consumers. Despite the absence of a regulatory requirement, the Department recognizes that it benefits consumers, metasearch sites, and airlines if all critical ancillary fee information is available through all sources that consumers use to shop for air transportation. As a result, the Department encourages airlines and metasearch sites to enter into voluntary agreements to share critical ancillary fee information while further regulatory action is under consideration.

The Department continues to hold the view that it is not appropriate to require carriers to use GDSs to distribute fee information to ticket agents. The Department's interest is in ensuring that ticket agents disclose critical ancillary service fees to consumers whenever fare and schedule information is provided. Whether carriers share the required data through GDSs or by direct connect or by NDC are business decisions, and the Department seeks to minimize

---

[107] As noted in sections E (3)(c) and E (7), the Department has decided not to move forward with its data sharing and transactability proposals related to family seating fees at this time.

government interference with the business relationships between airlines, GDSs, and others. The Department notes that changes appear to be ongoing in the marketplace for information distribution, including the adoption and use of NDC. Further, the comments illustrate that there continue to be disagreements between airlines and GDSs on whether GDSs have the modern technology airlines need to merchandise and sell their products the way the airlines choose. The Department is unwilling to impose a prescriptive requirement on this issue while the situation is evolving and while the dynamic between airlines and GDSs remains highly complex. We believe that these airline-GDS relationships are best left to the marketplace. Nothing in this rule precludes or requires airlines to use GDSs to distribute critical ancillary fee information to consumer-facing ticket agents. As noted in the NPRM, GDSs may provide the lowest cost and most efficient way of distributing this information to ticket agents that sell the carrier's ancillary services. This may lead airlines to conclude that they need or want to use GDSs to distribute fee information to meet the implementation deadlines imposed by this rule. The Department notes that these circumstances may change in the future and an overly prescriptive requirement may become too rigid and may ultimately hurt, rather than improve, the consumer experience.

Also, the Department is adopting its proposal requiring the sharing of critical ancillary fee information only with the entities that a carrier chooses to distribute its fare, schedule, and availability information. Under this final rule, airlines are required to share critical ancillary fee information only with those entities with whom they provide fare, schedule, and availability information and who are required to disclose this information directly to consumers. Airlines are not required to share ancillary service fee information with entities with whom they have no existing relationship for sharing airline schedule and fare information.

On the terms "current, useable, and accessible in real-time" (or "useable, current, and accurate," as this phrase appears in this final rule) and "dynamic, non-static fashion," the Department does not define these terms in the regulation. The Department recognizes commenters' concerns about the lack of standardization in the data sharing process; however, as with other aspects of the data sharing requirement in the regulation, the Department believes that the requirement is better

suited to a performance-based, rather than prescriptive, standard. A more performance-based framework could enable the marketplace to coalesce around several functioning models of data transfer that will work to meet the regulation's objectives—namely, for ticket agents to have access to ancillary fee information sufficient to meet the fee disclosure requirements under this rule. We do note that, to meet the fee disclosure requirements of this final rule, ticket agents would need to be able to access fee rules and/or specific fee information such that each consumer itinerary search will result in the provision of accurate and applicable critical ancillary fee information that this rule requires. The Department expects that this will mean automated data transfers rather than manual. We also note that the requirement is for airlines to provide information "sufficient to ensure compliance by such entities" with the disclosure requirement. If airlines transfer the data in a way that is generally inaccessible to ticket agents despite reasonable efforts by the ticket agents to incorporate the data into their systems, then the information provided by the airlines is not considered sufficient. We expect both airlines and ticket agents to work in good faith to ensure that the data is useable to the recipient. Understanding that smaller ticket agents may require additional time to modify their systems to receive data and to disclose fee information in accordance with the regulation, this rule provides for additional time for small ticket agents to come into compliance. See section F.

The Department has considered ticket agents' concern that they could be held liable for missing or inaccurate data provided by the airlines. After considering these comments, the Department has determined that this concern is best addressed through OACP's investigatory process since OACP would be able to determine whether ticket agents' failure to properly disclose fees is a result of receiving incomplete or inaccurate data from an airline, based on the specific facts and circumstances of each case. The disclosures required by this rulemaking apply to both airlines and ticket agents. Under the regulation, if OACP were to investigate and find that missing or erroneous fee information displayed on a ticket agent's website was entirely the result of airline action or inaction, then OACP would pursue action against the airline and not the ticket agent. This rule affords airlines flexibility on how fee information is transmitted to ticket agents (*i.e.,*

whether the airline decides to use direct connect, GDS, or another method of delivery) but also requires airlines to ensure that information is accurately, timely, and effectively transmitted.

*(9) Remedies for Noncompliance*

*Proposal:* The Department proposed to treat as an unfair and deceptive practice within the meaning of 49 U.S.C. 41712: (1) the failure by a carrier or ticket agent to provide the critical ancillary fee disclosures required by the proposed rule, and (2) the collection of a fee for critical ancillary services if that fee was not disclosed when fare and schedule information was provided. In addition, the Department proposed to require a seller of air transportation to refund any fee charged for a critical ancillary service if the fee was not disclosed at the time the consumer searched for and purchased air transportation.

*Comments:* The Department received only a few comments directly addressing these proposed provisions, all from industry commenters who opposed the requirement for a ticket agent to refund fees charged by an airline. USTOA stated that the proposed requirement for ticket agents to provide refunds for services actually provided, in contrast to refunds for services not provided, exceeds the Department's statutory authority. This comment asserted that the Department is authorized to issue civil penalties for violations of 49 U.S.C. 41712, but not equitable relief like disgorgement, and the comment urged the Department to rely on investigations and civil penalties to incentivize compliance. USTOA also raised concerns about the burdens of retaining information to demonstrate what critical ancillary fee information was provided to the consumer at the time of search. Similarly, ASTA raised concerns with the purported challenges of demonstrating what was disclosed by the ticket agent to a consumer in an offline transaction and the burden of providing refunds for funds collected by the airline, not the ticket agent. Finally, Google stated that an entity that displays and relies on ancillary fee information provided by an airline should not be liable for a later overcharge by the airline and expressed concern that the proposal was likely to impose "a severe financial burden on ticket agents." Google added that metasearch entities would need to collect and retain personal information for purposes of issuing a refund and would not be able to validate data provided by a consumer, such as frequent flier status, that may result in

an airline charging a higher fee than was originally displayed.[108]

*DOT Response:* After carefully considering the comments, the Department is maintaining its proposal to treat as an unfair and deceptive practice the failure by a carrier or ticket agent to provide and adhere to the critical ancillary fee disclosures required by this rule but is not moving forward with its proposal to require a seller of air transportation to refund a fee for any critical ancillary service charged if the fee was not disclosed at the time the consumer searched for and purchased air transportation. While the Department disagrees with USTOA's comment that the proposed remedy exceeds DOT's authority, the Department has determined that any violations of the disclosure requirements can be adequately addressed through its existing enforcement process, which can be initiated by a consumer's filing of a complaint through OACP's website. The Department notes that, as an enforcement policy, OACP ensures that the violating entity has corrected the problematic issue and made whole any consumer that was negatively impacted. This includes the Department seeking monetary relief for consumers in negotiated settlement agreements addressing violations of 49 U.S.C. 41712, where appropriate. The Department has obtained monetary relief for consumers in previous enforcement matters in addition to assessing civil monetary penalties. *See* 49 U.S.C. 46301.

*(10) Other Proposals*

(a) Air Tour Packages

*Proposal:* The Department proposed that the fee disclosures for a carry-on bag, a first checked bag, and a second checked bag under the NPRM would not apply to air-tour packages advertised or sold online by ticket agents if the air transportation component is not finalized and the carrier providing air transportation is not known at the time of booking. Instead, the Department proposed to require ticket agents in such situations to disclose that additional airline fees for baggage may apply and that those fees may be reduced or waived based on the passenger's frequent flyer status, method of payment, or other information specific to the consumer. The Department

further proposed that, once the identity of the carrier providing the air transportation becomes known, the ticket agent must provide passenger-specific fee information for a first checked bag, second checked, and carry-on bag to prospective passengers and those passengers who booked the air-tour package before the identity of the carrier was known. The Department requested comment on whether this exception for certain air tour packages adequately addresses concerns of air-tour package sellers and whether such an exception adequately protects consumers.

*Comments:* American Airlines opposed the Department's proposal to require sellers of air tour packages to state "baggage fees may apply" if the carrier is unknown at the time of booking. Asserting that the Department is essentially exempting air tour package sellers from the requirement to disclose baggage fees, American recommended that sellers of air tour packages instead be required to provide a range of baggage fees when a carrier's identity is unknown. American Airlines argued that the Department's proposal would expand a technology gap to the detriment of consumers, adding that "packagers are capable of providing reasonable estimates or ranges for potential expenses for travelers. These requirements would increase transparency and cost certainty for travelers." USTOA supported the Department's proposal but noted that the NPRM did not specify the timeframe within which a ticket agent must provide the required baggage fee disclosures to consumers after the identity of the air carrier becomes known.

*DOT Response:* The Department disagrees with American Airlines' assertion that the Department is exempting air tour package sellers from baggage fee disclosure requirements. The Department is adopting the proposal requiring that air tour package sellers provide the relevant fee information once the identity of the carrier is known. The rule does not require that air tour package sellers disclose specific bag fees at the time of sale when the identity of the airline is not known, as identifying specific bag fees without knowing the operating airline could lead to guessing and inaccurate information, thereby confusing consumers. The Department has long required carriers and ticket agents to provide specific fees for first checked, second checked, and carry-on baggage, even under existing regulations that permit other ancillary fees to be expressed as a range. Baggage fees across carriers vary significantly and so

requiring air tour package sellers to provide a range of baggage fees, as American Airlines recommends, would not assist consumers to assess the costs of transportation as the range of baggage fees for multiple carriers would be so wide as to render the information useless.

Under this final rule, if the airline for an air-tour package is unknown when a passenger books the package, then the ticket agent must disclose in a clear and conspicuous manner at the time that the ticket agent first offers a package fare quotation that additional airline fees for baggage may apply and that those fees may be reduced based on the passenger's frequent flyer status, method of payment, or other consumer information. In addition, in response to the comment from USTOA, this final rule clarifies that, once the identity of the airline for a tour package is known, the ticket agent must provide the baggage fee disclosures otherwise required by this final rule at the same time that the ticket agent discloses the name of the carrier to the passenger.

The failure to disclose that additional baggage fees may apply when a passenger books an air tour package without an identifiable carrier and the failure to disclose the passenger-specific fees for a carry-on bag, first checked bag, and second checked bag when the carrier is known is unfair because it causes or is likely to cause substantial injury, which is not reasonably avoidable, and the harm is not outweighed by benefits to consumers or competition. This practice is likely to cause substantial injury because of the additional funds spent to transport bags that might have been avoided if the consumer had been able to determine the true cost of travel up front. This harm is not reasonably avoidable because consumers likely will not know that the bag fees are not included without the disclosure that there may be additional bag fees. Also, consumers would not know the cost of the bag fee without the ticket agent sharing that information with the passenger when the carrier is identified. Further, the harm is not outweighed by benefits to consumers or competition as the disclosures would ensure consumers are making informed decisions and would enhance competition. It is also deceptive to fail to disclose that bag fees may apply when the carrier is not known and to fail to disclose the passenger-specific fees when the carrier is known. Without these disclosures, a reasonable consumer is likely to be misled to believe that baggage fees were included in the price and also misled about the total purchase price. This

---

[108] Google noted that the proposed rule's preamble stated that the refund would be owed by the "seller of air transportation," but the draft regulatory text did not use this term and instead referred to a refund by a "ticket agent," which the Department has previously asserted includes metasearch entities.

matter is material as it impacts consumers' funds.

Air tour package sellers should provide consumers the opportunity to modify their air tour package at no cost or to cancel their air tour package for a refund, if the consumer chooses, once the applicable bag fees are disclosed to the consumer.

### (b) 24-Hour Rule Disclosure

*Proposal:* The Department proposed to require carriers and ticket agents with websites marketed to U.S. consumers to display on the last page of the booking process a brief statement on whether the carrier or ticket agent permits the consumer's booking to be cancelled without penalty within 24 hours, or whether the carrier or ticket agent permits the consumer to hold the reservation without payment for 24 hours, provided that the reservation was made at least one week before the flight's departure. Carriers are already required to either permit consumers to cancel their tickets within 24 hours without penalty or hold their reservations at the quoted fare for 24 hours without payment if the reservation is made more than a week before the flight's departure. Similar requirements currently do not exist for ticket agents though agents may do so voluntarily. This proposal is that the carrier's and ticket agent's chosen policy be disclosed on the last page of the booking process, which is distinct from the existing requirement that the carrier's chosen policy (*i.e.,* 24-hour hold or cancel within 24 hours with no penalty) be disclosed in that carrier's customer service plan pursuant to 14 CFR 259.5.

*Comments:* The Department received few comments on this issue and those comments either supported the Department's proposal or were neutral. For example, IdeaWorks, a consulting firm, agreed that "[a]wareness of this benefit should be reinforced." In addition, IATA noted that it had no objection to the requirement for carriers to display the 24-hour cancellation policy on their websites, while USTOA stated that it did not object to the new requirement provided that the final rule was clear that ticket agents are not required to allow passengers to cancel a booking within 24 hours or to hold the ticket for 24 hours at the quoted price.

*DOT Response:* The Department adopts this proposal with three clarifying edits. As proposed, this final rule requires carriers to disclose on the last page of the booking process whether the consumer's booking can be cancelled within 24 hours of purchase without penalty or whether it can be held at the quoted fare for 24 hours without payment. The Department clarifies that this disclosure must be made only if the reservation is made at least one week before the flight's departure, consistent with the existing regulatory requirement for carriers in 14 CFR 259.5(b)(4). Ticket agents are required to provide the same disclosure of their policy on allowing a passenger to hold a reservation for 24 hours or cancel a reservation within 24 hours without a penalty, for flights departing one week or more after the reservation. Ticket agents that do not offer either the 24-hour free cancellation or 24-hour reservation hold options without charge must disclose before ticket purchase that the consumer will not be able to cancel his or her booking after it is executed, consistent with this rule. The Department has an open rulemaking that would address, among other things, requiring travel agents to adopt minimum customer standards such as the 24-hour rule similar to those imposed on carriers.[109] The Department clarifies in this rule that airlines and ticket agents must make the required disclosure in a clear and conspicuous manner. In addition, the Department is amending the requirement for carriers to include an assurance in their customer service plan that they will offer either a 24-hour free cancellation or 24-hour reservation hold option at no cost to also include an assurance to disclose their chosen 24-hour policy on the last page of the booking process before ticket purchase as required in this rule. The Department has determined that the failure to make the required disclosure before ticket purchase is an unfair and deceptive practice, as discussed in section D (1)(b).

### (c) E-Ticket Confirmations

*Proposal:* Section 399.85(c) currently requires air carriers and ticket agents to include information regarding the passenger's free baggage allowance and the specific fee information for first and second checked bags and a carry-on item on all e-ticket confirmations for air transportation, taking into account factors such as frequent flyer status that affect those charges. This regulation currently provides that carriers must provide this information in text form on the e-ticket confirmation. Agents may provide this information either in text form on the e-ticket confirmations or

through a hyperlink to the specific location on an airline website or their own website where this information is displayed. In the NPRM, the Department requested comment on whether there is a benefit in retaining these requirements.

*Comments:* Few commenters addressed this issue. A4A urged DOT to remove the e-ticket disclosure because, in its view, existing disclosures are "redundant, unnecessary, and burdensome" and because consumers would have already received the information required in the e-ticket confirmation during the search process.[110] On the other hand, AARP called the e-ticket confirmation "an essential element of consumer protection." AARP further noted that "the dates of travel may be weeks or months after the tickets were booked, and many consumers will have forgotten the specific fee amounts presented to them at the time of booking," making the e-ticket confirmation "an important record for consumers to have at the time of travel." FlyersRights asked the Department to require additional disclosure after ticket purchase of the size limitations for personal items, carry-on bags, checked bags, instruments, and sporting equipment.

*DOT Response:* The Department maintains in this final rule, with modifications, the requirements that carriers and ticket agents must include specific fee information for first and second checked bags and a carry-on item on all e-ticket confirmations for air transportation and that the fee information provided must take into account the passenger-specific factors that affect those charges. The Department agrees with AARP that the e-ticket confirmation serves as a valuable record for consumers concerning the fee information provided at the time of booking and disagrees with A4A that listing this information on the e-ticket is redundant or burdensome. To ensure that the e-ticket provides an accurate record of the fees disclosed to consumers at the time of purchase, the Department is removing

---

[109] Information on the rulemaking titled "Air Transportation Consumer Protection Requirements for Ticket Agents" (RIN 2015–AE57) is available in the Fall 2023 Unified Agenda of Regulatory and Deregulatory Action at *https://www.reginfo.gov/public/do/eAgendaViewRule?pubId=202310&RIN=2105-AE57.*

[110] In its comment, A4A also asked DOT to eliminate the existing requirement at 14 CFR 399.85(b) that U.S. carriers, foreign air carriers, agents of either, and ticket agents provide a prominent disclosure that "additional bag fees may apply" and where consumers can see these baggage fees. The Department proposed to replace that existing requirement with the requirement to disclose itinerary-specific or passenger-specific fees, depending upon the consumer's search type, for a first checked bag, second checked bag, and carry-on bag. The final rule removes the existing requirement as proposed. Requirements for the display of baggage fees under this final rule are discussed in section E (4).

the allowance for ticket agents to provide a link to baggage fees as an alternative to providing the information in text form.

The Department has determined that it is an unfair practice to provide links to bag fees in the e-ticket confirmation instead of providing the information in text form. Links to bag fees that lead to complex charts are confusing to consumers and may ultimately not be instructive for many consumers in determining the bag fee that would apply to them. Further, the lack of an e-ticket confirmation with the bag fee in text form is likely to cause substantial injury for consumers who are charged a bag fee that is higher than the one disclosed during the search process because consumers would lack a valuable record to demonstrate the fee information provided at the time of booking. This harm is not reasonably avoidable because consumers are not able to generate the confirmation on their own. Also, the harm that these consumers experience is not outweighed by benefits to consumers or competition because lack of clarity about applicable bag fees harms, rather than benefits, consumers, and competition. As such, the Department is imposing in this final rule the same requirement for ticket agents to display baggage fees in text form on the e-ticket confirmation that has traditionally applied to carriers. In response to the comment from FlyersRights, the Department also clarifies that the information about the passenger's free baggage allowance currently required to be included in the e-ticket confirmation must include information about a personal item. This is not a substantive change to existing requirements.

### (d) Bag Policy Change Disclosures

*Proposal:* The existing regulation at 14 CFR 399.85(a) requires carriers to disclose any increase in applicable fees for carry-on or first or second checked bags promptly and prominently, along with any change in baggage allowances, on the homepages of their websites for at least three months after the change becomes effective. In the NPRM, the Department proposed language changes to clarify the scope of websites covered by this existing requirement but did not propose substantive changes. DOT also requested comment on whether these requirements would still be useful to consumers if the NPRM was finalized.

*Comments:* The Department received few comments on this issue. One individual stated that additional guidance on how airlines should communicate baggage fee increases to consumers is needed. A4A urged the Department to remove this required disclosure because it would be redundant and unnecessary if the rule were adopted as proposed.

*DOT Response:* The Department agrees with A4A that the existing requirement to disclose baggage fee increases and changes in baggage allowances on the carrier's homepage is no longer necessary. Under this final rule, airlines and ticket agents must provide the consumer with passenger-specific or itinerary-specific fees, depending on the consumer's search type, for a first checked bag, a second checked bag, and a carry-on bag when a fare and itinerary is displayed in response to a consumer's search. As discussed in section E (10)(e), under 14 CFR 399.88, these fees may not increase from what was displayed to the consumer before ticket purchase. Applicable baggage fees must also be memorialized on the e-ticket confirmation. Accordingly, prominent disclosure of baggage fee increases on carriers' websites would be unnecessary under this final rule because carriers may not apply such increases to ticketed passengers.[111]

### (e) Post Purchase Price Increases

*Proposal:* The Department proposed to amend 14 CFR 399.88, which prohibits sellers of air transportation from increasing the price for air transportation including the price for ancillary services that have not yet been purchased after a ticket is purchased, except in the case of an increase in a government-imposed tax or fee or if the potential for an increase was disclosed as required prior to purchase. Although the existing regulation includes a broad prohibition on increases to all ancillary service fees, regardless of whether these items are purchased along with the air transportation, in 2011, the Department announced that with respect to fees for ancillary services that were not purchased with the air transportation, it would only enforce the prohibition on post-purchase price increases for carry-on bags and first and second checked bags.[112] The application of the prohibition of the post-purchase price increase was also at issue in a lawsuit filed by two airlines against the

Department. The court considered the rule as applied under the Department's 2011 guidance and upheld the Department's rule prohibiting post purchase price increases as it is currently being applied.[113] The proposed revisions were intended to make the regulatory text consistent with the Department's rule as applied under the Department's 2011 guidance and upheld by the Court.

The Department did not propose changes to the rule as it is applied but sought comment on whether it should require that the price for ancillary services not purchased with the ticket be frozen beyond first and second checked bag and a carry-on item. More specifically, the Department asked whether prohibition on post purchase price increase should extend to fees for all baggage (including fees for oversized or overweight bags) or all ancillary services that have been identified as being critical to a consumer's purchasing decision.

*Comments:* IATA and American Airlines opposed any expansion of the post-purchase price increase beyond the fees for first checked bag, second checked bag, and carry-on bag. Citing seat fees as one example, American Airlines stated that many ancillary fees are dynamically priced, and so prohibiting post-purchase increase of those fees "would have the unintended consequence of foreclosing discounts for early purchases and likely result in increased prices."

AARP and FlyersRights commented on this proposal on behalf of consumers. AARP stated that the prohibition should apply to "the ancillary fees covered by this rule" and added that allowing fees to increase at a later date would undermine the regulatory goal of enabling consumers to make informed purchasing decisions based on the full cost of travel. FlyersRights advocated for extending the post-purchase price increase prohibition to all ancillary fees, not only those critical ancillary fees required to be displayed by this rule. This commenter stated that fees advertised at the time of ticket sale should not be increased once a consumer is locked into a ticket purchase.

*DOT Response:* The final rule extends the post-purchase price increase prohibition to all fees for critical ancillary services. The Department notes that, in addition to the post-purchase price increase prohibition on

---

[111] In response to the individual commenter, the Department notes that the post-purchase price increase prohibition at 14 CFR 399.88 does not prohibit an airline from charging different fees for a first-checked, second-checked, or carry-on bag based on when the passenger pays the baggage fee (*e.g.*, in advance or at the airport), but that it instead prohibits airlines from changing baggage fee rules that apply when a ticket is purchased.

[112] *See* Guidance on Price Increases of Ancillary Services and Products not Purchased with the Ticket (December 28, 2011).

[113] *Spirit Airlines, Inc., v. U.S. Dept. of Transportation* (D.C. Cir. July 24, 2012), slip op. at 20–21. Petition for Writ of Certiorari denied on Apr. 1, 2013.

fees for first checked, second checked, and carry-on baggage, as currently applied and discussed above, change and cancellation fees may not be increased beyond what was disclosed to the consumer at the time of purchase under 14 CFR 253.7. Because the only critical ancillary services identified in this final rule are first checked, second checked, and carry-on baggage and ticket changes and cancellations, the modification from the proposal to cover all critical ancillary service fees does not impose any new burdens on carriers or ticket agents. If the Department identifies additional critical ancillary services, after notice and opportunity for comment, then the post-purchase price increase prohibition will apply to those services at that time. The Department declines to extend the prohibition to additional ancillary fees not critical to a consumer's purchasing decision at this time due to the complexity and dynamic nature of many ancillary services. For example, as noted by the airlines, some airlines offer dynamic seat fee pricing that may adjust based on demand and availability, and consumers relying on a specific seat fee may be confused if the seat associated with that fee is no longer available by the time the consumer is ready to purchase a seat assignment. As another example, freezing the price of inflight food offerings at the time of ticket purchase could cause different passengers to have different pricing regarding the same food product purchased at the same time, a situation which could cause consumer confusion and be difficult for airlines to manage.

(f) Full Fare Rule and Percentage Off Discounts

*Proposal:* The Department proposed non-substantive changes to the current "full fare" requirement in 14 CFR 399.84(a) that when a carrier or ticket agent quotes a price in advertising or a solicitation, the price must be the total fare, inclusive of taxes and fees. The proposed changes consisted of minor changes to § 399.84(a) to promote readability and accommodate the ancillary fee disclosures proposed in the NPRM. Specifically, the Department proposed that, if a consumer wishes to view ancillary service fees, such as bag fees, incorporated into the total quoted price during an itinerary search, carriers and ticket agents may display the total price of the transportation, inclusive of mandatory taxes and fees and the consumer's selected ancillary service fees, more prominently than a price that includes only all mandatory charges. These adjustments were not intended to

make substantive changes to the full fare rule.

Under the existing full fare rule, carriers and ticket agents may state separately any charges included within the single total price on their websites, but such charges may not be false or misleading, may not be displayed more prominently than the total price, may not be presented in the same or larger size as the total price, and must provide cost information on a per-passenger basis that accurately reflects the cost of the item covered by the charge. Consistent with this requirement, the Department explained that advertisements that state discounts in the form of percentage-off sales must refer to a discount off the total price to be paid by the consumer for the ticket, unless the airline or ticket agent explicitly states that the discount is based on only a portion of the fare. For example, an advertisement that indicates air transportation is on sale for a percentage off but does not apply the discount to the total price would be misleading if it did not specify that it is a percentage off only the "base fare" or other fare component. The Department further elaborated that, when the terms "flight," "ticket," or "fare" are used in an advertisement stating a percentage off (*e.g.,* "a 25% discount off the flight"), a reasonable consumer would understand that the percentage off applies to the total price of the transportation. In the NPRM, the Department explained that there is a lack of clarity about the meaning of the term "base fare" and offering a percentage discount off of the "base fare" may be misleading if the discount only applies to a portion of the carrier-imposed charges, and not the total amount of carrier-imposed charges (*i.e.,* the fare for the transportation plus carrier-imposed charges such as fuel surcharges and other mandatory carrier fees). The Department solicited comment on whether and how to address this issue in the final rule.

*Comments:* Several commenters representing both industry and consumers asked the Department to define "base fare" to mean all mandatory carrier-imposed charges and agreed with the Department's assessment in the NPRM that providing a "base fare" discount would be misleading if the base fare did not include all such mandatory charges. For example, Southwest Airlines stated that some airlines advertise "generous eye-catching percentage-off discounts that can be fairly described as 'bait-and-switch' tactics" of a large percentage off a low "base fare" that does not include all mandatory carrier-imposed fees.

Southwest explained that in such circumstances mandatory carrier-imposed fees "often make up the majority of the ticket price" and are not discounted. In addition, both Travelers United and Southwest Airlines requested that DOT clarify that the "base fare" must include all mandatory airline-imposed fees on the distribution channel where a fare is viewed (*e.g.,* if there is a charge for online booking and the consumer is searching for airfare online, then the online booking fee must be included in the base fare). A small travel agent asked the Department to go further and prohibit all fuel surcharges and carrier-imposed fees, stating that fares are filed to ATPCO with the base fare only, making it difficult to compare fares between carriers. On the other hand, IATA opposed any additional regulation in this area, stating that consumers understand that percentage-off discount offers do not discount carrier surcharges.

Regarding the existing full fare rule, a joint comment from multiple State attorneys general noted that airlines often charge fees in connection with different methods of booking, including online, telephone, or in-person booking fees. These commenters noted that they understand that the existing full fare rule already requires such fees to be included in the full fare, but asked DOT to cover such fees in this rulemaking in the event that understanding was incorrect.

*DOT Response:* In this final rule, the Department is permitting airlines and ticket agents to disclose a total price inclusive of mandatory taxes and fees and ancillary fees in place of or more prominently than a total price that only includes all mandatory taxes and fees.

In response to comments, the Department is adding a new paragraph (e) to § 399.84, which provides that it is an unfair and deceptive practice for an airline or ticket agent to offer a percentage-off discount for air transportation, a tour, or a tour component that does not make clear at the outset the terms and conditions of the offer, including how the discount is calculated. This new provision further provides that, when used in any advertising or solicitation, the term "base fare" must refer to the amount that includes all mandatory carrier-imposed charges. The Department agrees with commenters that an advertisement of a percentage-off discount that is unclear about its terms or is offered as a percentage off a "base fare" that does not include all mandatory carrier-imposed charges is unfair and deceptive to consumers. The Department is unpersuaded by IATA's

unsupported statement that consumers understand that base fare discounts do not include discounts off carrier-imposed surcharges, particularly as to those consumers who purchase air transportation infrequently. The Department notes that carriers and ticket agents may continue to list the components of the "base fare" separately, consistent with § 399.84(a).

Also, as requested in a joint comment from multiple State attorneys general, the Department is making clear that mandatory booking charges are required to be included in the quoted fare under the full fare rule. Southwest Airlines and Traveler's United also requested confirmation that if there is a charge for online booking and the consumer is searching for airfare online, then the online booking fee must be included in the base fare. That is correct. As the Department explained when it issued its final rule that addresses full fare advertising in 2011, while a carrier or ticket agent generally is not required to include a booking fee in its advertised fare if there are other means for the passenger to obtain the air transportation (*e.g.*, a booking fee only applies for tickets that are purchased over the telephone), where airfares are advertised via an internet site that permits consumers to purchase fares, the fares advertised on the site must include all charges required to make the purchase on the site. For example, it would be unfair and deceptive to hold out on such an internet site a fare that can be purchased only at airport ticket counters but that excludes a convenience fee that is applied to internet sales.[114] To avoid confusion in this area, the Department is adding this clarification to its full fare rule.

(g) Codeshare Flights

*Proposal:* The Department did not propose any new requirements specific to codeshare flights, separate from the general proposal that airlines and ticket agents disclose critical ancillary fees on an itinerary-specific basis.

*Comments:* A comment from multiple State attorneys general stated that "where there is a codeshare arrangement in place, the consumer must be notified of the fees that will actually be charged, whether they are imposed by the airline through which the consumer booked the flight or the airline operating the flight." Though this comment noted that the issue appeared to be addressed by the requirement that the fees provided be accurate, these commenters asked DOT to consider whether special

requirements were necessary for codeshare flights. Two individual commenters similarly stated that carriers should be required to disclose the fees of their partners.

*DOT Response:* The Department has determined that no revisions to the proposed rule are necessary to address these comments. The Department proposed, and this final rule requires, that airlines and ticket agents disclose critical ancillary fees on an itinerary-specific basis. This includes the requirement in § 399.85(c) of this rule for a carrier to accurately display itinerary-specific fees, including those involving flights operated by a partner carrier. In addition, this final rule maintains the existing regulatory requirement in § 399.85(e) (recodified in this rule at § 399.85(i)) that airlines must disclose through their websites any differences between their optional services and related fees and those of a carrier operating the flight under a codeshare arrangement. This existing requirement includes the fees for ancillary services that are not covered by the requirements of this final rule. This final rule also maintains the existing regulatory requirement in 14 CFR 399.87 that, for passengers whose ultimate ticketed origin or destination is a U.S. point, U.S. and foreign carriers must apply the baggage allowances and fees that apply at the beginning of a passenger's itinerary throughout his or her entire itinerary. That section also specifies that, in the case of code-share flights that form part of an itinerary whose ultimate ticketed origin or destination is a U.S. point, U.S. and foreign carriers must apply the baggage allowances and fees of the marketing carrier throughout the itinerary to the extent that they differ from those of any operating carrier.

(h) Additional Comments

The Department received several comments that did not specifically address the proposals in the NPRM.

*Comment:* Google noted that the NPRM did not address how the proposed requirements would affect existing requirements at 14 CFR part 256 governing how ticket agents and air carriers must respond to consumer searches and disclose display bias. Specifically, Google asked whether fees for baggage, ticket changes and cancellations, and seat assignments should be included in the total price when ranking responses based on the lowest total price.

*DOT Response:* The Department's existing regulation at 14 CFR 256.4 prohibits undisclosed display bias and requires each electronic airline

information system to "display information in an objective manner based on search criteria selected by the user;" the regulation provides "lowest total cost" as one example of search criterion. This regulation further requires that those flight options best satisfying the user's selected search criteria "must be ranked in lists above other flight options," but provides that this "does not preclude systems from setting default display parameters that are not deceptive or offering users the option to choose a variety of display methods within those parameters."

The Department clarifies that this final rule does not alter the existing requirements in part 256. If an airline or ticket agent's site enables a consumer to select desired ancillary services (*e.g.*, baggage) to be included in the total quoted price for search results and the consumer requests to receive search results by "lowest total cost," then any ancillary fees selected by the passenger should be included in the total price for purposes of ranking flight options to reflect the consumer's selected search parameters.

*Comments:* FlyersRights and multiple State attorneys general stated that states should be provided with statutory authority to regulate aviation consumer protection.

*DOT Response:* This issue is outside the Department's authority and cannot be addressed by the Department in this final rule. The Department works with state authorities on aviation consumer protection issues where appropriate and within the confines of existing statutory authority.[115]

*Comment:* The U.S. PIRG Education Fund asked the Department to update its method of reporting consumer complaints, suggesting models currently used by the National Highway Traffic Safety Administration (NHTSA) and the Consumer Financial Protection Bureau (CFPB).

*DOT Response:* The Department has been examining how best to review, process, and report air travel service consumer complaints, which has included looking at various models including models currently used by NHTSA and CFPB. The Department anticipates that its new modernized system will be operational in 2024 and will be further enhanced with funding

---

[114] 76 FR 23110, 23143 (Apr. 25, 2011).

[115] On April 16, 2024, the Department announced a new partnership with State attorneys general to prioritize misconduct cases referred to DOT by State attorneys general who uncover unfair or deceptive airline practices. *See https://www.transportation.gov/briefing-room/secretary-buttigieg-launches-bipartisan-partnership-state-attorneys-general-protect.*

from the Technology Modernization Fund (TMF) in the coming years.

*Comments:* A few individual commenters asked the Department to impose a comprehensive passengers' bill of rights.

*DOT Response:* This comment is outside of the scope of this rulemaking. The Department notes that it provides a comprehensive list of current consumer protections for air consumers at *https:// www.transportation.gov/airconsumer/ fly-rights* and an Airline Passengers with Disabilities Bill of Rights at *https:// www.transportation.gov/airconsumer/ disabilitybillofrights.* Also, the Department has an open rulemaking to respond to section 429 of the 2018 FAA Act which directs the Department to require carriers to submit a one-page document that describes the rights of air consumers to the agency and require those carriers to make that document available on their websites.[116]

## F. Compliance Period

*Proposal:* The Department proposed a six-month implementation period for the rule's requirements. In support of the proposed six-month implementation period, the Department noted that, at the June 2022 ACPAC meeting, one airline representative indicated that, broadly speaking, sharing ancillary fee data with ticket agents is not technologically difficult and could be accomplished within a short time frame.[117] The Department specifically sought comment on whether it should impose a date certain by which carriers must share ancillary service fee information with ticket agents.

*Comments:* The ACPAC decided to refrain from recommending a specific timeframe for compliance with the final rule. Instead, the ACPAC recommended at its January 12, 2023, meeting that the Department should consider what can be done realistically, as well as the need for consumers to have ancillary fee information as soon as possible, in determining the timeframe for compliance with the final rule.

A few groups representing consumers requested that the Department adopt either the six-month period from the NPRM or a shorter three-month implementation period. For example, AARP supported the proposed six-month compliance period, calling it a

"reasonable amount of time" and urged the Department to finalize and implement the rule quickly "so that the benefits of fee disclosure can be extended to travelers as soon as possible." In addition, FlyersRights asked the Department to instead require a three-month implementation period. In support, it cited the June 2022 ACPAC testimony that the Department cited in the NPRM as evidence that airlines and ticket agents could implement the proposed rule more quickly. On the other hand, Travelers United commented that the significant technological changes required by the proposal would require additional time to implement.

Industry commenters uniformly opposed the proposed six-month compliance period, stating that it was far too short and recommending significantly longer periods, with many stating at least three years was needed. Specifically, industry commenters raised concerns with the ability to complete data-sharing agreements, develop the proposed first page display of critical ancillary fees, display real-time, transactable family seating fees, and calculate and display passenger-specific fees within the six-month timeframe proposed. For example, A4A stated that a compliance period of at least three years was "necessary to provide time for all parties to re-engineer their own marketing platforms and re-design and re-engineer connections to other stake holders, especially with regard to family seating transactions and passenger-specific search information." IATA also recommended a three-year implementation period, citing prior challenges with data sharing using EDIFACT and testifying at the Department's March 30, 2023, hearing that providing transactable family seating fees would take years. In addition, Frontier Airlines suggested that required data sharing with ticket agents "would be measured in years, and perhaps decades," and American Airlines stated that "to disclose passenger-specific ancillary fees on the first page of search results requires a highly complex reconfiguration" of its distribution technology that "could take years to resolve."

Other industry commenters suggested less than three years was needed but still emphasized that implementation of the proposal would take longer than the six months proposed. For example, USTOA recommended an implementation period of at least 18 months, Travelport suggested a period of 24 months (with the first 12 months for data sharing) if the Department

elected not to require data sharing with GDSs, and Travel Tech stated that at least two years would be needed to display all critical ancillary fees at the first point in the search process where schedule and fare information is provided.

Some industry commenters stated or suggested that their time estimates would be shorter if the Department modified its proposal. For example, American Airlines stated that if the Department allowed itinerary-specific disclosures later in the booking process, its "estimate would change meaningfully." Bookings Holdings commented that its three-year implementation estimate could be reduced to two years if the Department required data sharing through GDSs and to 18 months if the Department allowed affirmative opt-ins or static rollovers, links, or pop-ups for the display of fees. Amadeus noted that "[r]evision of the rules to allow more flexible displays and to eliminate the proposed requirement that all critical fee data be provided on the first search results page will go far to allow for timely and cost-efficient implementation." Travel Tech stated that the rule could possibly be implemented in as few as 18 months with modifications to the proposal.

*DOT Response:* After carefully considering the comments received, the Department extends the proposed compliance period as follows: (1) airlines must share data with ticket agents as required in this rule not later than six months after this rule's publication date, or October 30, 2024; (2) airlines must meet the critical ancillary service fee disclosure requirements not later than 12 months after this rule's publication date, or April 30, 2025; (3) ticket agents that do not meet the SBA definition of a small entity[118] must meet the critical ancillary service fee disclosure requirements to consumers not later than 18 months after this rule's publication date, or October 30, 2025; and (4) ticket agents that meet the SBA definition of small entity must meet critical ancillary fee disclosure requirements to consumers not later than 24 months after this rule's publication date, or April 30, 2026. The additional six months for large ticket agents to comply beyond the deadline for airlines reflects that carriers already have access to the required ancillary fee information, but ticket agents cannot implement the disclosure requirements

---

[116] "One-Page Document on Passenger Rights" (RIN 2015–AE82) is available in the Fall 2023 Unified Agenda of Regulatory and Deregulatory Action at *https://www.reginfo.gov/public/do/ eAgendaViewRule?pubId=202310&RIN=2105-AE82.*

[117] Remark of American Airlines, *available at https://www.transportation.gov/airconsumer/ ACPAC/June2022Meeting/webcast* (Day 1 afternoon session).

[118] A ticket agent is a small entity if it has total annual revenues below $25 million *See https:// www.sba.gov/document/support--table-size-standards,* NAICS Code 561510.

in this rule until data-sharing arrangements are complete. The longer implementation period for small ticket agents reflects that those businesses may require additional time for compliance as discussed in section E (1)(b).

The Department believes that the implementation period set forth in this final rule is reasonable. The Department has modified several key aspects of the proposal in this final rule,—including in areas that were of particular concern to industry commenters—which will permit quicker implementation than the periods generally suggested by industry commenters. Among those significant changes, this final rule does not require display or transactability of family seating fees and provides additional flexibility in how critical ancillary fees must be disclosed, as requested by many commenters. In addition, while some commenters cited the requirement to provide passenger-specific fees as a challenge to timely implementation, the Department notes that some commenters appeared to misunderstand this requirement and mistakenly believed that information provided by the consumer would need to be validated before the airline or ticket agent could disclose passenger-specific fees, posing technological challenges. As discussed in section E (5), airlines and ticket agents may present passenger-specific ancillary fees based on the information provided by the consumer, and so this requirement should not significantly slow implementation.

Finally, although this final rule does not require data sharing with GDSs as requested by some commenters to speed implementation, the Department expects that airlines and ticket agents will work in good faith to come to an agreement on the method used to transmit the ancillary fee information required by this final rule. Nothing in this final rule prevents airlines and ticket agents from voluntarily agreeing to use GDSs to distribute the ancillary fee information if that is their preferred method for meeting the rule's requirements within the timeframe provided.

## Regulatory Notices

*Executive Order 12866 (Regulatory Planning and Review) and DOT Regulatory Policies and Procedures*

The final rule meets the threshold for a significant regulatory action as defined in section (3)(f)(1) of E.O. 12866, "Regulatory Planning and Review," as amended by E.O. 14094, "Modernizing Regulatory Review," because it is likely to have an annual effect on the economy of $200 million or more. Accordingly, the Department has prepared a regulatory impact analysis for the proposed rule, summarized in this section and available in the docket. Table X summarizes the results of the analysis.

The final rule changes how U.S. air carriers, foreign air carriers, and ticket agents disclose information about certain ancillary fees for flights. Expected benefits of the rule are due to the reduction of excess consumption of air travel, or deadweight loss, which occurs because consumers who are unaware of ancillary service fees behave as if the price for air travel were lower than it is. Annual benefits expected from reducing deadweight loss amount to $5.5 million. The other source of expected benefits is from the time consumers will save when they search for airfare because they no longer need to interrupt their search to find information on ancillary service fees. The amount in expected benefits due to time savings varies significantly depending on assumptions regarding the number of consumers who consider ancillary fee information when they search for airfare.

Expected costs of this rule include costs to consumers uninterested in receiving this information due to the time needed to navigate increased amounts of information, which again, varies according to the percentage of consumers who consider ancillary fee information relevant to their purchase decision. The primary costs of the rule to carriers and ticket agents are the costs that they would incur to modify their websites to adjust their displays of fares, schedules, and fees. Third parties involved in data exchange, such as GDSs and direct-channel companies might incur some costs due the need to upgrade their systems, though the Department understands that these entities are already upgrading systems for market reasons and have been for several years. As shown in table X, the analysis considered two scenarios, each representing an alternative estimate regarding the percentage of consumers who consider ancillary fee information when they purchase airfare. Across the two scenarios, the estimate of annual net benefits ranges from $30 million to $254 million, indicating that this percentage is a key driver of the results. Formal uncertainty analysis suggests that the final rule might be expected to produce net societal benefits with a probability of about 53 percent under plausible assumptions about the percentage of consumers who consider ancillary fees when they purchase airfare.

One effect of better information on ancillary fees, however, is that some consumers will pay less for the ancillary services they use when they travel by air. These economic effects are not societal benefits or costs but represent a transfer from airlines to consumers, estimated to be about $543 million annually. This transfer represents $543 million in overpayment in fees for consumers, or from the perspective of airlines, additional revenue from consumers who are surprised by fees and, for example, then need to pay a higher fee at the airport to check a bag. This transfer, as well as the benefits due to any reduction in deadweight loss, accrue to consumers and are expected to occur regardless of any time savings impacts.

TABLE X—SUMMARY OF ANNUAL ECONOMIC EFFECTS

[Millions of $2022]

| Item | Annual amount | |
|---|---|---|
| | Scenario 1 * | Scenario 2 ** |
| Benefits: | | |
| Reduction in deadweight loss ................................................................................................ | $5.5 | $5.5 |
| Reduction in search time for consumers interested in ancillary service fees when they search for airline tickets on airline sites ................................................................ | 365.2 | 484.3 |
| Reduction in search time for consumers interested in ancillary service fees when they search for airline tickets on non-airline sites ........................................................ | 37.4 | 49.5 |
| Total annualized benefits ........................................................................................ | 408.1 | 539.4 |
| Costs: | | |

TABLE X—SUMMARY OF ANNUAL ECONOMIC EFFECTS—Continued

[Millions of $2022]

| Item | Annual amount | |
|---|---|---|
| | Scenario 1 * | Scenario 2 ** |
| Increased time navigating search results | 330.8 | 238.9 |
| Annualized one-time and recurring costs for airlines to update price displays and provide fee information to ticket agents | 32.1 | 32.1 |
| Annualized one-time and recurring costs for ticket agents to update price displays | 13.9 | 13.9 |
| Annualized costs to ticket agent for offline disclosures | 1.0 | 1.0 |
| Costs to GDSs and other third-parties engaged in data exchange to upgrade systems | Unquantified | Unquantified |
| Total annualized costs | 377.8 | 285.9 |
| Net benefits (costs) | 30.3 | 253.5 |
| Transfers: | | |
| Reduction in prices paid for ancillary services (airlines to consumers) | 543.1 | 543.1 |

* Scenario 1: 46% of consumers consider ancillary fees when they search for airfare.
** Scenario 2: 61% of consumers consider ancillary fees when they search for airfare.

*Executive Order 13132 (Federalism)*

This final rule has been analyzed in accordance with the principles and criteria contained in E.O. 13132 ("Federalism"). This final rule does not include any requirement that (1) has substantial direct effects on the States, the relationship between the National Government and the States, or the distribution of power and responsibilities among the various levels of government, (2) imposes substantial direct compliance costs on State and local governments, or (3) preempts State law. States are already preempted from regulating in this area by the Airline Deregulation Act, 49 U.S.C. 41713. Therefore, the consultation and funding requirements of E.O. 13132 do not apply.

*Executive Order 13175*

This final rule has been analyzed in accordance with the principles and criteria contained in E.O. 13175 ("Consultation and Coordination with Indian Tribal Governments"). Because none of the provisions of this final rule will significantly or uniquely affect the communities of the Indian tribal governments or impose substantial direct compliance costs on them, the funding and consultation requirements of E.O. 13175 do not apply.

*Regulatory Flexibility Act*

When a Federal agency is required to publish a notice of proposed rulemaking (5 U.S.C. 553), the Regulatory Flexibility Act of 1980 (5 U.S.C. 601 *et seq.*) requires the agency to conduct a final regulatory flexibility analysis (FRFA). A FRFA describes the impact of the rule on small entities and describes the steps the agency has taken to minimize the significant economic impact on small entities consistent with the stated objectives of applicable statutes (5 U.S.C. 604). A FRFA is not required if the agency head certifies that a rule will not have a significant economic impact on a substantial number of small entities (5 U.S.C. 605). The Department has prepared a FRFA for this final rule, set forth in the paragraphs that follow. DOT has provided a statement of the need for, and objectives of, the rule elsewhere in the preamble and does not restate them here. In the preamble to this final rule, DOT responds to the comments received on the economic impacts of the rule, including on small entities, and provides DOT's assessment of those comments and any changes made as a result of those comments (*e.g.*, the extended compliance period, exclusion of corporate travel agents, removal of family seat fee disclosure and transactability, flexibilities provided in the way carriers and ticket agents display ancillary fee information, and permitting baggage and change and cancellation policies to be displayed later in the booking process). DOT does not repeat that information here. The Department's Regulatory Impact Analysis developed in support of this final rule also provides information on the economic impacts of the final rule, as modified in response to public comments and further consideration by the Department. DOT did not receive comments from the Chief Counsel for Advocacy of the Small Business Administration in response to the proposed rule.

*Description of and an estimate of the number of small entities to which the rule will apply.*

The rule will have some impact on U.S. air carriers, foreign air carriers and ticket agents that qualify as small entities. It would also have some impact on GDSs, but none of the three major GDS companies in the market (Amadeus, Sabre, and Travelport) qualify as small businesses.

A carrier is a small entity if it provides air transportation exclusively with small aircraft, defined as any aircraft originally designed to have a maximum passenger capacity of 60 seats or less or a maximum payload capacity of 18,000 pounds or less, as described in 14 CFR 399.73. In 2020, 28 carriers meeting these criteria reported passenger traffic data to the Bureau of Transportation Statistics.[119]

A ticket agent is a small entity if it has total annual revenues below $25 million.[120] This amount excludes funds received in trust for an unaffiliated third party, such as bookings or sales subject to commissions, but includes commissions received. In 2017, the latest year with available data, 7,827 travel agency establishments had annual revenues of less than $25 million.[121]

*Description of the projected reporting, recordkeeping, and other compliance requirements of the rule, including an estimate of the classes of small entities which will be subject to the requirement and the type of professional skills necessary for preparation of the report or record.*

The final rule would have impacts on small entities because carriers and ticket agents would incur costs to modify websites and upgrade systems to exchange ancillary fee data. The Department stated in its initial regulatory flexibility analysis prepared in support of the proposed rule that

---

[119] Bureau of Transportation Statistics. No date. "T1: U.S. Air Carrier Traffic and Capacity Summary by Service Class." *https://transtats.bts.gov/*.

[120] *See https://www.sba.gov/document/support--table-size-standards*, NAICS Code 561510.

[121] U.S. Census Bureau. 2022. "Economic Census." *https://www.census.gov/programs-surveys/economic-census.html*.

because the Department could not estimate these costs reliably, it could not determine whether the proposed rule would impose a significant impact on a substantial number of small entities. For this final rule, the Department estimated that the primary costs of the rule to carriers and ticket agents are the costs that they would incur to modify their websites by adjusting their displays of fares, schedules, and fees. Third parties involved in data exchange, such as GDSs and direct-channel companies might incur some costs due the need to upgrade their systems, though the Department understands that these entities are already upgrading systems for market reasons and have been for several years. DOT estimated quantified costs range from $658 million to $1.5 billion annually. The Department acknowledges that some portion of these costs would be incurred by small entities.

*Description of the steps the agency has taken to minimize the significant economic impact on small entities consistent with the stated objectives of applicable statutes, including a statement of the factual, policy, and legal reasons for selecting the alternative adopted in the final rule and why each one of the other significant alternatives to the rule considered by the agency which affect the impact on small entities was rejected.*

The Department considered several alternatives to the measures adopted in this final rule. In this section, the Department describes the steps taken to minimize the significant economic impact on small entities consistent with the objectives of 49 U.S.C. 41712 and the other authorities discussed in the Statutory Authorities section of this final rule.

The Department proposed to cover U.S. air carriers, foreign air carriers, and ticket agents that advertise or sell airline tickets, whether traditional brick-and-mortar travel agencies, corporate travel agents, OTAs or metasearch sites that display airline flight search options directly to consumers. The final rule defers for a separate rulemaking a determination on whether metasearch sites that display airline flight search options directly to consumers are ticket agents subject to the disclosure requirements in this rule. To ensure consumers have access to critical ancillary service fee information under this final rule while metasearch entities are excluded from the rule's disclosure requirements, the Department requires that airlines and ticket agents display the required critical ancillary service fee information on the landing page on the airline or ticket agent's online platform to which consumers are directed after using a metasearch site. The Department believes that this option best balances the concerns that more examination is needed in the Department's separate rulemaking on ticket agents before the Department determines whether to cover metasearch sites that display airline flight search options directly to consumers as ticket agents required to disclose critical ancillary fee and policy information to consumers.

The final rule also excludes corporate travel agents from the final rule's requirements. Ancillary fee disclosures by those agents are the subject of contractual agreements between a business client and the travel agent, with the relevant ancillary services and fees negotiated as part of the contract. Moreover, the fees often are irrelevant for corporate clients, and are not a significant consideration in corporate travelers' purchasing decisions. The corporate client, not the business traveler, generally pays the cost of transportation, including fees. The benefits of covering corporate agents would therefore be limited but would involve costs.

The Department also considered differing compliance periods for the requirements established in the rule. In the proposed rule, the Department proposed a compliance period of 6 months for all covered entities to comply with the rule's requirements. The Department received comment that additional time was needed for compliance, including from small entities. In consideration of these comments, the Department requires in this final rule that: (1) airlines must provide fee and policy information of critical ancillary services to entities required to disclose this information directly to consumers no later than six months after this rule's publication date, (2) airlines must comply with all other regulatory requirements not later than 12 months after this rule's publication date, (3) ticket agents that do not meet the SBA definition of small entity must comply with all regulatory requirements not later than 18 months after this rule's publication date, and (4) ticket agents that meet the SBA definition of small entity must comply with all regulatory requirements not later than 24 months after this rule's publication date.

In the proposed rule, DOT would have required airlines and ticket agents to provide fee information for first and second checked bags, carry-on bags, and change and cancellation fees in text form next to the fare information provided to consumers. On consideration of comments that the proposed requirements would result in screen clutter and be potentially confusing to consumers, the Department determined in this final rule to allow fee information to be displayed using pop-ups, expandable text, or other means except for hyperlinks as long as the disclosure is clear and conspicuous. This is intended to minimize clutter and allow airlines and ticket agents flexibility in how they disclose information. The Department also allows some information—specifically, airline policies for baggage and ticket changes and cancellations—later in the process, as long as the disclosure occurs before ticket purchase. Policy information can be displayed using hyperlinks. The Department believes that these additional flexibilities will reduce costs to airlines and assist consumers because airlines will be able to present the information in a manner that, while clear and conspicuous, is not confusing to consumers.

In this final rule, the Department also made changes to the proposed requirements for offline disclosures. In the proposed rule, the Department required these disclosures to be made for every quoted itinerary. The Department received comments that such disclosures would add a significant amount of ''talk time'' that would burden airlines and ticket agents with having to provide the information and consumers with having to spend time listening to the disclosures even if the information was not relevant to them. As a result of these comments, the Department is finalizing a requirement that airlines and ticket agents inform consumers purchasing air travel offline about whether a critical ancillary fee applies to the itinerary being quoted and give the consumer an opportunity to request information on the fee. The airline or ticket agent must then provide the critical ancillary fee information upon request of the consumer. This modification is expected to reduce extra time spent on the phone, which will benefit not only airlines and ticket agents, but also consumers who will not have to listen to information not relevant to them.

The Department considered whether to apply the disclosure requirements to all online platforms, in addition to computer websites. The Department finalizes the requirement that the disclosure requirements apply to all online platforms in this final rule. While this option may increase costs, the Department determined that it was necessary to ensure consumers received the same information on critical ancillary fees and policies regardless of

the online platform used to purchase their tickets for air travel.

DOT also considered whether to require disclosure of family seating fees in this rulemaking and to make those fees transactable by ticket agents. The Department is not finalizing the proposal to require carriers and ticket agents to disclose applicable fees for passengers 13 or under to be seated next to an accompanying adult on an aircraft, and to make those fees transactable. Instead, the Department is pursuing a separate rulemaking to address the issue of a young child being able to sit adjacent to an accompanying adult at no additional cost beyond the fare. Not requiring family seating disclosures and fee transactability reduces the cost burden on airlines and ticket agents.

*Paperwork Reduction Act*

In this final rule, the Department imposes new collections of information that require approval by the Office of Management and Budget (OMB) under the Paperwork Reduction Act of 1995 (Pub. L. 104–13, 49 U.S.C. 3501 *et seq.*). The Department also amends an existing collection of information, 2105–0561, in this final rule, with regard to the requirements for customer service plans. The Department has sought approval from OMB for the collections of information established in this final rule and will also seek approval for the amendment to the collection approved under OMB Control No. 2105–0561 as part of the renewal of that OMB control number, due to expire August 31, 2024. The Department will publish a separate notice in the **Federal Register** announcing OMB approval of the new and amended collections and advising the public of the associated OMB control numbers. Notwithstanding any other provisions of law, no person shall be subject to penalty for failing to comply with a collection of information if the collection of information does not display a currently valid OMB control number.

Industry commenters generally expressed the view that the proposed rule's disclosure requirements would impose significant burdens on industry. Many airlines stated that the disclosure requirements would require a reconfiguration of their processes. A study of the NPRM commissioned by A4A estimated $33 billion in costs to airlines over 10 years. A4A estimated that the initial airline cost of implementation would be $86.5 million and $9 million annually for maintenance and additional development. American Airlines stated that over 100,000 engineering hours would be required to begin reworking

the search process on the airline's desktop website and other platforms.

Booking Holdings and USTOA stated that the Department's PRA analysis in the NPRM greatly underestimated burdens for planning, development, and programming by ticket agents to provide online displays of ancillary fee information on their websites. In addition, Booking Holdings estimated that the initial costs of engineering and testing the required displays, including to ensure readability and timeliness, would be multiple millions of dollars per entity covered by the regulation for initial development. Similarly, while USTOA did not provide an alternative burden hour estimate, USTOA stated that the 80 hours per entity that DOT estimated for programming, data management, website modification, and other related costs was an underestimate, given what it characterized as the "extensive and ongoing website revisions that would be necessary to compile ancillary fee options," [122] and that the hourly wage of $45.90/hour used by the Department for web and interface designs was too low.[123]

Booking Holdings and USTOA asserted that the Department was incorrect to assume no costs for ongoing website maintenance by ticket agents. Instead, Booking Holdings estimated that the proposal would impose annual maintenance costs of hundreds of thousands of dollars per entity/ticket agent, stating that the proposal would require ticket agents to employ "multiple full time engineers/ developers, a project manager, and a full-time quality assurance associate to ensure that dynamic displays continue to operate appropriately" and to periodically update and maintain hardware associated with the searches, for example, as carriers update and change their ancillary service fee policies. Further, Booking Holdings stated that the Department failed to account for any costs of negotiating new data-sharing agreements with carriers. A4A estimated that $8.8 million would be spent to supply data to agents.

In USTOA's view, the Department underestimated the number of ticket agents who would be required to comply with the rule's requirements, given the rule's applicability to offline

---

[122] USTOA further stated that the costs of complying with the full fare rule were not analogous to the costs of displaying complex ancillary fee information, as DOT suggested.

[123] USTOA stated that an inflation adjustment of the Department's estimated hourly rate for such services from the 2014 NPRM would result in an hourly of wage of $142.85/hour for a total annual cost to ticket agents of "*at least* $6,856,800."

---

transactions. USTOA and ASTA also disagreed with the Department's assessment that orally conveying the proposed ancillary fee information in offline transactions would involve only a "marginal increase in time" with minimal burden. ASTA estimated that 17.2 million offline transactions are completed each year by ticket agents and that the proposed disclosures for offline transactions would add at least 20 seconds to each offline transaction at an estimated cost of $21.3 million per year in "talk time" for ticket agents.

The Department has carefully considered public comments regarding the costs of the information collections required by this rule and reexamined the burden estimates presented in this section in light of the regulatory impact analysis developed in support of the final rule. As noted above, the Department has made modifications in this final rule that may have differing effects on the information collection burdens implicated by the NPRM. In contrast to the NPRM, the final rule does not impose a requirement to disclose family seating fees and provides additional flexibility in how critical ancillary fee information is disclosed and when policy information is disclosed. The final rule also extends information collection requirements to online platforms, which includes mobile applications.

Based on comments that the hours used to account for the initial information disclosures in the NPRM was too low and comments that the rule's impact on maintenance and other ongoing costs is measurable (recognizing, however, that regulated entities have already been operating and maintaining their own online platforms prior to implementation of this rule), the Department increased the number of hours per entity that DOT estimated for programming, data management, website modification, and other related costs from 80 to 120 and also added additional burden hours for ongoing maintenance of online platforms. The Department also updated the applicable hourly wage from $45.90 to $53.27. The updated hourly wage was calculated using an hourly rate of $53.27 for computer programmers, which is based on a median wage of $40.02 for web and digital interface designers from the BLS Occupational Employment and Wage Statistics from May 2022, multiplied by 1.41 to account for employee benefits and other costs to employers.

The Department has also updated the number of ticket agents to whom this rule would apply using data from the *US Census Bureau, 2017 Economic*

Census based on NAICS Code 561501 Travel Agencies.

The Department also accepts commenters' arguments that the rule imposes a measurable burden on offline transactions and has added this additional burden to its estimates.

The Department has not added costs of negotiating new data-sharing agreements between ticket agents and carriers because contract negotiations are a cost that carriers and ticket agents incur to do business and are not a paperwork burden for purposes of the PRA.

The Department has consolidated all the information collections involving the disclosure of critical ancillary fees and policies into one information collection (i.e., the 24-hour cancellation and hold policy disclosure is included in the information collection for change and cancellation fee and bag fee disclosures). Consolidating the information collections better reflects the burden of respondents to implement the changes to their online platforms to implement this rule's disclosure requirements. At the same time, the Department is separately estimating the burden for offline disclosures of bag, change, and cancellation fees, as the labor type involved is substantially different from other disclosures in this rule.

This rule requires three information collections: (1) U.S. air carriers, foreign air carriers, and ticket agents must disclose, during the online booking process, applicable fee and policy information for the first and second checked baggage and for carry-on baggage, and applicable fee and policy information for changing and cancelling reservations (including 24-hour cancellation or reservation hold policy); (2) U.S. air carriers, foreign air carriers, and ticket agents in offline transactions must disclose that bag, change, or cancellation fees apply to a quoted itinerary and disclose such fees upon request, and (3) U.S. air carriers and foreign air carriers must ensure that entities to which they provide fare, schedule, and availability information that display or sell the carrier's flights directly to consumers receive information regarding baggage fee rules and policies as well as ticket change and cancellation fees and policies, if the entities are required to disclose this information to consumers.

For each of the information collections, the title, a description of the respondents, and an estimate of the burdens are set forth below:

1. *Requirement that U.S. air carriers, foreign air carriers, and ticket agents*

disclose, during the online booking process, the applicable fee and policy information for the first and second checked baggage, one carry-on bag, and the applicable fee and policy information for changing and canceling reservation (including 24-hour cancellation or reservation hold policy).

*Title:* Disclosure of Ancillary Fees and Policies During the Air Transportation Booking Process

*Respondents:* U.S. carriers, foreign air carriers, and ticket agents that sell or display carrier fare and schedule information to consumers in the United States.

*Number of Respondents:* We estimate that as many as 206 U.S. air carriers and foreign air carriers and as many as 7,497 ticket agents may be impacted by this requirement. Our estimate is based on the following information and assumptions: Ticket agents includes OTAs, brick-and-mortar travel agencies, and tour operators that market airline tickets. We updated our number of ticket agents based on data from NAICS code 561510 (*Source: US Census Bureau, 2017 Economic Census*), although not all of those entities market air transportation online to consumers in the United States. In addition, most ticket agents rely on GDSs to create online fare and schedule displays. GDSs and entities that create or develop and maintain their own online fare and schedule displays, such as many of the impacted carriers and the largest travel agents, will incur some planning, development, and programming costs to reprogram their systems to provide online displays of fare and schedule information that includes baggage fee information on their websites. Thus, our estimate of the number of impacted ticket agents may be overstated.[124] Many smaller carriers also rely on GDSs to create online fare and schedule displays, so our estimate of 206 impacted carriers may be overstated.

*Estimated Annual Burden on Respondents:* Approximately 133 hours per respondent (120 hours of initial display updates and 13 hours for ongoing maintenance). We base our estimate on the following information and assumptions: the primary costs to respondents for the disclosure

requirement would arise from programming, data management, website modification, and other related costs to carriers and ticket agents to display the required ancillary fee information. The Department has modified the estimated annual burden on respondents to account for the following: extension of this rule to online platforms, which have increased in usage; an incremental increase in one time and ongoing costs to maintain online platforms; inclusion of 24-hour cancellation and hold policy disclosures in this information collection;[125] and a reduction in burden from removal of the proposed requirement for family seating fee disclosures.[126] The more significant burdens in this rulemaking are expected to be incurred one time by regulated entities. Once the modifications required by this information collection have been incorporated into the online platforms of regulated entities, we expect that this information collection will impose smaller additional ongoing costs, such as website maintenance, beyond what regulated entities were already incurring for operating online platforms prior to the promulgation of this rulemaking. In response to the comments received on this point, however, the Department estimates that this information collection adds approximately 13 hours of burden per respondent to maintain online platform systems. This rulemaking does not require the creation of new websites or online platforms by regulated entities that did not already maintain such online platforms for the purpose of selling air transportation.

*Estimated Total Annual Burden:* Approximately 1,024,499 hours for all respondents (based on an assumption of 27,398 hours for carriers (24,720 hours for the initial upgrade and 2,678 hours for ongoing costs) and 997,101 hours for ticket agents (899,640 hours for the initial upgrade and 97,461 hours for ongoing maintenance)). Based on

---

[124] In the NPRM, we assumed for the PRA analysis that about five percent of United States ticket agents, including GDSs and large travel agencies would be impacted by this requirement. In the Department's FRIA developed in support of this final rule, however, the cost estimates for ticket agents included the total number of ticket agents who may incur costs, or 7,497. Therefore, we do not include the five percent assumption in our PRA analysis for the final rule and instead assume all ticket agents are impacted. This is consistent with the approach taken for airlines, even though smaller airlines may also use GDSs.

[125] The NPRM estimated an average annual burden of 80 hours per respondent for the design, programming, and modification of websites to provide disclosure of 24-hour cancellation or hold information. The Department believes this number was an overestimate due to the static nature of this disclosure (i.e., the disclosure should not have noticeable variation due to the relatively stagnant nature of 24-hour cancellation or hold policies). Such policies also exist generally unchanged in carrier customer service plans. The burden is also reduced as this final rule does not require this disclosure if the ticket is purchased within 7 days of the flight.

[126] The Department acknowledges USTOA's comment that the burdens of this rulemaking are not analogous to those in the full fare rule (76 FR 23110). The Department has taken this comment into account in increasing the paperwork burdens in this analysis, including the considerations noted above.

an estimated median hourly wage of $53.27 for web and digital interface designers,[127] this results in a total annual cost of $49,240,657 ($1,316,834 for carriers and $47,923,823 for ticket agents) for the first year. Note that after the initial costs are incurred, the annual cost will decrease to an estimated $142,657 per year for carriers and $5,191,747 per year for ticket agents.

*Frequency:* One time incorporation of information into online platform displays and ongoing costs (such as for maintenance). Costs are annual.

2. *U.S. air carriers, foreign air carriers, and ticket agents in offline transactions must disclose that bag, change, or cancellation fees apply to a quoted itinerary and disclose such fees upon request.*

*Title:* Disclosure of Ancillary Fees During the Offline Booking Process

*Respondents:* U.S. carriers, foreign air carriers, and ticket agents that sell or market tickets to U.S. consumers by phone or in-person

*Number of Respondents:* We estimate that as many as 206 U.S. air carriers and foreign air carriers and as many as 7,497 ticket agents may be impacted by this requirement. We base our estimate on the following information and assumptions: Ticket agents includes OTAs, brick-and-mortar travel agencies, and tour operators that market airline tickets. There may be an estimated 7,497 travel agencies in the United States, based on data from NAICS code 561510 (*Source: US Census Bureau, 2017 Economic Census*), although not all of those entities market air transportation by phone or in-person to U.S. consumers. Many carriers and ticket agents may not offer sales to U.S. consumers by phone or in-person; therefore, our estimate of 7,497 impacted ticket agents and 206 impacted carriers may be overstated.

*Estimated Annual Burden on Respondents:* Approximately 4 hours per respondent. This information collection adds additional disclosures to in-person or phone transactions when a ticket is marketed to U.S. consumers. The time required to provide the additional disclosure is not expected to be significant, and some consumers may not request additional disclosures.

The rule would require entities selling tickets marketed to U.S. consumers by phone or in-person to inform consumers about certain ancillary service fees at the time a fare is quoted. The

Department estimates that respondents will incur 4.3 additional hours of burden on average annually on providing the offline disclosures required by this rule.

*Estimated Total Annual Burden:* Approximately 33,123 hours for all respondents (based on an assumption of 886 hours for carriers and 32,237 hours for ticket agents). Based on an estimated median hourly wage of $31.46 for travel agents,[128] this results in a total annual cost of $1,042,050 ($27,874 for carriers and $1,014,176 for ticket agents). The PRA estimate developed here supports a determination that the additional "talk time" for carriers is *de minimis.*

*Frequency:* This information collection imposes an additional cost for carriers and ticket agents for each interaction between a consumer and the carrier or ticket agent's in-person or telephone reservation agents. Costs are annual.

3. *Requirement that U.S. air carriers and foreign air carriers ensure that entities to which they provide fare, schedule, and availability information to display or sell the carrier's flights directly to consumers receive information regarding baggage fee rules and ticket change and cancellation fees and policies, if the entities are required to disclose this information to consumers.*

*Title:* Disclosure of critical ancillary fee information to other entities required to disclose fee information to consumers.

*Respondents:* U.S. air carriers and foreign air carriers that provide fare, schedule, and availability information to ticket agents to sell or display flights within, to, or from the United States.

*Number of Respondents:* We estimate that approximately 206 carriers will be impacted by this requirement. This includes foreign carriers that may not serve the United States on their own equipment but may sell connecting itineraries between the United States and a foreign point, when at least one of the foreign-to-foreign segments is operated by the foreign carrier.

*Estimated Annual Burden on Respondents:* Approximately 30 hours per respondent. The information collection requires carriers to either distribute baggage and change and cancellation fee rules or make the specific rules, including the calculation of baggage and change and cancellation fees applicable for passenger-specific itineraries, available to third parties. Carriers selling tickets in the United States already display baggage and

ancillary fee information on their websites, as required by existing regulation (14 CFR 399.85(d)). This information includes the use of baggage fee calculators and other tables accessible to consumers. The rulemaking requires that this information be made available in such a way that other entities to which they provide fare, schedule, and availability information to display or sell the carrier's flights directly to consumers have access to this information in a non-static, dynamic format such that the entities can disclose baggage fee and change and cancellation fee information to consumers during each itinerary search. The Department adjusted its number of burden hours per respondent based on comments suggesting that the cost of data sharing with ticket agents is higher than the Department initially estimated. Several carriers, however, already share this information with other entities by agreement, which suggests that the added cost of implementing any modifications required by this rule may be limited for many carriers. This potential burden of 30 hours per respondent, as referenced here, may overestimate the actual burden for most carriers.

*Estimated Total Annual Burden:* This information collection would result in an estimated annual burden of 6,180 hours. Based on an estimated mean hourly wage of $66.30 for computer programmers,[129] this results in a total cost of approximately $409,734.

*Frequency:* This information collection imposes an additional cost for carriers to provide information on critical ancillary fees to ticket agents required to disclose this information to consumers. Costs are annual.

*Unfunded Mandates Reform Act*

The Unfunded Mandates Reform Act (UMRA) of 1995, 2 U.S.C. 1501, requires agencies to prepare a written assessment of the costs, benefits, and other effects of proposed or final rules that include a Federal mandate likely to result in the expenditures by States, local, or Tribal governments, or by the private sector, of $100 million or more (adjusted annually for inflation with base year of 1995) in any one year. The 2023 threshold after adjustment for inflation is $198 million, using the Implicit Price Deflator for the Gross Domestic Product. The assessment may be included in conjunction with other assessments, and

---

[127] The median base wage for web and digital interface developers in 2022 was $37.78, *https://www.bls.gov/oes/current/oes151254.htm.* We multiply this by 1.41 to account for benefits *https://www.bls.gov/news.release/archives/ecec_09202022.pdf.*

[128] The median base wage for travel agents in 2022 was $22.31, *https://www.bls.gov/oes/current/oes413041.htm.* We multiply this by 1.41 to account for benefits, *https://www.bls.gov/news.release/archives/ecec_09202022.pdf.*

[129] The median base wage for computer programmers in 2022 was $47.02, *https://www.bls.gov/oes/current/oes151251.htm.* We multiply this by 1.41 to account for benefits, *https://www.bls.gov/news.release/archives/ecec_09202022.pdf.*

the Department has provided the assessment required by UMRA within the RIA prepared in support of the final rule.

*National Environmental Policy Act*

The Department has analyzed the environmental impacts of this action pursuant to the National Environmental Policy Act of 1969 (NEPA) (42 U.S.C. 4321 *et seq.*) and has determined that it is categorically excluded pursuant to DOT Order 5610.1C, Procedures for Considering Environmental Impacts (44 FR 56420, Oct. 1, 1979). Categorical exclusions are actions identified in an agency's NEPA implementing procedures that do not normally have a significant impact on the environment and therefore do not require either an environmental assessment (EA) or environmental impact statement (EIS).[130] In analyzing the applicability of a categorical exclusion, the agency must also consider whether extraordinary circumstances are present that would warrant the preparation of an EA or EIS.[131] Paragraph 4(c)(6)(i) of DOT Order 5610.1C provides that "actions relating to consumer protection, including regulations" are categorically excluded. The purpose of this rulemaking is to enhance protections for air travelers and to improve the air travel experience. The Department does not anticipate any environmental impacts, and there are no extraordinary circumstances present in connection with this rulemaking.

*Congressional Review Act*

Pursuant to subtitle E of the Small Business Regulatory Enforcement Fairness Act of 1996 (the Congressional Review Act), OMB's Office of Information and Regulatory Affairs has found that this rule falls within the scope of 5 U.S.C. 804(2).

**List of Subjects**

*14 CFR Part 259*

Air carriers and foreign air carriers, Consumer protection, Reporting and recordkeeping requirements.

*14 CFR Part 399*

Administrative practice and procedure, Air carriers and foreign air carriers, Air rates and fares, Air taxis,

Consumer protection, Law enforcement, Small businesses.

**Peter Paul Montgomery Buttigieg,**
*Secretary of Transportation.*

For the reasons stated in the preamble, DOT amends 14 CFR chapter II, subchapters A and F, as follows:

## PART 259—ENHANCED PROTECTIONS FOR AIRLINE PASSENGERS

■ 1. The authority citation for part 259 continues to read as follows:

**Authority:** 49 U.S.C. 40101(a)(4), 40101(a)(9), 40113(a), 41702, 41708, 41712, and 42301.

■ 2. Amend § 259.5 by:
■ a. Revising paragraphs (a) and (b)(4);
■ b. Removing the word "and" at the end of paragraph (b)(13);
■ c. Removing the period at the end of paragraph (b)(14) and adding "; and" in its place; and
■ d. Adding paragraph (b)(15).
The revisions and addition read as follows:

### § 259.5  Customer Service Plan.

(a) *Adoption of Plan.* Each covered carrier must adopt a Customer Service Plan applicable to its scheduled flights as specified in paragraphs (b)(1) through (15) of this section and adhere to the plan's terms.

(b) * * *

(4) Allowing reservations to be held at the quoted fare without payment, or cancelled without penalty, for at least twenty-four hours after the reservation is made if the reservation is made one week or more prior to a flight's departure, and disclosing its chosen twenty-four hour policy on the last page of the booking process;

*        *        *        *        *

(15) Disclosing critical ancillary service fees to consumers on the carrier's online platform or when a customer contacts the carrier's reservation center to inquire about a fare or make a reservation in person or by telephone and disclosing policies for critical ancillary service fees to consumers on the carrier's online platform as required by § 399.85 of this chapter.

*        *        *        *        *

## PART 399—STATEMENTS OF GENERAL POLICY

■ 3. The authority citation for part 399 continues to read as follows:

**Authority:** 49 U.S.C. 40113(a), 41712, 46106, and 46107.

■ 4. Amend § 399.80 by revising the introductory text, adding paragraph (o),

and revising paragraph (s) to read as follows:

### § 399.80  Unfair and deceptive practices of ticket agents.

It is the policy of the Department to regard as an unfair or deceptive practice or unfair method of competition the practices enumerated in paragraphs (a) through (o) of this section by a ticket agent of any size and the practice enumerated in paragraph (s) of this section by a ticket agent that sells air transportation online and is not considered a small business under the Small Business Administration's size standards set forth in 13 CFR 121.201:

*        *        *        *        *

(o) Failing to disclose ancillary service fee information as required by § 399.85.

*        *        *        *        *

(s) Failing to disclose and offer web-based discount fares to prospective passengers who contact the agent through other channels (*e.g.,* by telephone or in the agent's place of business) and indicate they are unable to use the agent's website due to a disability.

■ 5. Amend § 399.84 by revising paragraph (a) and adding paragraphs (d) and (e) to read as follows:

### § 399.84  Price advertising and opt-out provisions.

(a) The Department considers any advertising or solicitation by a direct air carrier, indirect air carrier, an agent of either, or a ticket agent, for passenger air transportation, a tour (*i.e.,* a combination of air transportation and ground or cruise accommodations) or tour component (*e.g.,* a hotel stay) that must be purchased with air transportation that states a price for such air transportation, tour, or tour component to be an unfair and deceptive practice in violation of 49 U.S.C. 41712, unless the price stated is the entire price (all mandatory charges) to be paid by the customer to the carrier, or agent, for such air transportation, tour, or tour component. Mandatory charges refer to all taxes and fees that are required to purchase air transportation on the channel where the advertising or solicitation occurs (*e.g.,* if a fare is advertised online for $100 then that means the fare must be available for the consumer to purchase for $100 online). Mandatory charges included within the single total price listed may be stated separately or through links or "pop ups" on online platforms that display the total price, but such charges may not be false or misleading, may not be displayed prominently, may not be presented in the same or larger size as

[130] *See* 40 CFR 1508.4.
[131] *Id.*

the total price, and must provide cost information on a per passenger basis that accurately reflects the cost of the item covered by the mandatory charge.

\* \* \* \* \*

(d) A carrier or ticket agent may display a price that includes all mandatory charges and one or more ancillary service fees (*i.e.,* fees charged for any optional service related to air travel beyond passenger air transportation) in place of or more prominently than a price that only includes all mandatory charges.

(e) The Department considers any offer of a percentage-off discount for passenger air transportation or for a tour (*i.e.,* a combination of air transportation and ground or cruise accommodations) or tour component (*e.g.,* a hotel stay) that must be purchased with air transportation, that does not make clear at the outset the terms and conditions of the offer, including how the discount is calculated, to be an unfair and deceptive practice in violation of 49 U.S.C. 41712. When used in any advertising or solicitation, the term ''base fare'' must refer to an amount that includes all mandatory carrier-imposed charges and the terms ''flight,'' ''ticket,'' or ''fare'' must refer to an amount that includes all mandatory carrier-imposed and government charges.

■ 6. Revise § 399.85 to read as follows:

### § 399.85 Notice of ancillary service fees.

(a) *Definitions.* For purposes of this section, the following definitions apply:

*Air transportation* means interstate air transportation, foreign air transportation, or the transportation of mail by aircraft as defined in 49 U.S.C. 40102(a)(23) and (25).

*Ancillary service fee* means the fee charged for any optional service related to air travel that a U.S. or foreign air carrier provides beyond passenger air transportation. Such fees may include, but are not limited to, fees for checked or carry-on baggage, advance seat selection, access to in-flight entertainment programs, in-flight beverages, lounge access, snacks and meals, pillows and blankets, and seat upgrades.

*Ancillary service package* means a package or bundle of one or more ancillary services offered for sale by a carrier or ticket agent.

*Anonymous itinerary search* means a search that does not take into account information specific to the passenger but does take into account information specific to the itinerary (*e.g.,* geography, travel dates, cabin class, and ticketed fare class) that may impact the critical ancillary service fees to be charged or policies to be applied.

*Break in journey* means a deliberate interruption by a passenger of a journey between a point in the United States and a point in a foreign country where a stopover at a foreign point is scheduled. The factors to consider to determine whether a stopover is a deliberate interruption include whether the segment between two foreign points and the segment between a foreign point and the United States were purchased in a single transaction and as a single ticket/itinerary, whether the segment between two foreign points is operated or marketed by a carrier that has no codeshare or interline agreement with the carrier operating or marketing the segment to or from the United States, and whether the stopover at a foreign point involves the passenger picking up checked baggage, leaving the airport, and continuing the next segment after a substantial amount of time.

*Clear and conspicuous* means that a disclosure is difficult to miss (*i.e.,* easily noticeable), easily understandable by consumers, and presented in a manner that allows consumers to determine the true cost and enable them to select the best flight options for them.

*Critical ancillary service* means any ancillary service critical to consumers' purchasing decisions. Such services are: transporting the first checked bag, the second checked bag, or a carry-on bag, the ability for a consumer to cancel or change a reservation, and any other services determined, after notice and opportunity to comment, to be critical by the Secretary.

*Consumer* or *user* refers to a person who seeks to obtain information about or purchase air transportation from a U.S. carrier, a foreign carrier, or a ticket agent, whether through an online platform or other means (*e.g.,* over the telephone, in person).

*Corporate travel agent* refers to a ticket agent engaged in providing travel services to the employees of a business entity pursuant to a written contract with that entity for the business travel of its employees.

*Online platform* refers to any interactive electronic medium, including, but not limited to, websites and mobile applications, that allow the consumer to search for or purchase air transportation from a U.S. carrier, a foreign carrier, or a ticket agent.

*Passenger-specific itinerary search* means a search that takes into account information specific to the passenger (*e.g.,* the passenger's status in the airline's frequent flyer program, the passenger's military status, or the passenger's status as a holder of a particular credit card) that was affirmatively provided by that passenger

and information specific to the itinerary (*e.g.,* geography, travel dates, cabin class, and ticketed fare class) that may impact the critical ancillary service fees to be charged or policies to be applied.

(b) *Passenger-specific and anonymous itinerary searches.* Each U.S. air carrier, foreign air carrier, and ticket agent (except a corporate travel agent) that advertises or sells air transportation marketed to U.S. consumers must offer consumers both the option to conduct a passenger-specific itinerary search and the option to conduct an anonymous itinerary search.

(c) *Online disclosures of ancillary service fees*—(1) *Critical ancillary service fees.* Each U.S. air carrier, foreign air carrier, and ticket agent (except a corporate travel agent) that has an online platform marketed to U.S. consumers where it advertises or sells air transportation must clearly and conspicuously disclose on its online platform the accurate fee that applies, if any, for all critical ancillary services. The fee cannot be designated as $0 in circumstances where a critical ancillary service is not available to the consumer but rather must state ''not available'' or a similar notation. The fee information must be provided the first time that fare and schedule information is disclosed after a consumer conducts a passenger-specific itinerary search or an anonymous itinerary search. The fees cannot be displayed through a hyperlink.

(2) *Other ancillary service fees.* Each U.S. air carrier, foreign air carrier, and ticket agent (except a corporate travel agent) that has an online platform marketed to U.S. consumers where it advertises or sells air transportation may disclose ancillary service fees that are not critical ancillary service fees at the same time as critical ancillary service fees.

(3) *Ancillary service packages.* Each U.S. air carrier, foreign air carrier, and ticket agent (except a corporate travel agent) that has an online platform marketed to U.S. consumers where it advertises or sells air transportation must disclose the standalone fee for each critical ancillary service required under paragraph (c)(1) of this section when fare and schedule information is provided. Nothing in this section requires or prohibits a carrier or ticket agent from disclosing an ancillary service package that includes critical ancillary services if it chooses to do so.

(4) *Air tour packages.* Each ticket agent that has an online platform marketed to U.S. consumers where it advertises or sells air tour packages must clearly and conspicuously disclose, at the time the ticket agent

offers a package fare quotation for a specific itinerary selected by a consumer, where the carrier providing air transportation is not known, that additional fees for baggage may apply and that those fees may be reduced or waived based on the passenger's frequent flyer status, method of payment, or other consumer characteristic. When the carrier providing air transportation for an air-tour package is known, that ticket agent must provide baggage fee information as prescribed by this paragraph (c) at the time that the ticket agent discloses the name of the carrier to the consumer.

(5) *Website disclosure of all ancillary service fees.* A U.S. or foreign air carrier that has a website marketed to U.S. consumers where it advertises or sells air transportation must clearly and conspicuously disclose on its website accurate information on ancillary service fees available to a passenger purchasing air transportation with a clear and conspicuous link from the carrier's homepage directly to a page or a place on a page where all such ancillary services and related fees are disclosed. In general, fees for particular services may be expressed as a range; however, baggage fees must be expressed as specific charges taking into account any factors (*e.g.,* frequent flyer status, early purchase) that affect those charges.

(d) *Online disclosure of baggage policies.* Each U.S. air carrier, foreign air carrier, and ticket agent (except a corporate travel agent) that has an online platform marketed to U.S. consumers where it advertises or sells air transportation must clearly and conspicuously disclose on its online platform, before ticket purchase, the accurate weight and dimension limitations that the carrier imposes for a first and second checked bag and a carry-on bag after a consumer conducts a passenger-specific itinerary search or an anonymous itinerary search.

(e) *Intent to travel with a bag.* Each U.S. air carrier, foreign air carrier, and ticket agent that has an online platform marketed to U.S. consumers where it advertises or sells air transportation may clearly and conspicuously solicit information from a consumer prior to the consumer conducting a passenger-specific itinerary or an anonymous itinerary search for air transportation regarding the consumer's intention to travel with a carry-on bag, a first checked bag, or a second checked bag. If the consumer affirmatively takes action to indicate that the consumer and all others in the booking party do not intend to travel with a carry-on bag, a first checked bag, or a second checked

bag, then the carrier or ticket agent may forego disclosing the fees for that bag with the fare and schedule information as required by paragraph (c) of this section. Carriers and ticket agents (except a corporate travel agent) must disclose the baggage policies before ticket purchase as required by paragraph (d) of this section and must disclose information regarding the passenger's free baggage allowance and fee information for a carry-on bag, a first checked bag, and a second checked bag on e-ticket confirmations as required by paragraph (k) of this section even if a consumer indicates an intention not to travel with a bag.

(f) *Online disclosure of cancellation and change policies.* Each U.S. carrier, foreign air carrier, and ticket agent (except a corporate travel agent) that has an online platform marketed to U.S. consumers where it advertises or sells air transportation must accurately, clearly, and conspicuously, disclose on its online platform, before ticket purchase, the components of change and cancellation policies identified in paragraphs (f)(1) through (4) of this section.

(1) *Restrictions and prohibitions.* A summary of the applicable restrictions and prohibitions to change or cancel a ticket that apply to the consumer conducting a passenger-specific itinerary or an anonymous itinerary search, including any prohibitions or restrictions to obtaining a refund of the full amount paid;

(2) *Form of refund.* A summary of the applicable policy regarding the form of the refund for a change or cancellation (*e.g.,* a credit to the original form of payment, airline credits or voucher) that apply to the consumer conducting a passenger-specific itinerary or an anonymous itinerary search;

(3) *Fare differential.* A summary of the applicable policy regarding a consumer's right to, or responsibility for, any fare differential, including whether the consumer is entitled to a refund in fare difference if the consumer changes to a lower cost replacement flight, that apply to the consumer conducting a passenger-specific itinerary or an anonymous itinerary search; and

(4) *24-Hour hold or cancellation.* A statement disclosed clearly and conspicuously on the last page of the booking process on allowing the reservation to be held at the quoted fare without payment, or cancelled without penalty, for at least twenty-four hours after the reservation is made, consistent with a carrier's customer service plan in § 259.5(b)(4) of this chapter and consistent with a ticket agent's policy. A

ticket agent that has a policy of not allowing a 24-hour hold or cancellation must disclose that information clearly and conspicuously on the last page of the booking process. The disclosures in this paragraph (f)(4) are required if the reservation is made one week or more prior to a flight's departure.

(g) *Disclosures on landing page.* Each U.S. air carrier, foreign air carrier, and ticket agent (except a corporate travel agent) that has an online platform marketed to U.S. consumers where it sells air transportation and that accepts a redirect of consumers to its online platform to complete the booking must ensure that the required critical ancillary service fee information in paragraph (c) of this section is accurately, clearly, and conspicuously displayed on the first page of the online platform to which the consumer has been directed, unless the consumer was provided accurate fee information of critical ancillary services on the directing entity's online platform.

(h) *Seat guarantee notice.* Each U.S. carrier, foreign air carrier, and ticket agent (except a corporate travel agent) that has an online platform marketed to U.S. consumers where it advertises or sells air transportation must clearly and conspicuously disclose the following notice on any page or step of the booking process in which a consumer is offered a seat selection for a fee: "A seat is included in your fare. You are not required to purchase a seat assignment to travel. If you decide to purchase a ticket and do not select a seat prior to purchase, a seat will be provided to you without additional charge when you travel."

(i) *Code-share partner disclosures.* For air transportation within, to or from the United States, a carrier marketing a flight under its identity that is operated by a different carrier, otherwise known as a code-share flight, must through its website disclose to consumers booked on a code-share flight any differences between its optional services and related fees and those of the carrier operating the flight. This disclosure may be made through a conspicuous notice of the existence of such differences on the marketing carrier's website or a conspicuous hyperlink taking the reader directly to the operating carrier's fee listing or to a page on the marketing carrier's website that lists the differences in policies among code-share partners.

(j) *Offline fee disclosures of ancillary services.* Each U.S. air carrier, foreign air carrier, and ticket agent (except a corporate travel agent) that markets air transportation to U.S. consumers in person or by phone must disclose to

consumers, at the time a fare is quoted for an itinerary, that baggage fees (for a first checked, second checked, or carry-on bag), change fees, and cancellation fees apply, if that is the case. The U.S. carrier, foreign carrier, or ticket agent (other than a corporate travel agent) must then ask the consumer if they wish to hear more about the specific baggage fees, change fees, cancellation fees, and any other critical ancillary service fees that apply. These carriers and ticket agents, upon request from the consumer, must disclose those specific fees taking into account passenger-specific information provided by the consumer.

(k) *Disclosures of baggage fees on e-ticket confirmations.* A U.S. carrier, a foreign air carrier, or a ticket agent (except a corporate travel agent) that has an online platform marketed to U.S. consumers where it advertises or sells air transportation must include information regarding the passenger's free baggage allowance (including personal item) and the applicable fee for a carry-on bag and the first and second checked bag on all e-ticket confirmations for air transportation within, to or from the United States,

including on the summary page at the completion of an online purchase and in a post-purchase email confirmation. Carriers and ticket agents must provide the fee information for a carry-on bag, first checked bag, and second checked bag in text form in the e-ticket confirmation taking into account any passenger-specific factors that affect those charges.

(l) *Sharing information on fee rules and policies.* Each U.S. and foreign air carrier that provides fare, schedule, and availability information for air transportation within, to, or from the United States to an entity that is required by law to disclose critical ancillary service fee and policy information directly to consumers must disclose fee and policy information for critical ancillary fee services to that entity. The information provided must be useable, current, accurate, and sufficient to ensure compliance by such entities.

(m) *Unfair and deceptive practice.* The Department considers the failure to provide and adhere to the disclosures required by this section to be an unfair and deceptive practice within the meaning of 49 U.S.C. 41712.

■ 7. Amend § 399.88 by revising paragraph (a) to read as follows:

**§ 399.88   Prohibition on post-purchase price increase.**

(a) It is an unfair and deceptive practice within the meaning of 49 U.S.C. 41712 for any seller of scheduled air transportation within, to or from the United States, or of a tour (*i.e.,* a combination of air transportation and ground or cruise accommodations), or tour component (*e.g.,* a hotel stay) that includes scheduled air transportation within, to or from the United States, to increase the ticket price of that air transportation, tour or tour component, or to raise the price for critical ancillary services as defined in § 399.85(a) to a consumer after the air transportation has been purchased by the consumer, except in the case of an increase in a government-imposed tax or fee. A purchase is deemed to have occurred when the full amount agreed upon has been paid by the consumer.

*    *    *    *    *

[FR Doc. 2024–08609 Filed 4–29–24; 8:45 am]

**BILLING CODE 4910–9X–P**